**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 22-cv-01267-DDD-STV

JAN LAMBERT, and
ALI SAEE,

Plaintiffs,

v.

ENSERVCO CORPORATION,
CROSS RIVER PARTNERS, L.P.,
CROSS RIVER CAPITAL MANAGEMENT LLC,
RICHARD A. MURPHY, and
MARJORIE A. HARGRAVE

Defendants.

---

**FIRST AMENDED CLASS ACTION COMPLAINT**

---

**TABLE OF CONTENTS**


I. NATURE OF THE ACTION ... 1

II. JURISDICTION AND VENUE ... 6

III. PARTIES ... 7

IV. CONFIDENTIAL WITNESS FOUNDATION ALLEGATIONS ... 8

V. RELEVANT FINANCIAL REPORTING RULES ... 9

A. Fundamentals of Financial Reporting ... 9

B. Basic GAAP Rules Governing Financial Reporting ... 9

C. Internal Controls and Over Financial Reporting ... 11

VI. BACKGROUND ... 12

A. Background On the Company and Its Largest Shareholder ... 12

B. Enservco's Capitalization and Liquidity Strategy ... 13

C. The Company Is Crippled by Its Debt Obligations by The End of 2019 ... 14

D. Enservco Takes Action in 2020 to Improve Its Financial Condition ... 16

E. Key Events in Early 2021 ... 19

1. The February 2021 Equity Offering ... 19

2. The February 2021 Debt for Equity Exchange ... 20

3. Employee Retention Credits ... 22

F. Enservco Informs Investors That It Is No Longer in Danger of Failing ... 23

VII. NATURE OF THE FRAUD ... 24

A. The Individual Defendants Desperately Needed to Secure New Financing ... 24

B. Enservco Misrepresented Its Liquidity Position ... 26

1. Enservco's Capital Resources Were Insufficient to Sustain Operations Through the End of March 2022 ... 26

2. The Company Repeatedly Assures Investors That It Has Ample Liquidity to Satisfy Operations Well Beyond March 2022 ... 27

3. Investors Learn That Enservco Burned Through the Majority of Its Cash and Fell Out of Compliance with a Relevant Financial Covenant ... 28

4. Enservco Is Forced to Seek Emergency Funding in Early 2022 ... 29

C. Enservco Materially Misstated Its Financial Condition by Misreporting the February 2021 Debt for Equity Conversion and Exploiting the ERC Program ... 29

1. GAAP Requires the Recognition of a Loss When Debt Is Exchanged for Equity That Exceeds Its Value and Prohibits Recognizing Income On Items That a Company Is Unlikely to Receive ... 29

2. The Equity Issued in the February 2021 Debt for Equity Exchange Exceeded the Value of the Debt Exchanged for It and the Company Claimed ERCs That It Was Not Entitled to Receive ... 31

3. The Company Files Quarterly Reports in 2021 That Fail to Properly Account for the February 2021 Debt for Equity Exchange or Its ERCs ... 33

4. Enservco Admits After Completing Its Refinancing That It Needs to Restate Its 2021 Quarterly Reports and Suffers Related Fallout ... 34

D. Enservco Materially Misstated Its Financial Condition by Distorting Its DTA ... 40

1. GAAP Requires the Recognition of a Valuation Allowance to Offset Any Part of a DTA That Will Not Be Realized ... 40

2. The February 2021 Equity Offering Triggered an Ownership Change That Limited the Realizability of Enservco's DTA Under Federal Law ... 41

3. The Company Files Quarterly Reports in 2021 That Fail to Account for the Fact That Its DTA Became Limited ... 43

4. Enservco Admits After Filing the First Restatement That It Needs to Restate the Same Financials Again and Suffers Related Fallout ... 43

E. Enservco Misrepresented the Effectiveness of Its Disclosure Controls ... 48

1. The Individual Defendants Refuse to Remediate Known Weakness In Enservco's Accounting Department ... 48

2. The Individual Defendants Repeatedly Misrepresent the Effectiveness of Enservco's Disclosure Controls In Its Quarterly Reports in 2021 ... 50

3. Enservco Is Forced To Admit That It Lacked Effective Controls and Procedures Throughout 2021 ... 51

VIII. THE MATERIALLY FALSE AND MISLEADING STATEMENTS ... 52

A. The 2020 Form 10-K ... 52

B. The 1Q 2021 Form 10-Q ... 54

C. The 1Q 2021 Press Release ... 59

D. The 2Q 2021 Form 10-Q ... 60

E. The 2Q 2021 Press Release ... 65

F. The 3Q 2021 Form 10-Q ... 66

G. The 3Q 2021 Press Release ... 70

H. The 1Q 2021 Form 10-Q/A ........ 71

I. The 2Q 2021 Form 10-Q/A ........ 74

J. The 3Q 2021 Form 10-Q/A ........ 78

IX. ADDITIONAL ALLEGATIONS SUPPORTING AN INFERENCE OF SCIENTER ........ 81

A. The Fact That the Fraud Arose from a Material Weakness in ICFR Supports An Inference Of Scienter ........ 82

B. The Magnitude of the Accounting Errors Supports an Inference of Scienter ........ 83

C. The Dual Resignations of Enservco's CFO and PAO Following the First Restatement Supports an Inference of Scienter ........ 85

D. The Dismissal of Enservco's Auditor Supports an Inference Of Scienter ........ 86

X. PRESUMPTION OF RELIANCE ........ 87

XI. LOSS CAUSATION AND ECONOMIC LOSS ........ 89

XII. NO SAFE HARBOR ........ 92

XIII. CLASS ACTION ALLEGATIONS ........ 93

COUNT I ........ 94

COUNT II ........ 97

XIV. PRAYER FOR RELIEF ........ 98

XV. DEMAND FOR TRIAL JURY ........ 98

Court-appointed Lead Plaintiff Jan Lambert ("Lead Plaintiff") and Plaintiff Ali Saee (collectively, with Lead Plaintiff, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, as for their First Amended Class Action Complaint against Enservco Corporation ("Enservco" or the "Company"), Cross River Partners, L.P., Cross River Capital Management LLC, Richard A. Murphy, and Marjorie A. Hargrave (collectively, "Defendants"), allege the following on personal knowledge as to their own acts and on information and belief as to all else based upon the investigation conducted by counsel, which has included, among other things, a review and analysis of regulatory filings made with the U.S. Securities and Exchange Commission ("SEC"), securities analyst research reports, press releases, news reports, and other publicly available information issued by, or about, Enservco, as well as interviews of former Enservco employees. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. <u>NATURE OF THE ACTION</u>

1. This is a securities class action on behalf of all persons that purchased or otherwise acquired Enservco securities between March 23, 2021, and September 1, 2022, inclusive (the "Class Period"), for violations of the Securities Exchange Act of 1934 (the "Exchange Act").

2. Enservco, through its wholly owned subsidiaries, operates in the fiercely competitive domestic onshore oil and natural gas industry, where it provides well enhancement and fluid management services to well owners and operators, such as hot oil acidizing and frac water heating. At all relevant times, its largest stockholder has been Cross River Partners, L.P. ("Cross River Partners"), a private pooled investment fund managed by Enservco's President and CEO, Defendant Richard A. Murphy.

3. Enservco grew over the years by acquiring other companies and expanding into new geographies, but in doing so it took on an alarming amount of debt. By the beginning of its revenue-generating "heating season" in 2019, which generally spans the fourth and first quarters of the calendar year, Enservco had incurred over advances of approximately $1.2 million ***beyond*** the $37 million credit limit under its revolving credit facility with its senior secured lender and had issued over $2.5 million in subordinated debt to Cross River Partners.

4. But the 2019-2020 heating season proved to be exceptionally challenging due to an industry-wide downturn which ultimately intensified with the onset of the COVID-19 pandemic in early 2020. By the end of 2019, Enservco fell out of compliance with several financial covenants in the documents governing its credit facility, which made the entire loan balance immediately due. This caused the Enservco's working capital balance—funds available for day-to-day operations—to plunge to ***negative $31 million***, meaning its current liabilities exceeded its current assets by almost $31 million. As a result, the Company informed investors in March 2020 that its ability to continue as a going concern was placed in substantial doubt and would depend on its ability to renegotiate its debt obligations. As one former employee stated, Enservco was "struggling to stay alive" during this time.

5. In early 2020, senior management devised a multi-point plan to improve the Company's balance sheet. Over the first three quarters of 2020, Enservco cut over $4 million in costs out of the business. In September 2020, Cross River Partners exchanged half of the $2.5 million in subordinated debt it held for an equivalent amount of Enservco common stock, and the Company successfully finalized a debt restructuring with its lender which reduced its outstanding bank debt by $16 million, converted the remaining outstanding balance into a $17 million term

loan, and established a new $1 million working capital revolving line of credit. Less than a week later, the Company also raised another $3.5 million in an equity offering.

6. Enservco carried out several other capital improvement projects in February 2021, including two relevant to this action. First, between February 10, 2021 and February 11, 2021, the Company conducted another public offering in which it sold 4,199,998 shares of Enservco common stock at $2.30 per share (the "February 2021 Equity Offering"), and used $3 million of the proceeds to pay down the balance on its $17 million term loan. Second, upon completing the February 2021 Equity Offering, all remaining subordinated debt held by Cross River Partners was exchanged for an equivalent amount of Enservco common stock as well as a warrant to purchase shares of Enservco common stock with a fair value of $304,000 (the "February 2021 Debt for Equity Exchange"). In addition, the Company secured an amendment to its loan agreement which extended the maturity date of its term loan to October 15, 2022.

7. During this time, Enservco, like many other companies, also took advantage of various relief programs offered by the federal government in response to the COVID-19 pandemic. Starting in early 2021, Enservco began claiming employee retention credits ("ERCs") available under the Coronavirus Aid, Relief, and Security Act ("CARES Act") to offset federal payroll taxes, including by amending previously filed tax returns for periods during which ERCs were available.

8. By the start of the Class Period on March 23, 2021, Enservco had narrowly averted financial collapse, but it had not eliminated the risk entirely. The Company still had over $15 million of debt due by October 15, 2022, and, as a result, Enservco's ability to continue as a going concern hinged on its ability to successfully refinance that debt. This provided powerful economic incentive for the Individual Defendants misrepresent Enservco's financial condition and engage in

cash maximizing strategies ahead of its refinancing discussions, particularly Defendant Murphy, whose investment fund owned roughly 20% of Enservco's outstanding common stock, having recently converted over $2.5 million of subordinated debt into equity securities.

9. Throughout the Class Period, the Individual Defendants caused Enservco to file periodic reports with the SEC that materially misrepresented its liquidity and financial position. Many of these reports advised that, as a result of the Company's capital improvement projects, "we have ample capital resources to fund operational requirements beyond [March 23, 2022]." During 2021, the Company also filed three quarterly reports with the SEC on Form 10-Q which (i) affirmatively represented that financial statements therein were prepared in accordance with generally accepted accounting principles ("GAAP"); (ii) included certifications by the Individual Defendants that the information in each report fairly presented the financial condition of Enservco in all material respects; and (iii) informed investors that its disclosure controls and procedures were effective. These representations were all false, as the Company was later forced to admit.

10. The market began to learn the truth on November 15, 2021, when Enservco disclosed that it had burned through the majority of its cash balance by September 30, 2021, and recently fell out of compliance with a revenue covenant under its revised loan agreement, which restricted it from accessing its $1 million revolving line of credit. As Enservco later revealed, it was unable to draw on its $1 million revolver during the fourth quarter of 2021, and, consequently, depleted nearly its entire cash balance by the end of 2021. Indeed, in January and February 2022, the Company was in such dire need of working capital that it sought a series of loans from Cross River Partners and even used the ERC refund that it expected to receive from the Internal Revenue Service ("IRS") to secure a cash advance from its bank.

11. On March 28, 2022—the same day that it announced the successful completion of a refinancing transaction—Enservco revealed that it needed to restate the interim financials from every quarterly report it filed in 2021 to correct two accounting errors arising out of (i) its failure to account for the warrant issued to Cross River Partners in the February 2021 Debt for Equity Exchange; and (ii) its recognition of income for ERCs that it was not entitled to receive.

12. On April 11, 2022, Enservco filed amended quarterly reports, each of which restated the previously issued interim financial statements included therein to correct for the two accounting errors. In addition, these filings all acknowledged that the Company's disclosure controls and procedures were not effective at the time of each report. However, they all assured that the restated financials "were prepared in accordance with [GAAP]" and attached new certifications from Defendants Murphy and Hargrave declaring, among other things, that the amended filings fairly presented the financial condition of Enservco. This was again untrue.

13. On April 18, 2022, just one week after filing its restatement, Enservco disclosed that it needed to restate the same financials ***again*** to correct ***another*** accounting error. The new restatement, filed on May 24, 2022, revealed that Enservco experienced a "ownership change" within the meaning of section 382 of Title 26 of the United States Code (the "Internal Revenue Code" or "IRC") as a result of the February 2021 Equity Offering, which limited the ability of the Company to recognize up to $1.4 million of its deferred tax assets ("DTA"). As with the first restatement, the second restatement acknowledged that the Company's disclosure controls and procedures were not effective as of the end of the period covered by each filing.

14. To put the impact on the Company's bottom line into perspective, the adjustments made in connection with the two restatements collectively increased the net losses reported by

Enservco in the quarterly reports it originally filed by between approximately 19% to 80%. In other words, Defendants' misconduct allowed Enservco to ***understate its net losses by up to 80%***.

15. As Defendants' fraud unraveled, the Company experienced other fallout from the restatements. On March 31, 2022, Enservco informed the market it was unable to file its 2021 annual report by the deadline for doing so as a result of the need to restate its previously issued financials. At the beginning of April 2022, the Company's CFO, Defendant Marjorie Hargrave, and its Principal Accounting Officer ("PAO") both resigned. Enservco again delayed the filing of its 2021 annual report as a result of the need to restate its financial a second time. After filing the two restatements, the Company finally completed its 2021 annual report. But soon after doing so, which required an opinion based on an audit by its accounting firm, Enservco fired its auditor.

16. As a result of Defendants' wrongful acts and omissions, there was a precipitous decline in the market value of the Company's securities, and Plaintiffs and other members of the Class have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

18. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

19. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act. Enservco's principal executive office is located in this judicial district, Defendants transact business in this judicial district, and a substantial part of the events or omissions constituting the fraud alleged herein took place in this judicial district.

20. In connection with the acts, transactions, and omissions alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

21. Lead Plaintiff Jan Lambert acquired Enservco securities at artificially inflated prices during the Class Period, as set forth in the certification he previously filed with this Court (ECF No. 19-1, 19-3), and was damaged thereby, as set forth herein.

22. Plaintiff Ali Saee acquired Enservco securities at artificially inflated prices during the Class Period, as set forth in the Amended Certification attached hereto, and was damaged thereby, as set forth herein.

23. Defendant Enservco is a business incorporated under Delaware law with its principal executive office in Longmont, Colorado. At all times during the Class Period, Enservco's common stock was publicly traded on the NYSE American LLC ("NYSE American") under the trading symbol ENSV.

24. Cross River Partners is an investment fund formed under Delaware law with its principal place of business in Ridgefield, Connecticut.

25. Cross River Capital Management LLC ("Cross River GP") is a business incorporated under Delaware law with its principal place of business in Ridgefield, Connecticut.

26. Defendant Murphy has served as Enservco's Executive Chairman and CEO since May 2020 and has served as a director on Enservco's Board since January 2016.

27. Defendant Hargrave served as Enservco's CFO from July 2019 to April 2022.

28. Defendants Murphy and Hargrave are referred to as the "Individual Defendants."

## IV. CONFIDENTIAL WITNESS FOUNDATION ALLEGATIONS

29. Confidential Witness #1 ("CW1") was the Financial Reporting Manager from January 2018 to June 2020 in the Company's headquarters in Denver, Colorado. CW1 began reporting to Defendant Hargrave in July 2019, when she started as CFO. In CW1's capacity as Financial Reporting Manager, CW1 was responsible for drafting content for Enservco's public disclosures and SEC filings, including its quarterly reports on Form 10-Q and annual reports on Form 10-K. At times, CW1 acted as the interim Controller during transition periods.

30. Confidential Witness #2 ("CW2") worked at Enservco from April 2019 to August 2021 as an Accounts Receivable Clerk and, later, an Accounts Receivable Supervisor in the Company's headquarters in Denver, Colorado. CW2 reported to the Controller, who, in turn, reported to Defendant Hargrave. CW2 had direct interaction with Defendant Hargrave, explaining that her "pushy personality" was part of why CW2 decided to leave the Company.

31. Confidential Witness #3 ("CW3") was a manager of Enservco's South Texas operations from 2013 to March 2020. CW3 reported to the Chief Operating Officer.

32. Confidential Witness #4 ("CW4") was a Staff Accountant from April 2018 to March 2020. Like CW2, CW4 reported to the Controller, who, in turn, reported to Defendant Hargrave. In CW4's role, CW4 had direct interaction with Defendant Hargrave.

33. Confidential Witness #5 ("CW5") was the Controller at Enservco from April 2019 to November 2019. CW5 was based in the Company's headquarters in Denver, Colorado and reported to Enservco's previous CFO, Dustin Bradford, until he was replaced by Defendant Hargrave in July 2019, after which CW5 reported to Hargrave.

## V. RELEVANT FINANCIAL REPORTING RULES

### A. Fundamentals of Financial Reporting

34. In accordance with 15 U.S.C. §§ 78m(a) and 78o(d), the SEC has promulgated rules which require domestic issuers with registered securities to file annual reports on Form 10-K at the end of each fiscal year and quarterly reports on Form 10-Q at the end of the first three quarters of the fiscal year on an ongoing basis. Among other things, every Form 10-K or Form 10-Q filed with the SEC must contain a "financial statement" for the period covered by the filing that meets the requirements of Regulation S-X codified in 17 C.F.R. § 210 *et seq.* The financial information reported in each of these various components of the financial statement is important to investors because it offers insight on the performance and financial position of the filing entity.

35. Among other things, Regulation S-X requires that all financial statements filed with the SEC must be prepared in accordance with GAAP, including financial statements filed by "smaller reporting companies." 17 C.F.R. §§ 210.4-01(a)(1), 210.8-01(a). Regulation S-X makes clear that interim financial statements, *i.e.* those included in quarterly reports filed on Form 10-Q, must follow GAAP as well. 17 C.F.R § 210.10-01(a). Any financial statement filed with the SEC that is not presented in accordance with GAAP is ***presumed to be misleading***, despite any footnotes or other disclosures to the contrary. 17 C.F.R. § 210.4-01(a)(1).

### B. Basic GAAP Rules Governing Financial Reporting

36. GAAP refer to those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time promulgated by the Financial Accounting Standards Board ("FASB"). The FASB has codified GAAP into a numbered scheme called the Accounting Standards Codification ("ASC").

In addition, the FASB has issued guidance in the form of FASB Concept Statements ("FASCON"), which reflect the underlying basis and framework for the standards within GAAP.

37. According to the FASB, one of the basic qualitative characteristics of financial information that is "likely to be most useful to the existing and potential investors . . . for making decisions about the reporting entity" is ***faithful representation***. FASCON No. 8, Chapter 3, *Qualitative Characteristics of Useful Financial Information*, QC1 and QC5. FASCON No. 8 goes on to explain that "[t]o be a perfectly faithful representation, a depiction would have three characteristics." Specifically, "[i]t would be ***complete***, ***neutral***, and ***free from error***." *Id.* QC12.

38. Finally, both GAAP and SEC rules recognize that previously issued financial statements must be restated to correct material errors. ASC 250-10-45-23 provides that "[a]ny error in the financial statements of a prior period discovered after the financial statements are issued . . . shall be reported as an error correction, by restating the prior-period financial statements." ASC 250-10-20 defines an error in previously issued financial statements as follows:

> An error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts ***that existed at the time the financial statements were prepared***.

However, by its terms, the ASC only apply to material items. As such, SEC Staff Accounting Bulletin No. 108 ("SAB 108") confirms that "[c]orrecting prior year financial statements for immaterial errors would ***not*** require previously filed reports to be amended." Rather, financial statements with immaterial errors may be corrected in future filings (in what is known as a "little r restatement"). Accordingly, the full restatement of prior financials (known as a "big R restatement") is an acknowledgement that the errors in those financial statements were material.

C. <u>**Internal Controls and Over Financial Reporting**</u>

39. Following a series of high-profile financial scandals that occurred in the early 2000s at large public companies, Congress enacted the Sarbanes-Oxley Act of 2002 ("SOX") to protect investors by improving the accuracy and reliability of corporate disclosures.

40. Section 404 of SOX directed the SEC to prescribe rules which effectively required all public companies to establish and maintain a system of internal controls over financial reporting ("ICFR"), and to assess the effectiveness of those controls on a periodic basis. As provided in Rules 13a-15 and 15d-15 of the Exchange Act, management must not only maintain ICFR but evaluate the effectiveness of ICFR annually and evaluate any change that is reasonably likely to materially affect ICFR each quarter. In addition, Item 308 of SEC Regulation S-K requires management to provide an annual report on ICFR that includes (1) a statement that ICFR is management's responsibility; and (2) a discussion of management's assessment of the effectiveness of ICFR, which must include disclosure of any material weakness in ICFR. Notably, "management is not permitted to conclude that the company's internal control over financial reporting is effective if there are one or more material weaknesses in the company's internal control over financial reporting." 17 C.F.R. § 229.308(a)(3). Accordingly, ***management must disclose that its ICFR is ineffective if there is any material weakness in ICFR***.

41. Other provisions of SOX require the CEO and CFO to certify compliance with SOX in each annual and quarterly report filed with the SEC on Forms 10-K and 10-Q. Consistent with Section 302 of SOX, Rules 13a-14(a) and 15d-15(a) of the Exchange Act require such certifications, the text for which is set forth in Item 601(b)(31)(i) of Regulation S-K. Similarly, Section 906 of SOX requires each such report to contain a written statement by the CEO and CFO

certifying that (i) the report fully complies with the requirements of section 13(a) and 15(d) of the Exchange Act (including adherence to GAAP); and (ii) the information contained in the report fairly presents the financial condition and results of the issuer in all material respects.

## VI. BACKGROUND

### A. Background On the Company and Its Largest Shareholder

42. Enservco is a national provider of specialized well-site services to the domestic onshore oil and gas industry. These services include completion services, such as frac water heating, and production services, such as hot oiling and acidizing, as well as related support activities. The Company offers these services to customers in several major domestic oil and gas areas in the eastern, rocky mountain, and central regions of the United States.

43. Enservco's business is subject to seasonal shifts. The cooler months that comprise the fourth and first quarters of the calendar year are the period of peak demand for heating services and, as such, Enservco's revenues during the first and fourth quarters are significantly higher than revenues during the second and third quarters of the calendar year. For example, in 2020, the Company generated approximately 75% of its overall 2020 revenues during the first and fourth quarters of 2020 compared to third and fourth quarters of 2020.

44. As of the start of the Class Period, Enservco primarily conducted its business operations through its wholly owned subsidiary Heat Waves Hot Oil Services LLC, a limited liability company formed under the laws of Colorado.

45. Historically, the Company focused its growth strategy on expanding its services and geographical footprint through the acquisition of other companies and capital investment in the acquisition and fabrication property and equipment. For example, from 2010 through 2016, the

Company (i) expanded its services into several new markets in Wyoming, North Dakota, Ohio, and Texas; (ii) spent over $33 million for the acquisition of new frac water heating, hot oiling, and acidizing equipment; and (iii) acquired various water transfer assets for approximately $4.3 million.

46. Since Defendant Murphy's appointment to Enservco's Board in January 2016, Elanco's largest stockholder has been Cross River Partners. Cross River Partners has, at times between January 2016 and the end of the Class Period, beneficially owned in excess of 25% of Enservco's common stock (including warrants to purchase Enservco common stock).

47. Cross River Partners is a private pooled investment fund that invests in micro-cap and small-cap companies founded by Defendant Murphy in 2002. Its core portfolio contains a relatively small number of securities. At all times during the Class Period, Defendant Murphy was the managing member of Cross River's general partner, Cross River GP.

48. By virtue of its significant holdings in Enservco common stock, as well as its affiliation with and control by Defendant Murphy, Cross River Partners is considered a "related party" under Item 404 of Regulation S-K.

**B. Enservco's Capitalization and Liquidity Strategy**

49. Enservco has historically relied on cash flow from operations, borrowings under a revolving line of credit, also known as a "revolver," and debt and equity offerings to fund its operations. Similar to a credit card balance, a revolver allows a borrower to continuously draw down funds up to the maximum credit limit and repay some or all of the outstanding balance, thus replenishing the total available to draw down, until the maturity date. A revolver is particularly useful for companies that experience sharp fluctuations in cash flows or expenses. Because of this, it is often considered a form of short-term financing that is usually paid off quickly.

50. By May 18, 2017, Cross River Partners provided Enservco with $2.5 million to satisfy revised financial covenants under its existing revolver. On June 28, 2017, Enservco entered into a subordinated loan agreement with Cross River Partners (the "Subordinated Loan Agreement") to document the Company's obligations with respect to the above-mentioned cash advances and, in connection therewith, delivered to Cross River Partners two subordinated promissory notes with a total principal amount of $2.5 million (the "Subordinated Debt").

51. On August 10, 2017, the Company completed a refinancing and entered into a Loan and Security Agreement with East West Bank (the "2017 Credit Agreement"), which provided a three-year $30 million senior secured revolving credit facility (the "2017 Credit Facility"). The 2017 Credit Agreement contained various financial covenants, which, if not satisfied, could trigger an Event of Default (as defined in the 2017 Credit Agreement). Enservco received an initial advance of $21.8 million under the 2017 Credit Facility to repay in full the outstanding balance under its previous revolving line of credit, following which the Company had approximately $4.7 million in availability remaining under the 2017 Credit Agreement.

52. On June 29, 2018, Cross River exercised both warrants granted to it in connection with the Subordinated Loan Agreement and acquired 1,612,902 shares of Enservco common stock. Proceeds received by Enservco from the exercise of the warrants in the amount of $500,000 were used to reduce the principal amount on the Subordinated Debt from $2.5 million to $2 million.

## C. <u>The Company Is Crippled by Its Debt Obligations by The End of 2019</u>

53. On October 26, 2018, Enservco acquired one of its largest competitors, Adler Hot Oil Service, LLC for $12.5 million (the "Adler Acquisition"). In connection with the Adler Acquisition, East West Bank agreed to amend the 2017 Credit Agreement to increase the

borrowing limit for the 2017 Credit Facility from $30 million to $37 million, and Enservco used proceeds of $6.2 million from the revised 2017 Credit Facility to pay for closing costs.

54. The Adler Acquisition provided Enservco with valuable new assets, but it also created redundant personnel, facilities, and related costs which Enservco did not fully eliminate until mid-year 2019 due to the timing of the transaction coinciding with the start of its heating season. In addition, poor performance in the Company's water transfer business created a $1.2 million drag on profitability during the first six months of 2019 and unseasonably warm weather in April 2019 brought the heating season to an early end.

55. B September 30, 2019, Enservco's available liquidity was $218,000, which was comprised entirely of remaining availability under the 2017 Credit Facility. Faced with almost no cash to fund its operations as it headed into its busy heating season, in October 2019, Enservco incurred over advances of $1.2 million beyond its borrowing limit under the 2017 Credit Facility.

56. But rather than picking back up with the start of Enservco's heating season, demand for the Company's services experienced a heavy downturn in the fourth quarter of 2019. On November 11, 2019, the Company and Cross River Partners amended the Subordinated Loan Agreement to reflect a new loan in the amount of $500,000, bringing the total principal balance of the Subordinated Debt held by Cross River Partners back up to $2.5 million.

57. As of December 31, 2019, Enservco's available liquidity was $663,000, which was comprised entirely of its cash balance. By December 31, 2019, Enservco had fallen out of compliance with several financial covenants, which constituted Events of Default under the 2017 Credit Agreement. This caused Enservco to classify the entire $34 million balance outstanding under the 2017 Credit Facility as a current (as opposed to a long-term) liability. As a result, as of

December 31, 2019, the Company had a working capital of ***negative $31 million***, meaning its current liabilities exceeded its current assets by almost $31 million.

58. Business conditions did not improve in the first quarter of 2020. Drilling and completion activity continued to slow due to a sharp decline in crude oil prices resulting from the Saudi-Russia price war and general concerns surrounding the impact of COVID-19 on the global economy. As a result, Enservco was not generating adequate revenue to fund current operations and required substantial additional capital to maintain operations for the remainder of 2020. As CW1 stated, Enservco "was struggling to stay alive" during this time.

59. In its annual report on Form 10-K for the year ended December 31, 2019, filed with the SEC on March 20, 2020 (the "2019 Form 10-K"), Enservco revealed that its auditors expressed substantial doubt about the Company's ability to continue as a going concern. The Company explained that its ability to continue as a going concern would be dependent on its renegotiation of the 2017 Credit Agreement and raising additional sources of capital.

**D. <u>Enservco Takes Action in 2020 to Improve Its Financial Condition</u>**

60. In early 2020, Enservco personnel began holding discussions with East West Bank to obtain a waiver for the Events of Default and, more broadly, renegotiate its debt obligations.

61. On March 27, 2020, the CARES Act was signed into law. As amended, the CARES Act created or modified various relief programs in response to the COVID-19 pandemic, including, among others, the paycheck protection program ("PPP"). The PPP offered fully forgivable low interest loans to small businesses provided that funds were used for qualifying expenses, including payroll costs, and the borrower met other criteria. On April 10, 2020, Enservco received a PPP

loan from East West Bank in the principal amount of approximately $1.9 million (the "PPP Loan"). The Company stated that it planned to use all proceeds from the PPP Loan for qualifying expenses.

62. In addition, during the first half of 2020, management underwent a thorough analysis of its costs, including payroll and related costs, capital expenditures, and the profitability of various segments and locations. By mid-May, Enservco eliminated approximately $2 million in costs by modifying hiring practices, reducing headcount, cutting compensation across the organization, closing unprofitable locations, and scaling back its budget for capital expenditures.

63. On May 29, 2020, Enservco's President and CEO, Ian E. Dickinson, resigned and the Board appointed Richard A. Murphy, a member of Enservco's Board affiliated with the related party Cross River Partners, as Executive Chairman and CEO of the Company.

64. On August 13, 2020, Enservco and Cross River Partners entered into an agreement pursuant to which Cross River Partners agreed to convert 50% of the principal amount and $264,737 in accrued but unpaid interest on the Subordinated Debt it held into an equivalent amount of Enservco common stock. Effective September 15, 2020, Subordinated Debt in a principal amount of $1.25 million and $264,737 in accrued but unpaid interest, with a total monetary value of $1,514,737, converted into 6,054,022 shares of Enservco common stock based on a conversion price of approximately $.025 per share (the "September 2020 Debt for Equity Exchange").

65. Notably, an investment in Enservco common stock is fundamentally different than an investment in its Subordinated Debt. Whereas the Subordinated Debt offers a set return on investment over the life of the instrument based on a fixed interest rate, an investment in Enservco common stock is subject to the fluctuations of its market price, which may fall below the price paid to acquire the common stock. In addition, creditors such as bondholders have a preference to

payments over shareholders in the event of a bankruptcy. By converting Subordinated Debt to Enservco common stock, Cross River Partners signaled to its investors not only that it believed that Enservco had the fundamentals to continue as a going concern but that it believed the price of Enservco common stock would rise above $0.25 per share. Indeed, in a press release dated September 17, 2020, Defendant Murphy stated that "[t]he conversion of debt into equity by . . . Cross River will demonstrate confidence in the future of our business."

66. On September 23, 2020, Enservco and East West Bank entered into an comprehensive amendment to the 2017 Credit Agreement which, among other things, (i) waived Enservco's Events of Default; (ii) reduced the principal balance outstanding under the 2017 Credit Facility by $16 million in exchange for the issuance to East West Bank of 533,334 shares of Enservco common stock and a warrant to purchase up to 1,000,000 additional shares of Enservco common stock; (iii) converted the remaining balance outstanding under the 2017 Credit Facility in a principal amount of $17 million into an equipment term loan with a maturity date of October 15, 2021; (iv) established a new $1 million revolving line of credit; and (v) modified the applicable financial covenants (the "Fifth Amendment" to the 2017 Credit Agreement).

67. On September 29, 2020, the Company released an at-the-market offering of its common stock (the "September 2020 Equity Offering"). The September 2020 Equity Offering generated net proceeds of approximately $3.5 million.

68. As a result of the foregoing activities, as of December 31, 2020, Enservco's available liquidity was $1.8 million, which was comprised of $1.5 million in cash and approximately $300,000 in availability under the Fifth Amendment to the 2017 Credit Facility. In addition, as of December 31, 2020, Enservco's current assets exceeded its current liabilities by

$306,000, meaning that it built back a positive working capital balance as compared to the $31 million working capital deficit for the prior year ended December 31, 2019.

69. On February 1, 2021, Enservco and East West Bank entered into another amendment to the 2017 Credit Agreement (the "Sixth Amendment" to the 2017 Credit Agreement). The Sixth Amendment to the 2017 Credit Agreement extended the maturity date of the loan from October 15, 2021 to October 15, 2022, and modified certain financial covenants.

70. As amended by the Fifth Amendment and Sixth Amendment, the financial covenants of the 2017 Credit Agreement required, among other things, that the Company must (i) maintain not less than $3 million in one or more deposit accounts at East West Bank by no later than April 15, 2021, unless and until Enservco makes a prepayment on the term loan of at least $3 million; (ii) achieve gross revenue of at least 70% of the Company's projected gross revenue for each trailing three-month period commencing March 31, 2021; and (iii) not make capital expenditures in excess of $1.2 million in any fiscal year.

## E. <u>Key Events in Early 2021</u>

### 1. The February 2021 Equity Offering

71. The Sixth Amendment to the 2017 Credit Agreement offered much needed relief to Enservco by extending the maturity date for the $17 million balance on its term loan beyond its present fiscal year, but it came at a price. The Sixth Amendment added a $3 million liquidity covenant that was already nearly double the Company's available liquidity as of December 31, 2019, and which Enservco could not satisfy based on cash flow from operations. Enservco needed to raise additional capital to ensure compliance with the new liquidity covenant and/or eliminate it by making a $3 million prepayment on the outstanding balance of the term loan.

72. On January 21, 2021, the Company filed a registration statement on Form S-1 with the SEC (as amended, the "January 2021 Registration Statement") to register shares of Enservco common stock for a firm commitment underwritten public offering. The SEC declared the January 2021 Registration Statement effective on February 8, 2021. On February 9, 2021, the Company filed another registration statement on Form S-1 (the "February 2021 Registration Statement," and, together with the January 2021 Registration Statement, the "Registration Statements") to register additional shares of Enservco common stock for the offering pursuant to Rule 462(b) of the Securities Act of 1933, which became effective automatically upon filing. The February 2021 Registration Statement incorporated the January 2021 Registration Statement by reference. On February 10, 2021, Enservco filed a final prospectus on Form 424B3 relating to the offering contemplated by the Registration Statements (the "Final Prospectus").

73. Enservco conducted the February 2021 Equity Offering between February 10, 2021 and February 11, 2021. Ultimately, the Company sold 4,199,998 shares of Enservco common stock at a price of $2.30 per share in the February 2021 Equity Offering, generating net proceeds of approximately $8.8 million. Upon or soon after the closing of the 2021 Equity Offering, Enservco made a $3 million principal payment to East West Bank toward the outstanding balance of its term loan using net proceeds from the February 2021 Equity Offering, reducing the outstanding principal balance on its equipment term loan from $17 million to $14 million.

**2. The February 2021 Debt for Equity Exchange**

74. On February 3, 2011, Enservco and Cross River Partners entered into another agreement pursuant to which Cross River Partners agreed to convert all remaining principal and accrued but unpaid interest on its Subordinated Debt into an equivalent amount of Enservco

common stock and a five-year warrant to purchase 150,418 shares of Enservco common stock at an exercise price equal to $2.507 per share, conditioned on the closing of the February 2021 Equity Offering (the "Note Conversion Agreement"). In a current report on Form 8-K filed with the SEC on February 3, 2021 (the "February 3, 2021 Form 8-K"), Enservco disclosed its entry into the Note Conversion Agreement with Cross River Partners and the transactions contemplated thereby. Among other things, the February 3, 2021 Form 8-K specifically acknowledged that "Cross River is a related party of the Company by virtue of its significant ownership in the Company and Richard A. Murphy . . . is also the managing partner of Cross River Partners, L.P."

75. Automatically upon the closing of the February 2021 Equity Offering on February 11, 2021, as part of the February 2021 Debt for Equity Exchange, Subordinated Debt issued to Cross River Partners by Enservco comprising a principal amount of $1,250,000 and $61,651 in accrued but unpaid interest, with a total monetary value of $1,311,651, converted into (i) the right to receive 601,674 shares of Enservco common stock based on a conversion price of $2.18; and (ii) a warrant to purchase 150,418 shares of Enservco common stock at an exercise price of $2.507.

76. By converting Subordinated Debt to Enservco common stock, Cross River Partners signaled to its investors not only that it believed that Enservco had the fundamentals to continue as a going concern but that it believed the price of Enservco common stock would rise above $2.18 per share for all the same reasons described in ¶ 65. Indeed, as with the September 2020 Debt for Equity Exchange, Enservco issued a corresponding press release on February 3, 2021 (the "February 3, 2021 Press Release"), in which Defendant Murphy stated: "My agreement to convert debt to equity reflects my confidence in our business, our corporate staff and our field teams."

### 3. Employee Retention Credits

77. In addition to the PPP, the CARES Act also authorized eligible businesses to claim ERCs against federal payroll taxes for certain wages paid to employees between March 13, 2020 and December 31, 2020. As originally enacted under the CARES Act, businesses who received a PPP loan, like Enservco, were prohibited from utilizing these ERCs

78. Congress modified the ERC program in the Taxpayer Certainty and Disaster Tax Relief Act of 2020 (the "TCDTRA") contained in the Consolidated Appropriations Act, 2021, signed into law on December 27, 2020. Among other things, the TCDTRA (i) extended the ERC program through June 30, 2021; and (ii) allowed businesses who received PPP loans to claim ERCs with respect to wages not paid with proceeds from a forgiven PPP loan, including for prior periods in 2020 when the ERC program was in effect. Congress later extended the ERC program, as amended, through December 31, 2021, but subsequently terminated it as of September 30, 2021.

79. Since the ERC program began, the IRS permitted eligible businesses to reduce the amount of the monthly or semiweekly deposit to the IRS of federal payroll taxes by the amount ERCs that the employer anticipated claiming on wages paid as of the date of the deposit without incurring a failure to deposit penalty under the IRC, provided that the employer reported all ERCs claimed during the quarter on the employer's quarterly tax return filed on Form 941. In other words, claiming ERCs on a real time basis provided more cash on hand by reducing the amount of federal payroll taxes that needed to be paid throughout the quarter.

80. In light of the modifications to the ERC program in December 2020, Enservco claimed approximately $223,000 in ERCs for wages paid during the first quarter of 2021.

81. Enservco also wanted to take advantage of the ERC program for wages that it previously paid during the quarters ended September 30, 2020, and December 31, 2020. However, as a practical matter, Enservco had already deposited the employment taxes associated with the wages paid during those quarters with the IRS and already filed its quarterly tax returns for those quarters on Form 941. As such, during the second quarter of 2021, the Company filed amended tax returns for the quarters ended September 30, 2020 and December 31, 2020 on Form 941-X in order to claim a refund for ERCs available during those periods. Including the ERCs claimed on the amended tax returns for the third and fourth quarters of 2020, Enservco claimed a total of approximately $1.3 million in ERCs during the quarter ended June 30, 2021.

82. Enservco continued to claim ERCs in the third quarter of 2021. Enservco claimed approximately $612,000 in ERCs for wages paid to employees during that quarter.

**F. Enservco Informs Investors That It Is No Longer in Danger of Failing**

83. In each quarterly report that Enservco filed with the SEC in 2020, the Company continued to report—as it first did in its 2019 Form 10-K—that its precarious financial condition "raise[s] substantial doubt over our ability to continue as a going concern."

84. On March 23, 2021, Enservco filed its annual report on Form 10-K for the period ended December 31, 2020 with the SEC (the "2020 Form 10-K"). In the 2020 Form 10-K, the Company disclosed that it "believes there is ***no longer a substantial doubt*** over [its] ability to continue as a going concern from one year after . . . March 23, 2021" following its recent capitalization initiatives, including the Fifth and Sixth Amendment to the 2017 Credit Facility, the September 2020 Equity Offering, the September 2020 Debt for Equity Exchange, the February 2021 Equity Offering, and the February 2021 Debt for Equity Exchange.

## VII. NATURE OF THE FRAUD

### A. The Individual Defendants Desperately Needed to Secure New Financing

85. By the start of the Class Period, Enservco had narrowly avoided financial collapse by restructuring its debt obligations and raising additional capital. However, as of March 31, 2021, the Company still had an outstanding principal loan balance of approximately $14 million as well as $1.2 million in future interest payments, all due October 15, 2022.

86. The Individual Defendants were fully aware of this looming liability. Defendant Hargrave executed the Fifth Amendment and the Sixth Amendment to the 2017 Credit Agreement, and Defendant Murphy extensively discussed the debt restructuring on an investor call held on March 23, 2021, in which he volunteered that "East West Bank wrote off $16 million off our $33 million term loan, leaving us with a new $17 million term loan" and "we recently negotiated a 1-year term extension on both the term loan and revolver to October 15, 2022."

87. These known debt obligations continued to pose an existential threat to Enservco. The sharp decline in demand for Enservco services that began at the end of 2019 had continued through early 2021. As a result, the Individual Defendants warned investors in the 2020 Form 10-K that "we may be extremely limited in our ability to repay any indebtedness without substantial debt restructuring" and if it "could not repay or refinance our indebtedness when due . . . we may have to curtail operations that would adversely affect our ability to continue as a going concern."

88. Indeed, Enservco was forced to disclose this in its quarterly report on Form 10-Q for the period ended September 30, 2021, filed November 15, 2021 (the "3Q 2021 Form 10-Q"):

> Although the Company has made substantial progress in improving its capitalization and financial position over the past twelve months, the current maturity date of the Credit Facility is October 15, 2022. This maturity date of the

> Credit Facility creates substantial doubt over our ability to continue as a going concern from one year after the date of issuance of this report . . . .

In other words, Enservco did not expect that it would have sufficient capital to repay its remaining balance on October 15, 2022. This risk existed, according to the 3Q 2021 Form 10-Q, "absent our ability to refinance such debt or obtain equity financing, neither of which can be assured."

89. Thus, by the start of the Class Period, it became mission critical for Enservco to refinance its remaining debt. But doing so was far from guaranteed. The ability to secure any form of financing would depend in large part on Enservco's financial condition and outlook. Indeed, the Individual Defendants decided to wait until after the close of the first quarter of its upcoming revenue-generating heating season, *i.e.*, the fourth quarter of 2021, before addressing its financing options. However, as detailed in ¶¶ 92-95, Enservco barely had sufficient capital to last through December 31, 2021. It therefore became equally important for Enservco to fund its operations through the anticipated refinancing in early 2022.

90. This provided the Individual Defendants with tremendous incentive to misrepresent Enservco's financial position and pursue cash-maximizing business strategies in advance of any refinancing discussions. If the Company could not secure a new source of financing, or sustain operations until it could do so, Enservco was unlikely to continue as a going concern. In either case, the Individual Defendants risked losing their employment with Enservco. As regards Defendant Hargrave, her position with Enservco was her only source of full-time employment.

91. The economic incentive for Defendant Murphy was even greater. Cross River Partners owned over 2 million shares of Enservco common stock as of March 23, 2021. Indeed, between September 2020 and February 2021, Murphy authorized Cross River Partners to convert approximately $2.8 million of Subordinated Debt into such shares. The value of those holdings

would be eviscerated if the Company was no longer able to continue as a going concern. Indeed, because Cross River Partner's core portfolio contains a relatively small number of securities, the complete loss of an investment of this magnitude could cause investors in Cross River Partners to lose faith in Murphy's investment management strategy and leave Cross River Partners altogether.

## B. <u>Enservco Misrepresented Its Liquidity Position</u>

### 1. Enservco's Capital Resources Were Insufficient to Sustain Operations Through the End of March 2022

92. Direct operating expenses, also known as cost of goods sold (COGS), refer to all expenses attributable to the production of a specific product or service. For Enservco, direct operating expenses include, among other things, labor costs, propane, fuel, chemicals, truck repairs and maintenance, supplies, and site overhead costs for its business segments. Direct expenses do not include sales, general, and administrative (SG&A) expenses, which represent all other expenses incurred in operating a business that are not reflected in COGS, such as rent and utilities, marketing and advertising, and management and administrative salaries.

93. Enservco's direct operating expenses for the one-year period April 1, 2020 to and through March 31, 2021 were approximately $13.8 million. With SG&A expenses added in, its total operating expenses for the period April 1, 2020 through March 31, 2021 was approximately $18.1 million. On the other hand, revenue from operating segments for the one-year period from April 1, 2020, to and through March 31, 2021, was only approximately $11.4 million.

94. Accordingly, just based on performance in the same period from the prior year, as of March 31, 2021, Enservco needed at least $6.7 million beyond its cash flow from operations to cover its operating expenses through March 31, 2022. Having successfully completed the February 2021 Equity Offering, as of March 31, 2021, the Company's cash balance was $3.7

million. Thus, absent use of its $1 million revolver, Enservco's cash balance as of March 31, 2021 was alone insufficient to cover expenses through March 30, 2022, much less March 23, 2022.

95. However, Enservco's ability to access its revolver through the end of 2021 was not a certainty. As a practical matter, Enservco needed to generate more revenues than operating expenses to have funds to pay down any cash advances loaned under its $ 1 million revolver. Historically, Enservco did not generate more revenues than operating expenses during the slower second and third quarters of the year. Indeed, it had not done so ***once*** since entering into the 2017 Credit Agreement in August 2017. In addition, the Individual Defendants were aware, based on past experience, that the failure to maintain compliance with applicable financial covenants would automatically eliminate any availability under their revolving line of credit.

96. In its quarterly report on Form 10-Q for the period ended September 30, 2021, filed November 15, 2021 (the "Q3 2021 Form 10-Q"), the Company was forced to disclose what the Individual Defendants knew all along

#### 2. The Company Repeatedly Assures Investors That It Has Ample Liquidity to Satisfy Operations Well Beyond March 2022

97. Despite the limitations described above, Enservco assured investors that its funding was secure well beyond March 23, 2022. In both the Registration Statements and the Final Prospectus for the February 2021 Equity Offering, the Company informed investors that "[w]e believe the net proceeds of this offering, together with our cash and cash equivalents will be sufficient to meet our cash, operational and liquidity requirements for at least 12 months," *i.e.*, until February 2022. But beginning in its 2020 Form 10-K, the Company revised the wording of, and expanded, this disclosure. Therein, Enservco stated in words of certainty that, as a result of "the funding from the two equity offerings and the restructuring and further extension of the Credit

Facility, ***we have ample capital resources to fund operational requirements beyond the next twelve months***." As explained below, Enservco continued to make substantially similar representations in the next two quarterly reports that it filed with the SEC in 2021.

### 3. Investors Learn That Enservco Burned Through the Majority of Its Cash and Fell Out of Compliance with a Relevant Financial Covenant

98. Enservco filed its 3Q 2021 Form 10-Q with the SEC on November 15, 2021. In stark contrast to the assurances offered to investors in the 2020 Form 10-K, the 3Q 2021 Form 10-Q revealed that the Company's cash balance shrank from $3.8 million at the end of the prior quarter to approximately $1.7 million by September 30, 2021, as the Company was headed into its resource-demanding heating season, despite the availability of its $1 million revolver.

99. Making matters worse, the 3Q 2021 Form 10-Q also revealed that the Company fell out of compliance with a revenue covenant under loan agreement during the fourth quarter of 2021:

> Subsequent to September 30, 2021, the Company determined that it would be in non-compliance of its trailing three-month revenue covenant under the Credit Facility for the month ended October 31, 2021, and would likely also be in non-compliance for the trailing three-month period ending November 30, 2021.

This placed even more strain on Enservco's liquidity. As noted in the 3Q 2021 Form 10-Q, Enservco's overall liquidity was comprised of its cash balance and $1.0 million availability on the line of credit under our Credit Facility, the latter of which it had used "to fund working capital requirements and investments" during the year. But Enservco's ability to draw on the $1 million line of credit was conditioned on the absence of any Events of Defaults under the terms of the 2017 Credit Agreement. Although Enservco eventually secured a waiver of the Event of Default arising from its failure to meet the revenue covenant in November 2021, there was a period during its critical heating season when Enservco could not access its $1 million revolver.

#### 4. Enservco Is Forced to Seek Emergency Funding in Early 2022

100. As the Company ultimately admitted on July 7, 2022 in its next annual report on Form 10-K for the period ended December 31, 2021 (the "2021 Form 10-K"), it was "unable to borrow under [its $1 million] line of credit" during the fourth quarter of 2021, which forced Enservco to rely on cash flows from operations to satisfy its liquidity needs. The 2021 Form 10-K explained that inability to borrow under its revolver not only "impacted [the Company's] ability to fund operations during the busy heating season in the fourth quarter of 2021" but also decimated its cash balance to only $149,000 by December 31, 2021.

101. With close to no cash on hand, management took extraordinary action in early 2022 to keep the Company afloat. Even though Enservco expected to soon receive a refund from the IRS for the ERCs it claimed on the amended tax returns that it filed for the third and fourth quarters of 2020, on or around January 25, 2022, Enservco pledged its expected refund to East West Bank for a cash advance of $700,000. The $700,000 cash advance that Enservco received from East West Bank was backed by a commercial guaranty signed by Defendant Murphy pursuant to which Cross River Partners guaranteed repayment if the full amount of ERCs were not received by the Company. But that was not enough. Between February 18, 2022 and March 9, 2022, Cross River Partners also loaned Enservco approximately $1.2 million primarily for working capital purposes.

### C. Enservco Materially Misstated Its Financial Condition by Misreporting the February 2021 Debt for Equity Conversion and Exploiting the ERC Program

#### 1. GAAP Requires the Recognition of a Loss When Debt Is Exchanged for Equity That Exceeds Its Value and Prohibits Recognizing Income On Items That a Company Is Unlikely to Receive

102. ASC 470, *Debt Modifications and Extinguishments* ("ASC 470"), provides the relevant GAAP for debt extinguishments. ASC 470-50-40-2 states that the "difference between

the reacquisition price of debt"—*i.e.*, the consideration provided to extinguish the debt—"and the net carrying amount of the extinguished debt shall be recognized currently in income of the period of extinguishment as losses or gains." However, ASC 470-50-40-2, specifically recognizes that "extinguishment transactions between related entities may be in essence capital transactions."

103. Although recording a gain from a capital transaction is prohibited by GAAP, losses on such transactions must be recognized. A June 1, 2013, article in the Journal of Accountancy entitled *What's a little debt between friends?*, which discusses ASC 470, illustrates this principle:

> [I]f an entity has $50 million in debt outstanding to its owner and exchanges that debt for $80 million in equity (which might happen because of the related-party nature of the relationship), the entity has the following possible alternatives
>
> 1. Recognize no gain or loss (in which case the credit to equity would be for $50 million); or
>
> 2. Recognize a loss on the transaction, representing the fact that $80 million of equity was exchanged for only $50 million of debt.
>
> In this case the creditor appears to have received a benefit from its related-party status, as theoretically it could receive equity with a value of approximately $80 million for the $50 million in debt. The concept of recognizing expenses from certain transactions with related parties is widespread within U.S. GAAP. . . . Accordingly, the entity should derecognize the carrying value of its debt . . . and recognize the total fair value of equity provided, with the difference recorded as a loss on extinguishment of debt.

104. Thus, GAAP requires the recognition of a loss when debt is exchanged for equity that exceeds the carrying value of the debt, ***whether or not it with a related party***.

105. Separately, a "contingency" is "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible gain (gain contingency) or loss (loss contingency) to an entity that will ultimately be resolved when one or more future events occur or fail to occur." ASC 450-30-25-1 instructs that a gain contingency "usually should not be reflected

in the financial statements because to do so might be to recognize revenue before its realization." Thus, under GAAP, contingent gains should not be recognized until "realized" or "realizable."

### 2. The Equity Issued in the February 2021 Debt for Equity Exchange Exceeded the Value of the Debt Exchanged for It and the Company Claimed ERCs That It Was Not Entitled to Receive

106. As regards the February 2021 Debt for Equity Exchange, Enservco extinguished the remaining Subordinated Debt held by Cross River Partners in exchange for an equivalent amount of Enservco common stock ***as well as a warrant with a fair value of $304,000***. Stated differently, Enservco extinguished the remaining Subordinated Debt for consideration that exceeded its carrying value by the fair value of the warrant *i.e.*, $304,000. The Company accomplished a similar transaction in the September 2020 Debt for Equity Exchange, but the September 2020 Debt for Equity Exchange did not include the issuance of a warrant.

107. The Individual Defendants were fully apprised of the details of the February 2021 Debt for Equity Exchange, including the warrant issued in connection therewith. Enservco issued the warrant to Cross River Partners, an entity controlled and managed by Defendant Murphy and, according to CW2, Defendant Hargrave worked on the February 2021 Debt for Equity Exchange. Indeed, both Murphy and Hargrave executed the Note Conversion Agreement that set forth the terms of the exchange, including the issuance of the warrant to Cross River Partners, and both provided statements in the February 3, 2021 Press Release announcing the February 2021 Debt for Equity Exchange. Further, Defendant Murphy filed a Form 4 with the SEC on February 16, 2022 to report Cross River Partner's acquisition of the warrant issued in connection with the February 2021 Debt for Equity Exchange, and, one week later, filed a statement on Schedule 13D with the

SEC to report the change in Cross River Partner's beneficial holdings of Enservco stock as a result of its acquisition of, among other things, that same warrant.

108. In addition, the Company reevaluated the warrant issued in the February 2021 Debt for Equity Conversion in April 2021. On April 12, 2021, the SEC issued a staff statement entitled "Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies ('SPACs')." In this staff statement, the SEC explained that certain terms commonly found in SPAC warrants could require them to be classified as liabilities rather than equity, in which case the warrants would be subject to fair value adjustments during each reporting period. Although this staff statement focused on SPAC transactions, Enservco recognized that the same accounting considerations could apply to warrants issued by non-SPAC entities and performed an analysis on its ***entire population of warrants*** soon after the issuance of the staff statement.

109. Separately, during the second quarter of 2021, Enservco amended its previously filed tax returns for the third and fourth quarters of 2020 in order to claim a refund for ERCs available for wages paid during those periods. However, the Company claimed $304,000 in ERCs on those amended tax returns that it was not entitled to receive under the CARES Act due to the aggregation of eligible employees at the Company and its subsidiaries.

110. By this time, Enservco understood how to properly identify eligible wages for purposes of claiming ERCs and the positive impact they had on its financials. During the first quarter of 2021, Enservco claimed $223,000 in ERCs. Defendant Hargrave specifically acknowledged this on May 13, 2021, stating on a conference call that "we have begun receiving the Cares Act employee retention credits, totaled [sic] $223,000 through March 31, 2021." The quarterly report that Enservco filed on May 13, 2021, which was signed by the Individual

Defendants, also explained that the increase in other income that quarter was "due primarily to the recognition of CARES Act payroll tax credits during the first quarter of 2021" and the Company "expects the recognition of these . . . tax credits to continue during the second quarter of 2021."

111. The ERCs that Enservco claimed in its amended tax returns provided it with an outsized receivable against which net losses could be offset. Whereas the Company only claimed $223,000 in ERCs during the first quarter of 2021, it claimed ***$1.3 million*** in ERCs during the second quarter of 2021, over half of which were ERCs claimed on the amended tax returns.

### 3. The Company Files Quarterly Reports in 2021 That Fail to Properly Account for the February 2021 Debt for Equity Exchange or Its ERCs

112. Throughout 2021, Enservco filed quarterly reports on Form 10-Q with the SEC which publicly reported its financial condition. On May 13, 2021, Enservco filed its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q 2021 Form 10-Q"). On August 5, 2021, Enservco filed its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "2Q 2021 Form 10-Q"). On November 15, 2021, Enservco filed its 3Q 2021 Form 10-Q.

113. In the 1Q 2021 Form 10-Q, 2Q 2021 Form 10-Q, and 3Q Form 10-Q, Enservco affirmatively represented that financial statements contained therein were prepared in accordance with GAAP and the Individual Defendants affirmatively represented the information in each filing fairly presented the financial condition of the Company in all material respects.

114. In fact, the opposite was true. In the 1Q 2021 Form 10-Q, 2Q 2021 Form 10-Q, and 3Q Form 10-Q, Enservco failed to account for the value of the warrant issued to Cross River Partners in the February 2021 Debt for Equity Exchange in accordance with ASC 470 (the "Warrant Issuance Error") and/or recognized income on ERCs that it was ineligible to receive in

violation of ASC 450 (the "ERC Error") and, consequently, materially understated the Company's bottom line net loss and overstated its other income.

115. Indeed, the Individual Defendants fully understood the material impact of the ERCs that the Company claimed during the second quarter of 2021. The Company reported a 63% improvement in net losses for the second quarter of 2021, compared to the second quarter of 2020. On the corresponding investor call, held August 5, 2021, Defendant Murphy explained that the 63% improvement to the Company's "bottom line" was driven by three factors, including "the impact of the CARES Act tax credits." Later, on that same call, Defendant Hargrave explained that the "63% improvement over the net loss . . . was primarily attributed to three things," including "the booking of $1.3 million [in] CARES Act payroll tax credits into other income."

**4. Enservco Admits After Completing Its Refinancing That It Needs to Restate Its 2021 Quarterly Reports and Suffers Related Fallout**

116. On March 28, 2022, during pre-market hours, Enservco filed a current report on Form 8-K with the SEC announcing that the Company completed a refinancing transaction which terminated the 2017 Credit Facility with East West Bank and provided several new sources of financing with long-term maturities (the "March 28, 2022 Refinancing Form 8-K").

117. Moments after filing the March 28, 2022 Refinancing Form 8-K, Enservco filed another current report on Form 8-K with the SEC which disclosed that it needed to restate the financial statements previously reported in its Q1 2021 Form 10-Q, Q2 2021 Form 10-Q, and 3Q 2021 Form 10-Q to correct the Warrant Issuance Error and the ERC Error (the "March 28, 2022 Restatement Form 8-K"). The March 28, 2022 Restatement Form 8-K provided as follows:

> On March 22, 2022, Enservco . . . in consultation with the Audit Committee of its Board of Directors, concluded that the Company's previously issued condensed consolidated financial statements as of and for the quarters ended March 31, 2021,

June 30, 2021 and September 30, 2021 (collectively, the "Relevant Periods") should no longer be relied upon largely because of the Company's accounting for a conversion of debt to equity with a related party, in addition to misinterpretation of eligibility for certain employee retention tax credits under relevant provisions of the [CARES Act], as discussed below. The Company intends to amend its Quarterly Reports on Form 10-Q for the Relevant Periods to reflect restatements of its condensed consolidated financial statements for the Relevant Periods. . . .

*Employee Retention Tax Credits*

The errors in the condensed consolidated financial statements as of and for the quarters ended June 30, 2021 and September 30, 2021 relate to the Company's recognition of certain payroll tax credits ([ERCs]) under relevant provisions of the [CARES Act]. During the second quarter of 2021, the Company amended payroll tax returns originally filed for the third and fourth quarters of 2020 in order to claim refundable [ERCs] for those periods. Enservco reported such refundable [ERCs] as other receivables on each of its balance sheets for the quarters ended June 30, 2021 and September 30, 2021, and the amounts were reflected as other income in the Company's condensed consolidated statements of operations for the quarter ended June 30, 2021. . . [T]he Company has determined that it was not eligible for a portion of the [ERCs] due to the aggregation of eligible employees at the Company and its subsidiaries. As a result, the Company determined that it improperly recorded accounts receivable of approximately $304,000 during the quarter ended June 30, 2021 related to Employee Tax Credits to which it was not entitled, and recognized such amount in other income in the Company's condensed consolidated statements of operations for such quarter.

***

*Loss Attributable to Conversion of Subordinated Debt and Warrant Issuance*

On February 3, 2021, Cross River Partners, L.P., a related party, converted subordinated debt in the principal amount of $1.25 million and $62,000 in accrued interest into 601,674 shares of Company common stock. In connection with such conversion, the Company issued a warrant to Cross River Partners, L.P. to purchase up to 150,418 additional shares of Company common stock in the future at an exercise price of $2.507 per share. At the time, the Company did not record a loss on the debt conversion and recorded the transaction through equity . . . . The Company has since determined that the debt conversion in conjunction with the warrant issuance resulted in a loss of $304,000, which should have been reflected on the Company's consolidated statement of operations for the quarter ended March 31, 2021.

***

> [T]he Company has determined that these changes have a material impact on the as filed condensed consolidated financial statements for the Relevant Periods.

118. In a press release attached to the March 28, 2022 Restatement Form 8-K as Exhibit 99.1, Enservco expressly stated that "it applied for the [ERCs] based on third-party expert advice at the time and further based on management's understanding of the CARES Act . . . ."

119. On March 31, 2022, Enservco filed a Form 12b-25 with the SEC designated on the SEC's electronic filing system as Form NT 10-K (the "March 31, 2022 Form NT 10-K"), which disclosed that the Company was unable to file its 2021 Form 10-K by the deadline for doing so due to the need to restate its previously-issued financials. It stated as follows:

> On March 28, 2022, the [Company] announced that it would be restating its previously issued condensed consolidated financial statements as of and for the [Relevant Periods]. The [Company] is in the process of restating such financial statements and preparing amendments to its Quarterly Reports on Form 10-Q filings for the Relevant Periods, which must be completed prior to the completion and filing of the [Company]'s Annual Report on Form 10-K for the period ended December 31, 2021. As a result, such Annual Report on Form 10-K cannot be filed within the prescribed time period. Such Annual Report on Form 10-K will be filed on or before the 15th calendar day following the prescribed due date.

The March 31, 2022 Form NT 10-K also indicated that Enservco's "Form 10-K will be filed on or before the 15the calendar day following the prescribed due date."

120. On April 4, 2022, Enservco filed another current report on Form 8-K with the SEC (the "April 4, 2022 Form 8-K"), which disclosed that "Marjorie Hargrave, the President and Chief Financial Officer of Enservco . . . is departing the Company and will no longer be an executive officer and employee of the Company effective April 22, 2022." In addition, at or around the same time as Hargrave's departure, Enservco's PAO, Donovan Kelly, resigned, effective April 21, 2022.

121. On April 11, 2022, Enservco filed Amendment No. 1 to its 1Q 2021 Form 10-Q (the "1Q 2021 Form 10-Q/A"), Amendment No. 1 to its 2Q 2021 Form 10-Q (the "2Q 2021 Form

10-Q/A"), and Amendment No. 1 to its 3Q 2021 Form 10-Q (the "3Q 2021 Form 10-Q/A," and collectively, with the 1Q 2021 Form 10-Q/A and the 2Q 2021 Form 10-Q/A, the "First Restatement"), each of which restated the previously-issued financial statements included therein to correct the Warrant Issuance Error and/or ERC Error, as described more specifically below.

122. The 1Q 2021 Form 10-Q/A restated the interim financials included in the Q1 2021 Form 10-Q to correct for the Warrant Issuance Error. As stated therein, "[i]n accordance with Accounting Standards Codification ('ASC') 470-50, as well as guidance from a speech given by an SEC staff member at a 2010 AICPA conference, for debt extinguishments and conversions with related parties that meet certain criteria and give rise to a loss, an extinguishment loss should be recognized." With respect to the February 2021 Debt for Equity Exchange, the 1Q 2021 Form 10-Q/A provided that, because "the conversion of common stock was done for no gain or loss, the issuance of the warrant should have been accounted for as a loss equal to the warrant fair value at the date of issuance, or approximately $304,000." Accordingly, the 1Q 2021 Form 10-Q/A restated the financials reported in the 1Q 2021 Form 10-Q as follows:

| | **March 31, 2021** | | |
|---|---|---|---|
| **Condensed Consolidated Balance Sheet (in thousands)** | **As Previously Reported** | **Warrant Adjustments** | **As Restated** |
| **Liabilities / Stockholders' Equity** | | | |
| Stockholders' Equity | | | |
| Additional paid-in capital | 40,456 | 304 | 40,760 |
| Accumulated deficit | (29,702) | (304) | (30,006) |

| | **Three Months Ended March 31, 2021** | | |
|---|---|---|---|
| **Condensed Consolidated Statement of Operations (in thousands)** | **As Previously Reported** | **Warrant Adjustments** | **As Restated** |
| Other (expense) income | | | |
| Other (expense) income | 226 | (304) | (78) |
| Total other (expense) income | 193 | (304) | (111) |
| Loss from continuing operations before tax | (2,165) | (304) | (2,469) |

| | | | |
|---|---|---|---|
| Loss from continuing operations | (2,165) | (304) | (2,469) |
| Net loss | (2,173) | (304) | (2,477) |
| Loss from continuing operations per common share - basic and diluted | (0.24) | (0.03) | (0.27) |
| Net loss per share - basic and diluted | (0.24) | (0.03) | (0.27) |

123. The 2Q 2021 Form 10-Q/A restated the interim financials included in the Q2 2021 Form 10-Q to correct for the Warrant Issuance Error and the ERC Error. The 2Q 2021 Form 10-Q/A contained the same disclosures regarding the Warrant Issuance Error stated in ¶ 122. With respect to the ERC Error, the 2Q 2021 Form 10-Q/A stated that Enservco was not eligible to receive certain of the ERCs it claimed on the amended tax returns that it filed for the third and fourth quarters of 2020 during the second quarter of 2021 and, consequently, "the Company recognized other receivables and other income of approximately $304,000 in error." Accordingly, the 2Q 2021 Form 10-Q/A restated the financials reported in the 2Q 2021 Form 10-Q as follows:

| | **June 30, 2021** | | | |
|---|---|---|---|---|
| **Condensed Consolidated Balance Sheet (in thousands)** | **As Previously Reported** | **Warrant Adjustments** | **ERC Adjustments** | **As Restated** |
| **Assets** | | | | |
| Current Assets | | | | |
| Prepaid expenses and other current assets | 2,240 | - | (304) | 1,936 |
| Total current assets | 8,438 | - | (304) | 8,134 |
| TOTAL ASSETS | 30,652 | - | (304) | 30,348 |
| **Liabilities / Stockholders' Equity** | | | | |
| Stockholders' Equity | | | | |
| Additional paid-in capital | 40,481 | 304 | - | 40,785 |
| Accumulated deficit | (31,308) | (304) | (304) | (31,916) |
| Total stockholders' equity | 9,230 | | (304) | 8,926 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | 30,652 | | (304) | 30,348 |

| Consolidated Statement of Operations (in thousands) | Three Months Ended June 30, 2021<br>As Previously Reported | Warrant Adjustments | ERC Adjustments | As Restated |
|---|---|---|---|---|
| Other (expense) income | | | | |
| Other (expense) income | 1,361 | - | (304) | 1,057 |
| Total other (expense) income | 1,350 | - | (304) | 1,046 |
| Loss from continuing operations before taxes | (1,606) | - | (304) | (1,910) |
| Loss from continuing operations | (1,606) | - | (304) | (1,910) |
| Net loss | (1,606) | - | (304) | (1,910) |
| Loss from continuing operations per share - basic and diluted | (0.14) | - | (0.03) | (0.17) |
| Net loss per share - basic and diluted | (0.14) | - | (0.03) | (0.17) |

| Consolidated Statement of Operations (in thousands) | Six Months Ended June 30, 2021<br>As Previously Reported | Warrant Adjustments | ERC Adjustments | As Restated |
|---|---|---|---|---|
| Other (expense) income | | | | |
| Other (expense) income | 1,587 | (304) | (304) | 979 |
| Total other (expense) income | 1,543 | (304) | (304) | 935 |
| Loss from continuing operations before taxes | (3,771) | (304) | (304) | (4,379) |
| Loss from continuing operations | (3,771) | (304) | (304) | (4,379) |
| Net loss | (3,779) | (304) | (304) | (4,387) |
| Loss from continuing operations per share - basic and diluted | (0.37) | (0.03) | (0.03) | (0.43) |
| Net loss per share - basic and diluted | (0.37) | (0.03) | (0.03) | (0.43) |

124. The 3Q 2021 Form 10-Q/A restated the interim financials included in the Q3 2021 Form 10-Q to correct for the Warrant Issuance Error and the ERC Error. The 3Q 2021 Form 10-Q/A contained the same disclosures regarding the Warrant Issuance Error stated in ¶ 122 and the same disclosures regarding the ERC Error stated in ¶ 123. Accordingly, the 3Q 2021 Form 10-Q/A restated the financials reported in the 3Q 2021 Form 10-Q as follows:

| Condensed Consolidated Balance Sheet (in thousands) | September 30, 2021 | | | |
|---|---|---|---|---|
| | As Previously Reported | Warrant Adjustments | ERC Adjustments | As Restated |
| **Assets** | | | | |
| Current Assets | | | | |
| Prepaid expenses and other current assets | 2,456 | - | (304) | 2,154 |
| Total current assets | 7,306 | - | (304) | 7,002 |
| TOTAL ASSETS | 28,109 | - | (304) | 27,805 |
| **Liabilities / Stockholders' Equity** | | | | |
| Stockholders' Equity | | | | |
| Additional paid-in capital | 40,502 | 304 | - | 40,806 |
| Accumulated deficit | (31,485) | (304) | (304) | (32,093) |
| Total stockholders' equity | 9,074 | | (304) | 8,770 |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | 28,109 | | (304) | 27,805 |

| Consolidated Statement of Operations (in thousands) | Nine Months Ended September 30, 2021 | | | |
|---|---|---|---|---|
| | As Previously Reported | Warrant Adjustments | ERC Adjustments | As Restated |
| Other (expense) income | | | | |
| Other (expense) income | 4,267 | (304) | (304) | 3,668 |
| Total other (expense) income | 4,226 | (304) | (304) | 3,618 |
| Loss from continuing operations before taxes | (3,948) | (304) | (304) | (4,556) |
| Loss from continuing operations | (3,948) | (304) | (304) | (4,556) |
| Net loss | (3,956) | (304) | (304) | (4,564) |
| Loss from continuing operations per share - basic and diluted | (0.37) | (0.03) | (0.03) | (0.43) |
| Net loss per share - basic and diluted | (0.37) | (0.03) | (0.03) | (0.43) |

### D. Enservco Materially Misstated Its Financial Condition by Distorting Its DTA

#### 1. GAAP Requires the Recognition of a Valuation Allowance to Offset Any Part of a DTA That Will Not Be Realized

125. ASC 740, *Income Tax* ("ASC 740"), provides the relevant GAAP for income taxes. ASC 740-10-25-2 authorizes the recognition of a "deferred tax asset" for "estimated future tax effects attributable to temporary differences and carryforwards." A "carryforward" is defined as

"[d]eductions or credits that cannot be utilized on the tax return during a year that may be carried forward to reduce taxable income or taxes payable in a future year." One of the most common examples of a DTA is the carryforward of net operating losses, or NOLs. Generally speaking, businesses are allowed to use NOLs to offset taxable income in future years under IRC section 172. In that sense, the NOL is an "asset" for GAAP purposes in that it can provide future benefit.

126. However, GAAP recognizes that a DTA must be reduced by a "valuation allowance" if it becomes unlikely that it will be utilized. ASC-740-10-30-2 states that a DTA must be "reduced, if necessary, by the amount of any tax benefits that, based on available evidence, are not expected to be realized." Specifically, ASC 740-10-30-5 instructs entities to "[r]educe deferred tax assets by a valuation allowance if, based on the weight of available evidence, it is more likely than not (a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized" and further states that the "valuation allowance shall be sufficient to reduce the deferred tax asset to the amount that is more likely than not to be realized."

### 2. The February 2021 Equity Offering Triggered an Ownership Change That Limited the Realizability of Enservco's DTA Under Federal Law

127. As of the February 2021 Equity Offering, Enservco incurred net losses in a number of prior reporting periods. Indeed, as of December 31, 2021, the Company had approximately $28.2 million of net operating losses that it could carry forward for purposes of federal income taxes and, as such, reported a DTA attributable in large party to loss carryforwards.

128. The IRC contains provisions that can, under certain circumstances, limit the realizability of NOL carryforwards or other DTAs. Among other things, section 382 of the IRC limits the realizability of NOL carryforwards by entities that experience an "ownership change." Section 382 defines an "ownership change" as a 50% or greater change by an owner of 5% or more

of a company's stock following any change in the owners of 5% or more of the stock or any "equity structure shift," which includes recapitalizations and equity issuances.

129. Enservco experienced an "ownership change" within the meaning of section 382 following the issuance of 4,199,998 shares of common stock in the February 2021 Equity Offering.

130. The Individual Defendants were on notice that the issuance of stock could result in an "ownership change" under IRC section 382. Given its history of net losses, beginning in March 2018, the Company included the following risk disclosure in its annual report:

> Our ability to use our net operating loss carry forwards may be subject to limitation and may result in increased future tax liability.
>
> **Sections 382 and 383 of the Internal Revenue Code of 1986, as amended, or the Code, contain rules that limit the ability of a corporation that undergoes an "ownership change" to utilize its net operating loss carry forwards (NOLs)** and certain built-in losses recognized in years after the ownership change. **An 'ownership change' is generally defined as any change in ownership of more than 50% of a corporation's stock over a rolling three-year period by stockholders that own (directly or indirectly) 5% or more of the stock of the corporation, or *arising from a new issuance of stock by the corporation***. If an ownership change occurs, Section 382 generally imposes an annual limitation on the use of pre-ownership change net operating losses, or NOLs, credits and certain other tax attributes to offset taxable income earned after the ownership change. The annual limitation is equal to the product of the applicable long-term tax-exempt rate and the value of the corporation's stock immediately before the ownership change.

The same or substantially the same disclosure was included in each of the Company's following annual reports, including the 2019 Form 10-K, which was signed by the Individual Defendants. In fact, the Individual Defendants made this very same statement in the Registration Statements that were filed ***for the February 2021 Equity Offering***.

131. Even after finalizing the February 2021 Equity Offering, the Individual Defendants made the same or substantially the same disclosure in the Company's 2020 Form 10-K, filed March 23, 2021, over a month before the 1Q 2021 Form 10-Q was originally filed.

### 3. The Company Files Quarterly Reports in 2021 That Fail to Account for the Fact That Its DTA Became Limited

132. In the 1Q 2021 Form 10-Q, 2Q 2021 Form 10-Q, and 3Q Form 10-Q, Enservco affirmatively represented that financial statements contained therein were prepared in accordance with GAAP and the Individual Defendants affirmatively represented the information in each filing fairly presented the financial condition of the Company in all material respects.

133. This was not true. In the 1Q 2021 Form 10-Q, 2Q 2021 Form 10-Q, and 3Q Form 10-Q, Enservco did not reduce its DTA to reflect the fact that IRC section 382 prevented the Company from realizing up to $1.4 million of its DTA due to the "ownership change" it experienced as a result of the February 2021 Equity Offering (the "DTA Error") and, consequently, materially understated the Company's bottom line net loss.

134. On April 11, 2021, Enservco assured investors that following the First Restatement that the revised financial statements contained therein were prepared in accordance with GAAP and the Individual Defendants affirmatively represented the information in each restated filing fairly presented the financial condition of the Company in all material respects

135. This was, again, untrue. The 1Q 2021 Form 10-Q/A, 2Q 2021 Form 10-Q/A, and 3Q Form 10-Q/A continued to contain, and failed to correct, the DTA Error.

### 4. Enservco Admits After Filing the First Restatement That It Needs to Restate the Same Financials Again and Suffers Related Fallout

136. On April 18, 2022, just one week after filing the First Restatement, Enservco filed a current report on Form 8-K with the SEC (the "April 18, 2022 Form 8-K"), which disclosed that it needed to restate the financials from the First Restatement ***again*** to correct for yet another accounting error, and, as a result, it had to delay the filing of its 2021 Form 10-K ***again***:

> On April 14, 2022, Enservco . . . in consultation with the Audit Committee of its Board of Directors, concluded that the Company's previously issued condensed consolidated financial statements as of and for the quarters ended March 31, 2021, June 30, 2021 and September 30, 2021 (collectively, the "Relevant Periods") should no longer be relied upon due to the Company's utilization of certain deferred tax liabilities in 2021. The Company intends to amend its Quarterly Reports on Form 10-Q for the Relevant Periods to reflect restatements of its condensed consolidated financial statements for the Relevant Periods. . . . Because of such amendments to its Quarterly Reports on Form 10-Q, the Company will not be filing its Form 10-K for the fiscal year ended December 31, 2021 within the 15 day extension period provided by the Company's 12b-25 filing.

Unlike the March 28, 2022 Restatement Form 8-K, the April 18, 2022 Form 8-K did not provide any further details regarding the nature of the accounting error.

137. On May 24, 2022, Enservco filed Amendment No. 2 to its 1Q 2021 Form 10-Q (the "1Q 2021 Form 10-Q/2A"), Amendment No. 2 to its 2Q 2021 Form 10-Q (the "2Q 2021 Form 10-Q/2A"), and Amendment No. 2 to its 3Q 2021 Form 10-Q (the "3Q 2021 Form 10-Q/2A," and collectively, with the 1Q 2021 Form 10-Q/2A and the 2Q 2021 Form 10-Q/2A, the "Second Restatement"). Each filing included in the Second Restatement disclosed that "during the first quarter of 2021, the Company experienced a change in control pursuant to the issuance of 4,199,998 shares of common stock" and, as a result, "the realizability of the Company's deferred tax assets became limited" under IRC section 382. Accordingly, the 1Q 2021 Form 10-Q/2A, 2Q 2021 Form 10-Q/2A, and 3Q 2021 Form 10-Q/2A restated the already-restated interim financial statements included therein to correct for the DTA Error, as described more specifically below.

138. The 1Q 2021 Form 10-Q/2A stated that, "as of March 31, 2021, $1.4 million of deferred tax liabilities could reverse without an offsetting deferred tax asset" due to the limitation imposed by IRC section 382. As such, "[i]n accordance with Accounting Standards Codification ('ASC') 740 . . . the Company has determined that for the three months ended March 31, 2021 the

Company should have recognized deferred income tax expense through the recording of additional valuation allowance" in that amount. Accordingly, the 1Q 2021 Form 10-Q/2A restated the financials reported in the 1Q 2021 Form 10-Q/A as follows:

| | March 31, 2021 | | |
|---|---|---|---|
| **Condensed Consolidated Balance Sheet (in thousands)** | **As Previously Restated** | **DTA Adjustments** | **As Restated** |
| **Liabilities / Stockholders' Equity** | | | |
| Long-Term Liabilities | | | |
| Deferred tax liability, net | - | 1,425 | 1,425 |
| Total long-term liabilities | 17,955 | 1,425 | 19,380 |
| Total liabilities | 21,623 | 1,425 | 23,048 |
| Stockholders' Equity | | | |
| Accumulated deficit | (30,006) | (1,425) | (31,431) |
| Total stockholders' equity | 10,811 | (1,425) | 9,386 |

| | Three Months Ended March 31, 2021 | | |
|---|---|---|---|
| **Condensed Consolidated Statement of Operations (in thousands)** | **As Previously Restated** | **DTA Adjustments** | **As Restated** |
| Deferred income tax expense | - | | (1,425) |
| Loss from continuing operations | (2,469) | (1,425) | (3,894) |
| Net loss | (2,477) | (1,425) | (3,902) |
| Loss from continuing operations per common share - basic and diluted | (0.27) | (0.15) | (0.42) |
| Net loss per share - basic and diluted | (0.27) | (0.15) | (0.42) |

139. The 2Q 2021 Form 10-Q/2A explained that, after accounting for other offsets available in the quarter ended June 30, 2021, "as of June 30, 2021, $0.9 million of deferred tax liabilities could reverse without an offsetting deferred tax asset" due to the limitation imposed by IRC section 382. As such, "[i]n accordance with Accounting Standards Codification ('ASC') 740 . . . the Company has determined that for the three months ended June 30, 2021 the Company should have recognized deferred income tax benefit through a partial release of the Company's valuation allowance" reflecting the difference between $0.9 million and $1.4 million "as well as recognizing deferred income tax expense . . . through the recording of additional valuation

allowance" for sixth months ended June 30, 2021. Accordingly, the 2Q 2021 Form 10-Q/2A restated the financials reported in the 2Q 2021 Form 10-Q/A as follows:

| | June 30, 2021 | | |
|---|---|---|---|
| **Condensed Consolidated Balance Sheet (in thousands)** | **As Previously Restated** | **DTA Adjustments** | **As Restated** |
| **Liabilities / Stockholders' Equity** | | | |
| Long-Term Liabilities | | | |
| Deferred tax liability, net | - | 948 | 948 |
| Total long-term liabilities | 17,205 | 948 | 18,153 |
| Total liabilities | 21,422 | 948 | 22,370 |
| Stockholders' Equity | | | |
| Accumulated deficit | (31,916) | (948) | (32,864) |
| Total stockholders' equity | 8,926 | (948) | 7,978 |

| | Three Months Ended June 30, 2021 | | |
|---|---|---|---|
| **Condensed Consolidated Statement of Operations (in thousands)** | **As Previously Restated** | **DTA Adjustments** | **As Restated** |
| Deferred income tax benefit | - | 477 | 477 |
| Loss from continuing operations | (1,910) | 477 | (1,433) |
| Net loss | (1,910) | 477 | (1,433) |
| Loss from continuing operations per common share - basic and diluted | (0.17) | 0.04 | (0.13) |
| Net loss per share - basic and diluted | (0.17) | 0.04 | (0.13) |

| | Six Months Ended June 30, 2021 | | |
|---|---|---|---|
| **Condensed Consolidated Statement of Operations (in thousands)** | **As Previously Restated** | **DTA Adjustments** | **As Restated** |
| Deferred income tax expense | - | (948) | (948) |
| Loss from continuing operations | (4,379) | (948) | (5,327) |
| Net loss | (4,387) | (948) | (5,335) |
| Loss from continuing operations per common share - basic and diluted | (0.43) | (0.09) | (0.52) |
| Net loss per share - basic and diluted | (0.43) | (0.09) | (0.52) |

140. The 3Q 2021 Form 10-Q/2A explained that, after accounting for other offsets available in the quarter ended September 30, 2021, "as of September 30, 2021, $0.4 million of deferred tax liabilities could reverse without an offsetting deferred tax asset" due to the limitation

imposed by IRC section 382. As such, "[i]n accordance with Accounting Standards Codification ('ASC') 740 . . . the Company has determined that for the three months ended September 30, 2021 the Company should have recognized deferred income tax benefit through a partial release of the Company's valuation allowance" reflecting the difference between $0.4 million and $0.9 million "as well as recognizing deferred income tax expense . . . through the recording of additional valuation allowance" for the nine months ended September 30, 2021. Accordingly, the 3Q 2021 Form 10-Q/2A restated the financials reported in the 3Q 2021 Form 10-Q/A as follows:

| | **September 30, 2021** | | |
|---|---|---|---|
| **Condensed Consolidated Balance Sheet (in thousands)** | **As Previously Restated** | **DTA Adjustments** | **As Restated** |
| **Liabilities / Stockholders' Equity** | | | |
| Long-Term Liabilities | | | |
| Deferred tax liability, net | - | 402 | 402 |
| Total long-term liabilities | 14,542 | 402 | 14,944 |
| Total liabilities | 19,035 | 402 | 19,437 |
| Stockholders' Equity | | | |
| Accumulated deficit | (32,093) | (402) | (32,495) |
| Total stockholders' equity | 8,770 | (402) | 8,368 |

| | **Three Months Ended September 30, 2021** | | |
|---|---|---|---|
| **Condensed Consolidated Statement of Operations (in thousands)** | **As Previously Restated** | **DTA Adjustments** | **As Restated** |
| Deferred income tax benefit | - | 546 | 546 |
| Loss from continuing operations | (177) | 546 | 369 |
| Net loss | (177) | 546 | 369 |
| Loss from continuing operations per common share - basic and diluted | (0.02) | 0.05 | 0.03 |
| Net loss per share - basic and diluted | (0.02) | 0.05 | 0.03 |

| | **Nine Months Ended September 30, 2021** | | |
|---|---|---|---|
| **Condensed Consolidated Statement of Operations (in thousands)** | **As Previously Restated** | **DTA Adjustments** | **As Restated** |
| Deferred income tax expense | - | (402) | (402) |
| Loss from continuing operations | (4,556) | (402) | (4,958) |
| Net loss | (4,564) | (402) | (4,966) |

| | | | |
|---|---|---|---|
| Loss from continuing operations per common share - basic and diluted | (0.43) | (0.03) | (0.46) |
| Net loss per share - basic and diluted | (0.43) | (0.03) | (0.46) |

141. Finally, on September 1, 2022, Enservco filed a current report on Form 8-K with the SEC (the "September 1, 2022 Form 8-K") announcing that, on August 26, 2022, it fired its long-time auditor, Plante & Moran PLLC ("Plante") and, "based on management's recommendation," hired Pannell Kerr Forster of Texas, P.C., effective immediately.

## E. Enservco Misrepresented the Effectiveness of Its Disclosure Controls

### 1. The Individual Defendants Refuse to Remediate Known Weakness In Enservco's Accounting Department

142. Prior to and during the Class Period, Enservco's accounting department was thinly staffed. CW1 noted that when Defendant Hargrave started in July 2019, the accounting department was down from approximately eight people to six people. Of those six, only three had a bachelor's degree in accounting, including CW1. CW2 also observed that the accounting department was "stretched thin" beginning in 2020. CW2 highlighted that the Company was short on staff accountants, adding "it's not like we had four or five accountants." When CW2 left the Company in August 2021, the accounting department was staffed by four full-time employees and an intern.

143. As noted by CW5, Enservco interviewed two candidates for the CFO role in mid-2019, including Defendant Hargrave. CW5 explained that the other candidate was a CPA with a background in accounting, and Hargrave had a background in banking. CW5 was part of the hiring discussions and pushed for the other candidate, but the Board decided to hire Defendant Hargrave.

144. According to CW1, when Hargrave started, she quickly realized that the accounting department was unable to handle a significant amount of work. CW1 explained that Defendant Hargrave had to "step in" and do substantive work herself. As CW1 put it, "she had to get involved

. . . because there was no one else to do it." For example, CW1 recalled that one of the tasks which Hargrave took on was completing the daily cash report. According to CW1, this was a "complex, tedious process" which took five to six hours every day. CW3 also expressed the view that, after Defendant Hargrave was hired, she involved herself in the day-to-day operations of the accounting department, stating "she took over accounting . . . she took that by the wheel."

145. However, multiple CWs from Enservco's accounting department shared the view that Defendant Hargrave did not have a firm grasp on accounting. CW1 stated that "her expertise was not in doing the nitty gritty accounting work." CW2 also felt that Defendant Hargrave did not know accounting very well. Similarly, CW4 indicated that accounting was not Defendant Hargrave's strongest asset, noting "she didn't really have that accounting knowledge" and "I think she had a hard time understanding accounting sometimes." CW4 stated that others in accounting had the same experience with Defendant Hargrave. For example, CW5 specified that Defendant Hargrave had "a banking background" and "[h]er skill set was not day-to-day accounting."

146. CW1 thought that Defendant Hargrave might have alerted Defendant Murphy to the fact that she needed additional help to complete complex accounting items.

147. Despite needing additional staffing and expertise in the accounting department, the Company refused to hire new employees. CW1 stated that, after Hargrave started, the Company was not hiring for new positions or replacing staff who left. CW2 agreed that when employees left the accounting department, the Company often did not replace them. For example, after CW1 left the Company, CW1 learned that another employee from the accounting department took on CW1's responsibility for preparing the schedules and footnotes in Enservco's Form 10-Qs and Form 10-Ks, despite not having any background in that highly technical work. In fact, CW4

confirmed that, when CW1 left, the Company did not hire anyone else for that position. Similarly, CW2 was promoted when her supervisor left but no one was hired to fill CW2's old role.

148. It is reasonable to infer that the staffing issues within Enservco's accounting department persisted throughout the Class Period. By the time CW2 left in August 2021, the accounting department was down to four full-time employees. In addition, on August 12, 2022, Enservco filed a Form 12b-25 with the SEC (the "August 12, 2022 Form 12b-25") signed by Defendant Murphy providing notice that Enservco was unable to file its quarterly report on Form 10-Q for the period ended June 30, 2022 by the prescribed deadline. The August 12, 2022 Form 12b-25 solely attributed the inability to file on time to "internal and external staffing issues."

### 2. The Individual Defendants Repeatedly Misrepresent the Effectiveness of Enservco's Disclosure Controls In Its Quarterly Reports in 2021

149. In the 1Q 2021 Form 10-Q, 2Q 2021 Form 10-Q, and 3Q Form 10-Q, Enservco affirmatively represented that its disclosure controls and procedures were effective based on an evaluation performed by the Individual Defendants and attached certifications by each declaring that they had designed effective disclosure controls and procedures.

150. This was not true. For each period covered by the 1Q 2021 Form 10-Q, 2Q 2021 Form 10-Q, and 3Q Form 10-Q, there was a material weakness in Enservco's ICFR related to its accounting for complex financial instruments and income taxes, particularly with regard to the segregation of duties, and, as a result, it lacked effective disclosure controls and procedures.

151. Following the First Restatement, Enservco informed investors that there was a material weakness "as a result of" the Warrant Issuance Error and/or the ERC Error and, as a result, the Company's disclosure controls and procedures were ineffective solely "due to" that weakness.

152. This too was materially misleading. The Company failed to disclose, as it ultimately did in the Second Restatement, that for each period in question there was a material weakness in Enservco's ICFR related to its accounting for income taxes, and, as a result, it lacked effective disclosure controls and procedures due that weakness as well.

### 3. Enservco Is Forced To Admit That It Lacked Effective Controls and Procedures Throughout 2021

153. In the filings that comprised the First Restatement, Enservco disclosed that, in light of the Warrant Issuance Error and/or ERC Error, "our management concluded that . . . there was a material weakness in our internal control over financial reporting related to our accounting for complex financial instruments" as of March 31, 2021, June 30, 2021, and September 30, 2021. For purposes of the foregoing admission, Enservco defined a "material weakness" as "a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the financial statements will not be prevented or detected and corrected on a timely basis." Accordingly, the filings that comprised the First Restatement further explained that the Individual Defendants had concluded that "our disclosure controls and procedures were not effective to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms" due to the material weakness related to the Warrant Issuance and ERC Error.

154. In the filings that comprised the Second Restatement, Enservco further disclosed that, in light of the DTA Error, "our management concluded that there was a material weakness in our internal control over financial reporting . . . related to our accounting for complex financial instruments and our accounting for income taxes" as of March 31, 2021, June 30, 2021, and

September 30, 2021. For purposes of the foregoing admission, Enservco defined a "material weakness" in the same manner as set forth in ¶ 153. Accordingly, the filings that comprised the Second Restatement further explained that the Individual Defendants had concluded that "our disclosure controls and procedures were not effective to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms" due to the material weakness related to the DTA Error.

155. Finally, in connection with dismissing Enservco's external auditor, the September 1, 2022 Form 8-K further revealed that "there were no 'reportable events' as defined under Item 304(a)(1)(v) of Regulation S-K ***except with respect to the material weakness in internal controls in that the Company has not properly segregated duties as one or two individuals initiate, authorize, and complete certain transactions***." That filing continued by stating that "***[t]his material weakness resulted in the [Warrant Issuance Error], the [ERC Error], and the [DTA Error], which resulted in restatements of the Company's consolidated financial statements for the quarterly and year-to-date periods ended March 31, June 30, and September 30, 2021***."

## VIII. THE MATERIALLY FALSE AND MISLEADING STATEMENTS

### A. The 2020 Form 10-K

156. The Class Period begins on March 23, 2021, when Enservco filed its 2020 Form 10-K with the SEC. The 2020 Form 10-K was signed by each of the Individual Defendants.

157. In the 2020 Form 10-K, Enservco identified a variety of risk factors which "could materially affect the Company and its current business operations and activities" in the event they "actually occur," including the following:

> ***Our ability to use our net operating loss carry forwards may be subject to limitation and may result in increased future tax liability.***
>
> Sections 382 and 383 of the Internal Revenue Code of 1986, as amended, or the Code, contain rules that limit the ability of a corporation that undergoes an "ownership change" to utilize its net operating loss carry forwards ("NOLs") and certain built-in losses recognized in years after the ownership change. An "ownership change" is generally defined as any change in ownership of more than 50% of a corporation's stock over a rolling three-year period by stockholders that own (directly or indirectly) 5% or more of the stock of the corporation, or arising from a new issuance of stock by the corporation. If an ownership change occurs, Section 382 generally imposes an annual limitation on the use of pre-ownership change net operating losses, or NOLs, credits and certain other tax attributes to offset taxable income earned after the ownership change. The annual limitation is equal to the product of the applicable long-term tax-exempt rate and the value of the corporation's stock immediately before the ownership change. This annual limitation may be adjusted to reflect any unused annual limitation for prior years and certain recognized built-in gains for the year. In addition, Section 383 generally limits the amount of tax liability in any post-ownership change year that can be reduced by pre-ownership change tax credit carryforwards. ***If we were to experience an "ownership change," this could result in increased U.S. federal income tax liability for us if we generate taxable income after the ownership change. Limitations on the use of NOLs and other tax attributes could also increase our state tax liabilities.*** The use of our tax attributes will also be limited to the extent that we do not generate positive taxable income in future tax periods. As a result of these limitations, we may be unable to offset future taxable income, if any, with NOLs before such NOLs expire. Accordingly, these limitations may increase our federal and state income tax liabilities.

158. The statements referenced in ¶ 157 were materially false and misleading because they created the false impression that Enservco had not yet experienced an "ownership change" for purposes of IRC section 382 at the time the statement was made. In truth, and as the Company ultimately admitted in the Second Restatement, it experienced an "ownership change" for purposes of IRC section 382 by no later than February 11, 2021 as a result of the February 2021 Equity Offering, which limited the realizability of $1,425,000 of the Company's DTA.

159. With respect to the Company's liquidity, the 2020 Form 10-K stated as follows:

> We have accomplished several capitalization initiatives in the past year that have positioned us into a much more favorable liquidity situation. We successfully completed two equity offerings during late 2020 and early 2021 that provided net proceeds of $12.5 million. Additionally, we entered into two amendments during the in late [sic] third quarter 2020 and the first quarter of 2021 that provided us with significant relief under our Credit Facility, including a $16.0 million principal reduction, and two extensions of the debt which now matures on October 15, 2022. . . . . ***Due to the funding from the two equity offerings and the restructuring and further extension of the Credit Facility, we have ample capital resources to fund operational requirements beyond the next twelve months***.

160. The statements referenced in ¶ 159 were materially false and misleading because, at the time they were made, Enservco's capital resources were insufficient to fund its operational requirements through March 23, 2022, much less beyond March 23, 2022. As described above, and as the Company admitted in its 2021 Form 10-K, Enservco was unable to borrow under its $1 million revolving line of credit during the quarter ended December 31, 2021, which depleted nearly its entire cash balance by December 31, 2021, and forced the Company to seek alternative sources of financing between January and March 2022 to fund its operations, including several cash loans.

**B. <u>The 1Q 2021 Form 10-Q</u>**

161. On May 13, 2021, Enservco filed it 1Q 2021 Form 10-Q. The 1Q 2021 Form 10-Q was signed by the Individual Defendants.

162. In the 1Q 2021 Form 10-Q, Enservco represented that "***[t]he accompanying unaudited condensed consolidated financial statements were prepared in accordance with generally accepted accounting principles in the United States of America ('GAAP')***," including, among others, FASCON 8, meaning they were complete and free from error.

163. The 1Q 2021 Form 10-Q included financials statements that reported the unadjusted items set forth in ¶ 122.

164. In addition, the 1Q 2021 Form 10-Q stated as follows:

> ***Net loss for the three months ended March 31, 2021, was approximately $2.2 million or $0.24 per share***, compared to a net loss of approximately $2.8 million, or $0.77 per share, in the same period last year due to the factors noted above.
>
> * * *
>
> ***Other income for the three months ended March 31, 2021 was approximately $226,000***, compared to other income of approximately $20,000 for the three months ended March 31, 2020, respectively. This increase in other income was due primarily to the recognition of CARES Act payroll tax credits during the first quarter of 2021. The Company expects the recognition of these CARES Act payroll tax credits to continue during the second quarter of 2021.

165. The 1Q 2021 Form 10-Q attached a certification by Individual Defendants pursuant to 18 U.S.C. § 1350, adopted in accordance with Section 906 of SOX, wherein each stated:

> 1. ***The [1Q 2021 Form 10-Q] complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934***; and
>
> 2. ***The information contained in the [1Q 2021 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company***.

166. The statements referenced in ¶¶ 162-165 were materially false and misleading because, at the time they were made, and as the Company ultimately admitted in the March 28, 2022 Restatement Form 8-K, the First Restatement, the April 18, 2022 Form 8-K, and the Second Restatement, (i) Enservco did not recognize a loss on the warrant issued to Cross River Partners in connection with the February 2021 Debt for Equity Exchange in accordance with ASC 470; (ii) Enservco could no longer realize $1,425,000 of its DTA under the IRC following the February 2021 Equity Offering in violation of ASC 740; (iii) as a result of the foregoing errors, Enservco misrepresented or otherwise omitted numerous items in the financial statements reported in the 1Q 2021 Form 10-Q, as set forth in ¶¶ 122, 138; (iv) the adjustments necessary to correct the foregoing errors materially impacted the financial statements in the 1Q 2021 Form 10-Q and, consequently,

required a full restatement of those financials; and (v) accordingly, the financial statements from the 1Q 2021 Form 10-Q failed to comply with GAAP.

167. With respect to Enservco's disclosure controls and procedures and ICFR, the 1Q 2021 stated as follows:

> We carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) or 15d-15(e) promulgated under the Exchange Act, as of March 31, 2021. This evaluation was carried out under the supervision and with the participation of our Chief Executive Officer (our principal executive officer) and our Chief Financial Officer (our principal financial officer). Based on that evaluation, ***our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of March 31, 2021***.

168. Indeed, the 1Q 2021 Form 10-Q appended signed certifications from Defendants Murphy and Hargrave required by Section 302 of SOX, which provided:

> The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a) ***designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;
>
> b) ***designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;***
>
> c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal

> quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

169. The statements referenced in ¶¶ 167-168 were materially false and misleading because, at the time they were made, and as the Company ultimately admitted in the First Restatement and the Second Restatement, (i) there was a material weakness in Enservco's ICFR as of March 31, 2021 related to its accounting for complex financial instruments and income taxes; and (ii) as a result, Enservco lacked effective disclosure controls and procedures, as such term is defined under Rule 13a-15(e) or 15d-15(e) of the Exchange Act, as of March 31, 2021.

170. In addition, the 1Q 2021 Form 10-Q expressly stated that all of the "risk factors set forth in the Company's annual report on Form 10-K for the year ended December 31, 2020, filed on March 23, 2021" were "incorporated herein by reference," including the following:

> ***Our ability to use our net operating loss carry forwards may be subject to limitation and may result in increased future tax liability.***
>
> Sections 382 and 383 of the Internal Revenue Code of 1986, as amended, or the Code, contain rules that limit the ability of a corporation that undergoes an "ownership change" to utilize its net operating loss carry forwards ("NOLs") and certain built-in losses recognized in years after the ownership change. An "ownership change" is generally defined as any change in ownership of more than 50% of a corporation's stock over a rolling three-year period by stockholders that own (directly or indirectly) 5% or more of the stock of the corporation, or arising from a new issuance of stock by the corporation. If an ownership change occurs, Section 382 generally imposes an annual limitation on the use of pre-ownership change net operating losses, or NOLs, credits and certain other tax attributes to offset taxable income earned after the ownership change. The annual limitation is equal to the product of the applicable long-term tax-exempt rate and the value of the corporation's stock immediately before the ownership change. This annual limitation may be adjusted to reflect any unused annual limitation for prior years and certain recognized built-in gains for the year. In addition, Section 383 generally limits the amount of tax liability in any post-ownership change year that can be reduced by pre-ownership change tax credit carryforwards. ***If we were to experience an "ownership change," this could result in increased U.S. federal income tax liability for us if we generate taxable income after the ownership change. Limitations on the use of NOLs and other tax attributes could also***

> ***increase our state tax liabilities.*** The use of our tax attributes will also be limited to the extent that we do not generate positive taxable income in future tax periods. As a result of these limitations, we may be unable to offset future taxable income, if any, with NOLs before such NOLs expire. Accordingly, these limitations may increase our federal and state income tax liabilities.

171. The statements referenced in ¶ 170 were materially false and misleading because they created the false impression that Enservco had not yet experienced an "ownership change" for purposes of IRC section 382 at the time the statement was made. In truth, and as the Company ultimately admitted in the Second Restatement, it experienced an "ownership change" for purposes of IRC section 382 by no later than February 11, 2021 as a result of the February 2021 Equity Offering, which limited the realizability of $1,425,000 of the Company's DTA.

172. Finally, the 1Q 2021 Form 10-Q continued to assure investors that the Company had ample liquidity beyond the period reported in the 2020 Form 10-K:

> We have accomplished several capitalization initiatives in the past year that have positioned us into a much more favorable liquidity situation. We successfully completed two equity offerings during late 2020 and early 2021 that provided aggregate net proceeds of $12.3 million. Additionally, we entered into two amendments to our Credit Facility during the third quarter of 2020 and the first quarter of 2021 that provided us with significant relief under our Credit Facility, including a $16.0 million principal reduction, and two extensions of the debt which now matures on October 15, 2022. . . . ***Due to the funding from the two equity offerings and the restructuring and further extension of the Credit Facility, we have ample capital resources to fund operational requirements beyond the next twelve months***.

173. The statements referenced in ¶ 172 were materially false and misleading because, at the time they were made, Enservco's capital resources were insufficient to fund its operational requirements through May 13, 2022, much less beyond May 13, 2022. As described above, and as the Company admitted in its 2021 Form 10-K, Enservco was unable to borrow under its $1 million revolving line of credit during the quarter ended December 31, 2021, which depleted nearly

its entire cash balance by December 31, 2021, and forced the Company to seek alternative sources of financing between January and March 2022 to fund its operations, including several cash loans.

### C. The 1Q 2021 Press Release

174. At or around the same time that the 1Q 2021 Form 10-Q was filed with the SEC, Enservco also issued a press release announcing its results for the quarter ended March 31, 2021 (the "1Q 2021 Press Release"). In that press release, the Company reported that "***[n]et loss in the first quarter was $2.2 million, or $0.24 per diluted share***, a 23% reduction from the net loss of $2.8 million, or $0.77 per diluted share, in the same quarter last year." Further, the 1Q 2021 Press Release stated "***[n]et loss improved to $2.2 million from $2.8 million.***"

175. In addition, the 1Q 2021 Press Release reproduced the financials statements from the 1Q 2021 Form 10-Q which reported the unadjusted items set forth in ¶ 122.

176. The statements referenced in ¶¶ 174-175 were materially false and misleading because, at the time they were made, and as the Company ultimately admitted in the March 28, 2022 Restatement Form 8-K, the First Restatement, the April 18, 2022 Form 8-K, and the Second Restatement, (i) Enservco did not recognize a loss on the warrant issued to Cross River Partners in connection with the February 2021 Debt for Equity Exchange in accordance with ASC 470; (ii) Enservco could no longer realize $1,425,000 of its DTA under the IRC following the February 2021 Equity Offering in violation of ASC 740; (iii) as a result of the foregoing errors, Enservco misrepresented or otherwise omitted numerous items in the financial statements reported in the 1Q 2021 Form 10-Q, as set forth in ¶¶ 122, 138; and (iv) the adjustments necessary to correct the foregoing errors materially impacted the financial statements in the 1Q 2021 Form 10-Q and, consequently, required a full restatement of those financials.

**D. The 2Q 2021 Form 10-Q**

177. On August 5, 2021, Enservco filed its 2Q 2021 Form 10-Q. The 2Q 2021 Form 10-Q was signed by the Individual Defendants.

178. In the 2Q 2021 Form 10-Q, Enservco represented that "***[t]he accompanying unaudited condensed consolidated financial statements were prepared in accordance with generally accepted accounting principles in the United States of America ('GAAP')***," including, among others, FASCON 8, meaning they were complete and free from error.

179. The 2Q 2021 Form 10-Q included financials statements that reported the unadjusted items set forth in ¶ 123.

180. In addition, the 2Q 2021 Form 10-Q stated as follows:

> ***Net loss for the three months ended June 30, 2021 was approximately $1.6 million or $0.14 per share***, compared to a net loss of approximately $4.4 million, or $1.18 per share, in the same period last year. ***Net loss for the six months ended June 30, 2021 was approximately $3.8 million or $0.37 per share***, compared to a net loss of approximately $7.2 million, or $1.95 per share, in the same period last year due to the factors noted above.
>
> * * *
>
> ***Other income for the three months ended June 30, 2021 was approximately $1.4 million***, compared to other income of approximately $76,000 for the three months ended June 30, 2020, respectively. ***Other income for the six months ended June 30, 2021 was approximately $1.6 million***, compared to other income of approximately $96,000 for the three months ended June 30, 2020, respectively. ***These increases in other income were due primarily to the recognition of Employee Retention Credits during the first two quarters of 2021***. The Company expects to continue receiving the Employee Retention Credits throughout the remainder of 2021 pursuant to the extension of the program to December 31, 2021, through the American Rescue Plan Act.

181. Disclosures in the 2Q 2021 Form 10-Q also indicated that Enservco was eligible to receive approximately $1.2 million for ERCs it claimed during the quarter ended June 30, 2021:

> ***During the second quarter of 2021, the Company amended payroll tax returns originally filed for the third and fourth quarters of 2020 in order to claim refundable Employee Retention Credits for those periods. For the three and six months ended June 30, 2021, the Company recorded $1.3 million and $1.5 million, respectively***.

182. The 2Q 2021 Form 10-Q attached a certification by Individual Defendants pursuant to 18 U.S.C. § 1350, adopted in accordance with Section 906 of SOX, wherein each stated:

> 1. ***The [2Q 2021 Form 10-Q] complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934***; and
>
> 2. ***The information contained in the [2Q 2021 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company***.

183. The statements referenced in ¶¶ 178-182 were materially false and misleading because, at the time they were made, and as the Company ultimately admitted in the March 28, 2022 Restatement Form 8-K, the First Restatement, the April 18, 2022 Form 8-K, and the Second Restatement, (i) Enservco did not recognize a loss on the warrant issued to Cross River Partners in connection with the February 2021 Debt for Equity Exchange in accordance with ASC 470; (ii) Enservco could no longer realize $1,425,000 of its DTA under the IRC following the February 2021 Equity Offering in violation of ASC 740; (iii) Enservco recognized income for $304,000 in ERCs during the quarter ended June 30, 2021 that it was ineligible to receive in violation of ASC 450; (iv) as a result of the foregoing errors, Enservco misrepresented or otherwise omitted numerous items in the financial statements reported in the 2Q 2021 Form 10-Q, as set forth in ¶¶ 123, 139; (v) the adjustments necessary to correct the foregoing errors materially impact the financial statements in the 2Q 2021 Form 10-Q and, consequently, required a full restatement of those financials; and (vi) accordingly, the financial statements from the 2Q 2021 Form 10-Q failed to comply with GAAP.

184. With respect to Enservco's disclosure controls and procedures and ICFR, the 2Q 2021 Form 10-Q stated as follows:

> We carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) or 15d-15(e) promulgated under the Exchange Act, as of June 30, 2021. This evaluation was carried out under the supervision and with the participation of our Chief Executive Officer (our principal executive officer) and our Chief Financial Officer (our principal financial officer). Based on that evaluation, ***our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of June 30, 2021***.

185. Indeed, the 1Q 2021 Form 10-Q appended signed certifications from Defendants Murphy and Hargrave required by Section 302 of SOX, which provided:

> The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a) ***designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;
>
> b) ***designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;***
>
> c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

186. The statements referenced in ¶¶ 184-185 were materially false and misleading because, at the time they were made, and as the Company ultimately admitted in the First Restatement and the Second Restatement, (i) there was a material weakness in Enservco's ICFR as of June 30, 2021, related to its accounting for complex financial instruments and income taxes; and (ii) as a result, Enservco lacked effective disclosure controls and procedures, as such term is defined under Rule 13a-15(e) or 15d-15(e) of the Exchange Act, as of June 30, 2021.

187. In addition, the 2Q 2021 Form 10-Q expressly stated that all of the "risk factors set forth in the Company's annual report on Form 10-K for the year ended December 31, 2020, filed on March 23, 2021" were "incorporated herein by reference," including the following:

> ***Our ability to use our net operating loss carry forwards may be subject to limitation and may result in increased future tax liability.***
>
> Sections 382 and 383 of the Internal Revenue Code of 1986, as amended, or the Code, contain rules that limit the ability of a corporation that undergoes an "ownership change" to utilize its net operating loss carry forwards ("NOLs") and certain built-in losses recognized in years after the ownership change. An "ownership change" is generally defined as any change in ownership of more than 50% of a corporation's stock over a rolling three-year period by stockholders that own (directly or indirectly) 5% or more of the stock of the corporation, or arising from a new issuance of stock by the corporation. If an ownership change occurs, Section 382 generally imposes an annual limitation on the use of pre-ownership change net operating losses, or NOLs, credits and certain other tax attributes to offset taxable income earned after the ownership change. The annual limitation is equal to the product of the applicable long-term tax-exempt rate and the value of the corporation's stock immediately before the ownership change. This annual limitation may be adjusted to reflect any unused annual limitation for prior years and certain recognized built-in gains for the year. In addition, Section 383 generally limits the amount of tax liability in any post-ownership change year that can be reduced by pre-ownership change tax credit carryforwards. ***If we were to experience an "ownership change," this could result in increased U.S. federal income tax liability for us if we generate taxable income after the ownership change. Limitations on the use of NOLs and other tax attributes could also increase our state tax liabilities.*** The use of our tax attributes will also be limited to the extent that we do not generate positive taxable income in future tax periods. As a result of these limitations, we may be unable to offset future taxable income,

> if any, with NOLs before such NOLs expire. Accordingly, these limitations may increase our federal and state income tax liabilities.

188. The statements referenced in ¶ 187 were materially false and misleading because they created the false impression that Enservco had not yet experienced an "ownership change" for purposes of IRC section 382 at the time the statement was made. In truth, and as the Company ultimately admitted in the Second Restatement, it experienced an "ownership change" for purposes of IRC section 382 by no later than February 11, 2021 as a result of the February 2021 Equity Offering, which limited the realizability of $1,425,000 of the Company's DTA.

189. Finally, the 2Q 2021 Form 10-Q continued to assure investors that the Company had ample liquidity beyond the period reported in the 2020 Form 10-K and the 1Q 2021 Form 10-Q. Specifically, the 2Q 2021 Form 10-Q stated as follows:

> We have accomplished several capitalization initiatives in the past year that have positioned us into a much more favorable liquidity situation. We successfully completed two equity offerings during late 2020 and early 2021 that provided aggregate net proceeds of $12.3 million. Additionally, we entered into two amendments to our Credit Facility during the third quarter of 2020 and the first quarter of 2021 that provided us with significant relief under our Credit Facility, including a $16.0 million principal reduction, and two extensions of the debt which now matures on October 15, 2022. . . . ***Due to the funding from the two equity offerings and the restructuring and further extension of the Credit Facility, we have ample capital resources to fund operational requirements beyond the next twelve months***.

190. The statements referenced in ¶ 189 were materially false and misleading because, at the time they were made, Enservco's capital resources were insufficient to fund its operational requirements through August 5, 2022, much less beyond August 5, 2022. As described above, and as the Company admitted in its 2021 Form 10-K, Enservco was unable to borrow under its $1 million revolving line of credit during the quarter ended December 31, 2021, which depleted nearly

its entire cash balance by December 31, 2021, and forced the Company to seek alternative sources of financing between January and March 2022 to fund its operations, including several cash loans.

### E. The 2Q 2021 Press Release

191. At or around the same time that the 2Q 2021 Form 10-Q was filed with the SEC, Enservco also issued a press release announcing its results for the quarter ended June 30, 2021 (the "2Q 2021 Press Release"). In the 2Q 2021 Press Release, the Company disclosed that it "reported a reduced ***net loss of $1.6 million, or $0.14 per diluted share, in the second quarter***, compared to a net loss of $4.4 million, or $1.18 per diluted share, in the same quarter last year" and "***[n]et loss for the six-month period improved to $3.8 million, or $0.37 per diluted share***, compared to a net loss of $7.2 million, or $1.95 per diluted share, in the same period last year."

192. Further, Defendant Hargrave was quoted as stating that "***we booked $1.3 million in CARES Act payroll tax credits into other income in the second quarter***." Accordingly, the 2Q 2021 Press Release explained that "***[t]he improvement [in net losses for the quarter ended June 30, 2021] was due to . . . $1.3 million in CARES Act payroll tax credits***" and stated that "***Q2 net loss improves by 63%, reflecting*** higher revenue, cost efficiencies, ***CARES Act tax credits*** and lower interest expense following debt refinancing."

193. In addition, the 2Q 2021 Press Release reproduced the financials statements from the 2Q 2021 Form 10-Q which reported the unadjusted items set forth in ¶ 123.

194. The statements referenced in ¶¶ 191-193 were materially false and misleading because, at the time they were made, and as the Company ultimately admitted in the March 28, 2022 Restatement Form 8-K, the First Restatement, the April 18, 2022 Form 8-K, and the Second Restatement, (i) Enservco did not recognize a loss on the warrant issued to Cross River Partners

in connection with the February 2021 Debt for Equity Exchange in accordance with ASC 470; (ii) Enservco could no longer realize $1,425,000 of its DTA under the IRC following the February 2021 Equity Offering in violation of ASC 740; (iii) Enservco recognized income for $304,000 in ERCs during the quarter ended June 30, 2021 that it was ineligible to receive in violation of ASC 450; (iv) as a result of the foregoing errors, Enservco misrepresented or otherwise omitted numerous items in the financial statements reported in the 2Q 2021 Form 10-Q, as set forth in ¶¶ 123, 139; and (v) the adjustments necessary to correct the foregoing errors materially impact the financial statements in the 2Q 2021 Form 10-Q and, consequently, required a full restatement of those financials.

### F. <u>The 3Q 2021 Form 10-Q</u>

195. On November 15, 2021, Enservco filed its 3Q 2021 Form 10-Q. The 3Q 2021 Form 10-Q was signed by the Individual Defendants.

196. In the 3Q 2021 Form 10-Q, Enservco represented that "***[t]he accompanying unaudited condensed consolidated financial statements were prepared in accordance with generally accepted accounting principles in the United States of America ('GAAP')***," including, among others, FASCON 8, meaning they were complete and free from error.

197. The 3Q 2021 Form 10-Q included financials statements that reported the unadjusted items set forth in ¶ 124.

198. In addition, the 3Q 2021 Form 10-Q stated as follows:

> ***Net loss for the three months ended September 30, 2021 was approximately $177,000 or $0.02 per share***, compared to net income of approximately $8.4 million, or $2.15 per share, for the same period in 2020. ***Net loss for the nine months ended September 30, 2021 was approximately $4.0 million or $0.37 per share***, compared to net income of approximately $1.2 million, or $0.32 per share, in the same nine-month period in 2020 due to the factors noted above.

* * *

> ***Other income for the three months ended September 30, 2021 was approximately \$2.7 million***, compared to other income of approximately \$11.5 million for the same period in 2020. . . . ***Other income for the nine months ended September 30, 2021 was approximately \$4.2 million***, compared to other income of approximately \$10.4 million for the same period in 2020. ***This decrease of \$6.2 million, or 59%, was due primarily to the \$11.9 million gain on the restructuring of the Credit Facility reduced by \$1.7 million in interest expense during the nine months ended September 30, 2020, partially offset by the \$2.0 million gain on forgiveness of the PPP Loan and \$2.1 million in Employee Retention Credits during the same period in 2021***.

199. Disclosures in the 3Q 2021 Form 10-Q also indicated that Enservco was eligible to receive all of the ERCs it claimed during the quarter ended September 30, 2021:

> ***During the second quarter of 2021, the Company amended payroll tax returns originally filed for the third and fourth quarters of 2020 in order to claim refundable Employee Retention Credits for those periods. For the three and nine months ended September 30, 2021, the Company recorded \$612,000 and \$2.1 million, respectively, to other income in the condensed consolidated statements of operations***.

200. The 3Q 2021 Form 10-Q attached a certification by Individual Defendants pursuant to 18 U.S.C. § 1350, adopted in accordance with Section 906 of SOX, which stated:

> 1. ***The [2Q 2021 Form 10-Q] complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934***; and
>
> 2. ***The information contained in the [2Q 2021 Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company***.

201. The statements referenced in ¶¶ 196-200 were materially false and misleading because, at the time they were made, and as the Company ultimately admitted in the March 28, 2022 Restatement Form 8-K, the First Restatement, the April 18, 2022 Form 8-K, and the Second Restatement, (i) Enservco did not recognize a loss on the warrant issued to Cross River Partners in connection with the February 2021 Debt for Equity Exchange in accordance with ASC 470; (ii)

Enservco could no longer realize $1,425,000 of its DTA under the IRC following the February 2021 Equity Offering in violation of ASC 740; (iii) Enservco recognized income for $304,000 in ERCs during the quarter ended June 30, 2021 that it was ineligible to receive in violation of ASC 450; (iv) as a result of the foregoing errors, Enservco misrepresented or otherwise omitted numerous items in the financial statements reported in the 3Q 2021 Form 10-Q, as set forth in ¶¶ 124, 140; (v) the adjustments necessary to correct the foregoing errors materially impact the financial statements in the 3Q 2021 Form 10-Q and, consequently, required a full restatement of those financials; and (vi) accordingly, the financial statements from the 3Q 2021 Form 10-Q failed to comply with GAAP.

202. With respect to Enservco's disclosure controls and procedures and ICFR, the 3Q 2021 Form 10-Q stated as follows:

> We carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) or 15d-15(e) promulgated under the Exchange Act, as of September 30, 2021. This evaluation was carried out under the supervision and with the participation of our Chief Executive Officer (our principal executive officer) and our Chief Financial Officer (our principal financial officer). Based on that evaluation, ***our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of September 30, 2021***.

203. Indeed, the 3Q 2021 Form 10-Q appended signed certifications from Defendants Murphy and Hargrave required by Section 302 of SOX, which provided:

> The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a) ***designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated***

> ***subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;
>
> b) ***designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*;**
>
> c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

204. The statements referenced in ¶¶ 202-203 were materially false and misleading because, at the time they were made, and as the Company ultimately admitted in the First Restatement and the Second Restatement, (i) there was a material weakness in Enservco's ICFR as of September 30, 2021, related to its accounting for complex financial instruments and income taxes; and (ii) as a result, Enservco lacked effective disclosure controls and procedures, as such term is defined under Rule 13a-15(e) or 15d-15(e) of the Exchange Act, as of September 30, 2021.

205. In addition, the 3Q 2021 Form 10-Q expressly stated that all of the "risk factors set forth in the Company's annual report on Form 10-K for the year ended December 31, 2020, filed on March 23, 2021" were "incorporated herein by reference," including the following:

> ***Our ability to use our net operating loss carry forwards may be subject to limitation and may result in increased future tax liability.***
>
> Sections 382 and 383 of the Internal Revenue Code of 1986, as amended, or the Code, contain rules that limit the ability of a corporation that undergoes an "ownership change" to utilize its net operating loss carry forwards ("NOLs") and certain built-in losses recognized in years after the ownership change. An "ownership change" is generally defined as any change in ownership of more than

> 50% of a corporation's stock over a rolling three-year period by stockholders that own (directly or indirectly) 5% or more of the stock of the corporation, or arising from a new issuance of stock by the corporation. If an ownership change occurs, Section 382 generally imposes an annual limitation on the use of pre-ownership change net operating losses, or NOLs, credits and certain other tax attributes to offset taxable income earned after the ownership change. The annual limitation is equal to the product of the applicable long-term tax-exempt rate and the value of the corporation's stock immediately before the ownership change. This annual limitation may be adjusted to reflect any unused annual limitation for prior years and certain recognized built-in gains for the year. In addition, Section 383 generally limits the amount of tax liability in any post-ownership change year that can be reduced by pre-ownership change tax credit carryforwards. ***If we were to experience an "ownership change," this could result in increased U.S. federal income tax liability for us if we generate taxable income after the ownership change. Limitations on the use of NOLs and other tax attributes could also increase our state tax liabilities.*** The use of our tax attributes will also be limited to the extent that we do not generate positive taxable income in future tax periods. As a result of these limitations, we may be unable to offset future taxable income, if any, with NOLs before such NOLs expire. Accordingly, these limitations may increase our federal and state income tax liabilities.

206. The statements referenced in ¶ 205 were materially false and misleading because they created the false impression that Enservco had not yet experienced an "ownership change" for purposes of IRC section 382 at the time the statement was made. In truth, and as the Company ultimately admitted in the Second Restatement, it experienced an "ownership change" for purposes of IRC section 382 by no later than February 11, 2021 as a result of the February 2021 Equity Offering, which limited the realizability of $1,425,000 of the Company's DTA.

## G. <u>The 3Q 2021 Press Release</u>

207. At or around the same time that the 3Q 2021 Form 10-Q was filed with the SEC, Enservco also issued a press release announcing its results for the quarter ended September 30, 2021 (the "3Q 2021 Press Release"). In the 3Q 2021 Press Release, the Company disclosed that "***[n]et loss for the nine-month period was $4.0 million, or $0.37 per basic share***, compared to net income of $1.2 million, or $0.32 per basic share, in the same period last year."

208. In addition, the 3Q 2021 Press Release reproduced the financial statements from the 3Q 2021 Form 10-Q which reported the unadjusted items set forth in ¶ 124.

209. The statements referenced in ¶¶ 207-208 were materially false and misleading because, at the time they were made, and as the Company ultimately admitted in the March 28, 2022 Restatement Form 8-K, the First Restatement, the April 18, 2022 Form 8-K, and the Second Restatement, (i) Enservco did not recognize a loss on the warrant issued to Cross River Partners in connection with the February 2021 Debt for Equity Exchange in accordance with ASC 470; (ii) Enservco could no longer realize $1,425,000 of its DTA under the IRC following the February 2021 Equity Offering in violation of ASC 740; (iii) Enservco recognized income for $304,000 in ERCs during the quarter ended June 30, 2021 that it was ineligible to receive in violation of ASC 450; (iv) as a result of the foregoing errors, Enservco misrepresented or otherwise omitted numerous items in the financial statements reported in the 3Q 2021 Form 10-Q, as set forth in ¶¶ 124, 140; and (v) the adjustments necessary to correct the foregoing errors materially impact the financial statements in the 3Q 2021 Form 10-Q and, consequently, required a full restatement of those financials.

**H. <u>The 1Q 2021 Form 10-Q/A</u>**

210. On April 11, 2022, Enservco filed it 1Q 2021 Form 10-Q/A in connection with the First Restatement. The 1Q 2021 Form 10-Q/A was signed by the Individual Defendants.

211. In the 1Q 2021 Form 10-Q/A, Enservco represented that "***[t]he accompanying unaudited condensed consolidated financial statements were prepared in accordance with generally accepted accounting principles in the United States of America ('GAAP')***," including, among others, FASCON 8, meaning they were complete and free from error.

212. The 1Q 2021 Form 10-Q/A included financials statements that reported the unadjusted items set forth in ¶ 138

213. In addition, the 1Q 2021 Form 10-Q/A stated as follows:

> ***Net loss for the three months ended March 31, 2021, was approximately $2.5 million or $0.27 per share***, compared to a net loss of approximately $2.8 million, or $0.77 per share, in the same period last year due to the factors noted above.

214. The 1Q 2021 Form 10-Q/A attached a new certification by Individual Defendants pursuant to 18 U.S.C. § 1350, adopted in accordance with Section 906 of SOX, which stated:

> 1. ***The [1Q 2021 Form 10-Q/A] complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934***; and
>
> 2. ***The information contained in the [1Q 2021 Form 10-Q/A] fairly presents, in all material respects, the financial condition and results of operations of the Company***.

215. The statements referenced in ¶¶ 211-214 were materially false and misleading because, at the time they were made, and as the Company ultimately admitted in the April 18, 2022 Form 8-K and the Second Restatement, (i) Enservco could no longer realize $1,425,000 of its DTA under the IRC following the February 2021 Equity Offering in violation of ASC 740; (ii) as a result of the foregoing error, Enservco misrepresented or otherwise omitted numerous items in the financial statements reported in the 1Q 2021 Form 10-Q/A, as set forth in ¶ 138; (iii) the adjustments necessary to correct the foregoing error materially impacted the financial statements in the 1Q 2021 Form 10-Q/A and, consequently, required a full restatement of those financials; and (iv) accordingly, the financial statements from the 1Q 2021 Form 10-Q/A failed to comply with GAAP.

216. With respect to Enservco's disclosure controls and procedures and ICFR, the 1Q 2021 Form 10-Q/A stated as follows:

> We carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) or 15d-15(e) promulgated under the Exchange Act, as of March 31, 2021. This evaluation was carried out under the supervision and with the participation of our Chief Executive Officer (our principal executive officer) and our Chief Financial Officer (our principal financial officer). Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that , ***due to the material weakness in our internal control over financial reporting described below, as of the Evaluation Date, our disclosure controls and procedures were not effective to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms***. . . . In connection with the preparation of this Quarterly Report, management re-evaluated the Company's application of the accounting for the debt conversion, specifically the accounting for the award of the warrant. Upon such re-evaluation, ***management determined that the award of the warrant resulted in a loss on the transaction with a related party, as discussed in Note 2 to our condensed financial statements in this Quarterly Report. As a result, our management concluded that the aforementioned material weakness had not been remediated and that there was a material weakness in our internal control over financial reporting related to our accounting for complex financial instruments in internal control over financial reporting as of March 31, 2021.***

217. The 1Q 2021 Form 10-Q/A also appended new signed certifications from Defendants Murphy and Hargrave required by Section 302 of SOX, which provided:

> The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a) ***designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;
>
> b) ***designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;***

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

218. The statements referenced in ¶¶ 216-217 were materially false and misleading because, at the time they were made, and as the Company ultimately admitted in the Second Restatement, (i) there was a material weakness in Enservco's ICFR as of March 31, 2021 related to its accounting for income taxes; and (ii) as a result, Enservco lacked effective disclosure controls and procedures, as such term is defined under Rule 13a-15(e) or 15d-15(e) of the Exchange Act, as of March 31, 2021. In particular, the representation that there was a material weakness in Enservco's ICFR solely "as a result" of the Warrant Issuance Error, and that the Company's disclosure controls and procedures were ineffective solely "due to" that material weakness, gave the materially false impression that there were no other material weaknesses in ICFR and that the Company's disclosure controls and procedures were otherwise effective as of March 31, 2021. In truth, there was a material weakness in Enservco's ICFR as of March 31, 2021, arising from the DTA Error, and the Company's disclosure controls and procedures were ineffective as of March 31, 2021, due to the material weakness related to the DTA Error.

## I. <u>The 2Q 2021 Form 10-Q/A</u>

219. On April 11, 2022, Enservco filed it 2Q 2021 Form 10-Q/A in connection with the First Restatement. The 2Q 2021 Form 10-Q/A was signed by the Individual Defendants.

220. In the 2Q 2021 Form 10-Q/A, Enservco represented that "***[t]he accompanying unaudited condensed consolidated financial statements were prepared in accordance with generally accepted accounting principles in the United States of America ('GAAP')***," including, among others, FASCON 8, meaning they were complete and free from error.

221. The 2Q 2021 Form 10-Q/A included financials statements that reported the unadjusted items set forth in ¶ 139.

222. In addition, the 2Q 2021 Form 10-Q/A stated as follows:

> ***Net loss for the three months ended June 30, 2021, was approximately $1.9 million or $0.17 per share***, compared to a net loss of approximately $4.4 million, or $1.18 per share, in the same period last year. ***Net loss for the six months ended June 30, 2021 was approximately $4.4 million or $0.43 per share***, compared to a net loss of approximately $7.2 million, or $1.95 per share, in the same period last year due to the factors noted above.

223. The 2Q 2021 Form 10-Q/A attached a new certification by Individual Defendants pursuant to 18 U.S.C. § 1350, adopted in accordance with Section 906 of SOX, which stated:

> 1. ***The [2Q 2021 Form 10-Q/A] complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934***; and
>
> 2. ***The information contained in the [2Q 2021 Form 10-Q/A] fairly presents, in all material respects, the financial condition and results of operations of the Company***.

224. The statements referenced in ¶¶ 220-223 were materially false and misleading because, at the time they were made, and as the Company ultimately admitted in the April 18, 2022 Form 8-K and the Second Restatement, (i) Enservco could no longer realize $1,425,000 of its DTA under the IRC following the February 2021 Equity Offering in violation of ASC 740; (ii) as a result of the foregoing error, Enservco misrepresented or otherwise omitted numerous items in the financial statements reported in the 2Q 2021 Form 10-Q/A, as set forth in ¶ 139; (iii) the

adjustments necessary to correct the foregoing error materially impacted the financial statements in the 2Q 2021 Form 10-Q/A and, consequently, required a full restatement of those financials; and (iv) accordingly, the financial statements from the 2Q 2021 Form 10-Q/A failed to comply with GAAP.

225. With respect to Enservco's disclosure controls and procedures and ICFR, the 2Q 2021 Form 10-Q/A stated as follows:

> We carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) or 15d-15(e) promulgated under the Exchange Act, as of June 30, 2021. This evaluation was carried out under the supervision and with the participation of our Chief Executive Officer (our principal executive officer) and our Chief Financial Officer (our principal financial officer). Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that , ***due to the material weakness in our internal control over financial reporting described below, as of the Evaluation Date, our disclosure controls and procedures were not effective to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms***. . . . In connection with the preparation of this Quarterly Report, management re-evaluated the Company's application of the accounting for the debt conversion, specifically the accounting for the award of the warrant. Upon such re-evaluation, ***management determined that the award of the warrant resulted in a loss on the transaction with a related party***. Additionally, management re-evaluated the Company's eligibility to receive certain ERCs. Upon such re-evaluation, ***management determined that the Company was not eligible to receive certain amounts awarded, both as discussed in Note 2 to our condensed financial statements in this Quarterly Report***. ***As a result, our management concluded that the aforementioned material weakness had not been remediated and that there was a material weakness in our internal control over financial reporting related to our accounting for complex financial instruments in internal control over financial reporting as of June 30, 2021***.

226. The 2Q 2021 Form 10-Q/A also appended new signed certifications from Defendants Murphy and Hargrave required by Section 302 of SOX, which provided:

> The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules

13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

e) ***designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;

f) ***designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;***

g) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

h) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

227. The statements referenced in ¶¶ 225-226 were materially false and misleading because, at the time they were made, and as the Company ultimately admitted in the Second Restatement, (i) there was a material weakness in Enservco's ICFR as of June 30, 2021, related to its accounting for income taxes; and (ii) as a result, Enservco lacked effective disclosure controls and procedures, as such term is defined under Rule 13a-15(e) or 15d-15(e) of the Exchange Act, as of June 30, 2021. In particular, the representation that there was a material weakness in Enservco's ICFR solely "as a result" of the Warrant Issuance Error and the ERC Error, and that the Company's disclosure controls and procedures were ineffective solely "due to" that material weakness, gave the materially false impression that there were no other material weaknesses in ICFR and that the Company's disclosure controls and procedures were otherwise effective as of

June 30, 2021. In truth, there was a material weakness in Enservco's ICFR as of June 30, 2021, arising from the DTA Error, and the Company's disclosure controls and procedures were ineffective as of June 30, 2021, due to the material weakness related to the DTA Error.

**J. The 3Q 2021 Form 10-Q/A**

228. On April 11, 2022, Enservco filed it 3Q 2021 Form 10-Q/A in connection with the First Restatement. The 3Q 2021 Form 10-Q/A was signed by the Individual Defendants.

229. In the 3Q 2021 Form 10-Q/A, Enservco represented that "***[t]he accompanying unaudited condensed consolidated financial statements were prepared in accordance with generally accepted accounting principles in the United States of America ('GAAP')***," including, among others, FASCON 8, meaning they were complete and free from error.

230. The 3Q 2021 Form 10-Q/A included financials statements that reported the unadjusted items set forth in ¶ 140.

231. In addition, the 3Q 2021 Form 10-Q/A stated as follows:

> Net loss for the three months ended September 30, 2021 was approximately $177,000, or $0.02 per share, compared to net income of approximately $8.4 million, or $2.15 per share, for the same period in 2020. ***Net loss for the nine months ended September 30, 2021 was approximately $4.6 million, or $0.43 per share***, compared to net income of approximately $1.2 million, or $0.32 per share, for the same nine-month period in 2020 due to the factors noted above.

232. The 3Q 2021 Form 10-Q/A attached a new certification by Individual Defendants pursuant to 18 U.S.C. § 1350, adopted in accordance with Section 906 of SOX, which stated:

> 1. ***The [3Q 2021 Form 10-Q/A] complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934***; and
>
> 2. ***The information contained in the [3Q 2021 Form 10-Q/A] fairly presents, in all material respects, the financial condition and results of operations of the Company***.

233. The statements referenced in ¶¶ 229-232 were materially false and misleading because, at the time they were made, and as the Company ultimately admitted in the April 18, 2022 Form 8-K and the Second Restatement, (i) Enservco could no longer realize $1,425,000 of its DTA under the IRC following the February 2021 Equity Offering in violation of ASC 740; (ii) as a result of the foregoing error, Enservco misrepresented or otherwise omitted numerous items in the financial statements reported in the 3Q 2021 Form 10-Q/A, as set forth in ¶ 140; (iii) the adjustments necessary to correct the foregoing error materially impacted the financial statements in the 3Q 2021 Form 10-Q/A and, consequently, required a full restatement of those financials; and (iv) accordingly, the financial statements from the 3Q 2021 Form 10-Q/A failed to comply with GAAP.

234. With respect to Enservco's disclosure controls and procedures and ICFR, the 2Q 2021 Form 10-Q/A stated as follows:

> We carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as such term is defined under Rule 13a-15(e) or 15d-15(e) promulgated under the Exchange Act, as of June 30, 2021. This evaluation was carried out under the supervision and with the participation of our Chief Executive Officer (our principal executive officer) and our Chief Financial Officer (our principal financial officer). Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that , ***due to the material weakness in our internal control over financial reporting described below, as of the Evaluation Date, our disclosure controls and procedures were not effective to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Securities and Exchange Commission's rules and forms***. . . . In connection with the preparation of this Quarterly Report, management re-evaluated the Company's application of the accounting for the debt conversion, specifically the accounting for the award of the warrant. Upon such re-evaluation, ***management determined that the award of the warrant resulted in a loss on the transaction with a related party***. Additionally, management re-evaluated the Company's eligibility to receive certain ERCs. Upon such re-evaluation, ***management determined that the Company was not eligible to receive certain amounts awarded, both as discussed in Note 2 to our condensed financial***

> ***statements in this Quarterly Report*. *As a result, our management concluded that the aforementioned material weakness had not been remediated and that there was a material weakness in our internal control over financial reporting related to our accounting for complex financial instruments in internal control over financial reporting as of June 30, 2021*.**

235. The 2Q 2021 Form 10-Q/A also appended new signed certifications from Defendants Murphy and Hargrave required by Section 302 of SOX, which provided:

> The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> i) ***designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;
>
> j) ***designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;***
>
> k) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> l) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is reasonably likely to materially affect, the registrant's internal control over financial reporting;

236. The statements referenced in ¶¶ 234-235 were materially false and misleading because, at the time they were made, and as the Company ultimately admitted in the Second Restatement, (i) there was a material weakness in Enservco's ICFR as of September 30, 2021, related to its accounting for income taxes; and (ii) as a result, Enservco lacked effective disclosure

controls and procedures, as such term is defined under Rule 13a-15(e) or 15d-15(e) of the Exchange Act, as of September 30, 2021. In particular, the representation that there was a material weakness in Enservco's ICFR solely "as a result" of the Warrant Issuance Error and the ERC Error, and that the Company's disclosure controls and procedures were ineffective solely "due to" that material weakness, gave the materially false impression that there were no other material weaknesses in ICFR and that the Company's disclosure controls and procedures were otherwise effective as of September 30, 2021. In truth, there was a material weakness in Enservco's ICFR as of September 30, 2021, arising from the DTA Error, and the Company's disclosure controls and procedures were ineffective as of September 30, 2021, due to the material weakness related to the DTA Error.

## IX. <u>ADDITIONAL ALLEGATIONS SUPPORTING AN INFERENCE OF SCIENTER</u>

237. Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false or misleading; knew that such documents would be issued or disseminated publicly; and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements. Defendants, by virtue of their receipt of information reflecting the true facts or reckless disregard thereof, and by virtue of their control over, and/or receipt, and/or modification of Enservco's admittedly and allegedly materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

238. As set forth below, Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The multi-period fraud could not have been perpetrated during the Class Period without the

knowledge, complicity, or, at the very least, the reckless disregard of personnel at the highest levels of the Company, including the Individual Defendants.

## A. The Fact That the Fraud Arose from a Material Weakness in ICFR Supports An Inference Of Scienter

239. As described in ¶ 155, Enservco has admitted that the First Restatement and the Second Restatement were the direct result of a material weakness in ICFR for the periods covered by the 1Q 2021 Form 10-Q, 2Q 2021 Form 10-Q, and the 3Q 2021 Form 10-Q, in particular that "the Company has not properly segregated duties" regarding the execution of certain transactions.

240. At all relevant times, Defendants Murphy and Hargrave, as CEO and CFO of Enservco, were legally obligated to establish and maintain adequate ICFR consistent with SOX and SEC rules and regulations. As set forth in ¶¶ 167-168, 184-185, and 202-203, Defendants Murphy and Hargrave made affirmative representations in the Q1 2021 Form 10-Q, Q2 2021 Form 10-Q, and 3Q 2021 Form 10-Q, and signed certifications pursuant to SOX, evidencing their access to, and review of, Enservco's disclosure controls and procedures during the periods covered by the SEC filings that were the subject of the First Restatement and the Second Restatement.

241. Through their periodic testing of ICFR, Defendants were either aware that the Company did not properly segregate duties as to how one or two individuals initiate, authorize, and complete certain transactions, or failed to adequately evaluate Enservco's ICFR. ICFR is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with GAAP. The fact that three separate financial statements were subject to not one but ***three*** accounting errors and needed to be restated just one week after they were ***already restated*** raises the inference that Enservco's ICFR during the relevant period did not even provide "reasonable assurance" that Enservco's financial reporting

and its ability to comply with GAAP was reliable. By ignoring material weaknesses in ICFR or failing to adequately test ICFR, Defendants were either aware, or recklessly disregarded, that the financial statements issued by Enservco may not be prepared in accordance with GAAP and, thus, require a restatement, which, by extension, could delay the filing of other periodic reports Enservco must file with the SEC, and lead to the resignation and/or dismissal of key senior officers of the Company and its independent registered accounting firm.

242. The Individual Defendants' conduct amounts to an extreme departure from the standards of ordinary care to the extent that the severity of the material weakness was either known by the Individual Defendants or so obvious that they must have been aware of it.

**B. The Magnitude of the Accounting Errors Supports an Inference of Scienter**

243. The adjustments made in the First Restatement to correct the Warrant Issuance Error and/or the ERC Error significantly increased net losses for all relevant periods, and significantly decreased other income for all relevant periods, as reflected in the tables below:

**Income (net loss)**

| Time Period | Error(s) | As Previously Reported | As Restated | Change |
|---|---|---|---|---|
| Three months ended March 31, 2021 | Warrant | (2,173) | (2,477) | 13.99% |
| Three months ended June 30, 2021 | ERC | (1,606) | (1,910) | 18.93% |
| Six months ended June 30, 2021 | Warrant<br>ERC | (3,779) | (4,387) | 16.09% |
| Nine months ended September 30, 2021 | Warrant<br>ERC | (3,956) | (4,564) | 15.37% |

**Other income (expense)**

| Time Period | Error(s) | As Previously Reported | As Restated | Change |
|---|---|---|---|---|
| Three months ended March 31, 2021 | Warrant | 226 | (78) | 134.51% |
| Three months ended June 30, 2021 | ERC | 1,361 | 1,057 | 22.34% |
| Six months ended June 30, 2021 | Warrant<br>ERC | 1,587 | 979 | 38.31% |
| Nine months ended September 30, 2021 | Warrant | 4,276 | 3,668 | 14.22% |

| | | | | |
|---|---|---|---|---|
| | ERC | | | |

244. The adjustments made in the Second Restatement to correct the DTA Error significantly increased net losses for all relevant periods, as reflected in the tables below:

**Income (net loss)**

| Time Period | Error | As Previously Reported | As Restated | Change |
|---|---|---|---|---|
| Three months ended March 31, 2021 | DTA | (2,477) | (3,902) | 57.53% |
| Six months ended June 30, 2021 | DTA | (4,387) | (5,335) | 21.61% |
| Nine months ended September 30, 2021 | DTA | (4,564) | (4,966) | 8.81% |

245. Collectively, the adjustments made in both the First Restatement and the Second Restatement to correct the Warrant Issuance Error, the ERC Error and the DTA Error significantly increased net losses for all relevant periods and significantly decreased other income for all relevant periods, as reflected in the tables below:

**Income (net loss)**

| Time Period | Error(s) | As Previously Reported | As Restated | Change |
|---|---|---|---|---|
| Three months ended March 31, 2021 | Warrant<br>DTA | (2,173) | (3,902) | 79.57% |
| Three months ended June 30, 2021 | ERC | (1,606) | (1,910) | 18.93% |
| Six months ended June 30, 2021 | Warrant<br>ERC<br>DTA | (3,779) | (5,335) | 41.17% |
| Nine months ended September 30, 2021 | Warrant<br>ERC<br>DTA | (3,956) | (4,966) | 25.53% |

**Other income (expense)**

| Time Period | Error(s) | As Previously Reported | As Restated | Change |
|---|---|---|---|---|
| Three months ended March 31, 2021 | Warrant | 226 | (78) | 134.51% |
| Three months ended June 30, 2021 | ERC | 1,361 | 1,057 | 22.34% |
| Six months ended June 30, 2021 | Warrant<br>ERC | 1,587 | 979 | 38.31% |
| Nine months ended September 30, 2021 | Warrant<br>ERC | 4,276 | 3,668 | 14.22% |

### C. The Dual Resignations of Enservco's CFO and PAO Following the First Restatement Supports an Inference of Scienter

246. On April 4, 2022, Enservco announced that Defendant Hargrave was resigning the Company effective April 22, 2022. At or around the same time, Enservco's Controller and PAO, Donovan Kelly, voluntary resigned as well, effective April 21, 2022. The circumstances surrounding these two departures are suspicious and further support the inference of scienter.

247. By April 2022, Defendant Hargrave had only served as CFO for less than two years and nine months, and Donovan Kelly had only served as Controller and PAO for less than one year and nine months. As Enservco's CFO, Defendant Hargrave was directly responsible the financial management of the Company, including, but not limited to, financial reporting and the preparation of financial statements in compliance with GAAP. Like other Controllers before him, Donovan Kelly reported to Defendant Hargrave and was primarily responsible external reporting, including compliance with GAAP. Between March 28, 2022, and March 31, 2022, the Company announced the need to make the First Restatement to correct two accounting errors and publicly delayed the filing of its 2021 Form 10-K with the SEC. Just five days later, Enservco confirmed in the First Restatement that the accounting errors demonstrated that there was a material weakness in the Company's ICFR. The sudden departure of Hargrave and Kelly in the wake of these developments further supports the inference of scienter.

248. In addition, on April 13, 2022, Enservco and Defendant Hargrave entered into a Separation Agreement and Release (the "Separation Agreement and Release"). Prior to entering into the Separation Agreement and Release, Defendant Hargrave was entitled to receive certain benefits upon her resignation under her existing Employment Agreement, effective July 24, 2019

(the "Employment Agreement"), including (i) a lump sum severance payment of approximately $172,500; (ii) health care benefits for six months from the date of the resignation; and (iii) immediate vesting of all non-vested equity awards. Under the Separation Agreement and Release, the Company agreed to provide Defendant Hargrave with ***even greater benefits*** than those she was entitled to receive under the Employment Agreement in exchange for an unconditional waiver and release of any and all claims, complaints, causes of action, or demands of whatever kind as against Enservco, including (i) a severance payment of $187,500 in equal installment payments over nine months; (ii) health care benefits through January 31, 2023; (iii) immediate vesting of all non-vested equity awards; (iv) the issuance of an additional 50,000 shares of unrestricted shares of Enservco common stock; (v) the ability to retain the computer issued to her by the Company; and (vi) partial relief from the non-compete restriction in the Employment Agreement.

**D. <u>The Dismissal of Enservco's Auditor Supports an Inference Of Scienter</u>**

249. Enservco fired Plante after filing its 2021 Form 10-K. The circumstances surrounding Plante's dismissal are suspicious and further support the inference of scienter.

250. Plante and/or its predecessors had served as Enservco's auditor since 2010. Between 2010 and October 1, 2018, EKS&H LLLP ("EKS&H") served as Enservco's independent registered public accounting firm. Effective October 1, 2018, EKS&H combined with and into Plante Moran. As a result of this transaction, EKS&H resigned as Enservco's independent registered public accounting firm and Enservco engaged Plante Moran to fill that role.

251. Consistent with Regulation S-X, the three quarterly reports on Form 10-Q filed by Enservco that were the subject of the First Restatement and the Second Restatement were unaudited. However, Plante Moran was required to perform an examination of Enservco's

financial statements for the year ended December 31, 2021, in advance of, and prior to, the filing of the Company's 2021 Form 10-K, which historically took place in the second half of March.

252. As stated in the March 28, 2022 Restatement Form 8-K and the April 14, 2022 Form 8-K, the errors giving rise to First Restatement and the Second Restatement, and the need to inform investors that the 1Q 2021 Form 10-Q, 2Q 2021 Form 10-Q, and 3Q 2021 Form 10-Q should no longer be relied upon were discussed with Plante Moran.

253. After finalizing the First Restatement and the Second Restatement, the Company could finally turn back to completing its annual report for the year ended December 31, 2021. Enservco filed its 2021 Form 10-K on July 7, 2022, which incorporated all of the adjustments reflected in the First Restatement and the Second Restatement. In the report that it was required to furnish in the 2021 Form 10-K as a result of its audit, Plant Moran stated that the fact that "[t]he Company has not properly segregated duties as one or two individuals initiate, authorize, and complete certain transactions" was a "material weakness" in ICFR which Plant Moran "identified . . . as a critical audit matter" during the course of its audit.

## X. <u>PRESUMPTION OF RELIANCE</u>

254. At all relevant times, the market for the Company's securities was open, well-developed and efficient for the following reasons, among others:

- Enservco shares were listed and actively traded on the NYSE American, a highly efficient and automated market;
- As a regulated issuer, Enservco filed periodic public reports with the SEC and/or NYSE American;
- Enservco was eligible to file, and did in fact file, a registration statement on Form S-3;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- Enservco regularly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or
- Enservco was followed by securities analysts employed by brokerage firms;

255. As a result of the foregoing, the market for Enservco securities promptly digested new information regarding Enservco and its business from all publicly available sources and reflected it in the price of those securities. Accordingly, Plaintiffs and others who purchased or otherwise acquired the Company's securities did so relying upon the integrity of their market price.

256. Throughout the Class Period, Enservco and the Individual Defendants made, or caused to be made, false or misleading statements about Enservco's business, prospects, and operations, including its liquidity, internal controls and procedures, compliance with GAAP, and financial results. These false or misleading statements were material and would tend to induce a reasonable investor to misjudge the value of the Company's securities. Plaintiffs and members of the Class purchased or otherwise acquired Enservco securities following one or more of these misstatements without knowledge of the true facts concerning the misconduct alleged herein.

257. A presumption of reliance is also appropriate under *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), because the claims asserted herein are grounded in material omissions. As this action involves Defendants' failure to disclose material adverse information regarding the true state of the Company's liquidity, internal controls and procedures, compliance with GAAP, and financial results—information that Defendants were

obligated to disclose in light of their statements on these very topics and applicable SEC rules and regulations—positive proof of reliance is not a prerequisite to recovery.

## XI. LOSS CAUSATION AND ECONOMIC LOSS

258. Defendants' wrongful conduct, as alleged herein, directly and proximately caused economic loss to Plaintiffs and the Class. As described above, throughout the Class Period, the Individual Defendants made false and misleading statements which inflated the price of Enservco securities. Accordingly, Plaintiffs and other members of the Class purchased or otherwise acquired Enservco securities at prices that were inflated by the fraud described herein. Later, the price of Enservco securities declined as the prior inflation came out of the price over time in response to the truth being released to the market through a series of partial disclosures. As a result of their purchase of Enservco securities during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

259. On November 15, 2021, during aftermarket hours, Enservco filed its 3Q 2021 Form 10-Q with the SEC, in which it disclosed that the Company's cash balance shrank to approximately $1.7 million as of September 30, 2021, as the Company was headed into its cash-demanding heating season, and that the Company fell out of compliance with the revenue covenant under the 2017 Credit Agreement during the start of the fourth quarter of 2021, which restricted it from accessing its $1 million revolving line of credit, as set forth in ¶¶ 98-99. On this news, Enservco's common stock fell to close at a low of $1.19 on November 16, 2021. Despite this decline in the Company's stock price, Enservco securities continued to trade at artificially inflated prices through the remainder of the Class Period because the risks concealed by the fraud had not yet fully

materialize and/or because of Defendants' continued misstatements and omissions regarding the true scope and severity of the misconduct.

260. On March 28, 2022, during pre-market hours, Enservco filed the March 28, 2022 Restatement Form 8-K with the SEC, which announced that the Company needed to restate the financials reported in its 1Q 2021 Form 10-Q, the 2Q 2021 Form 10-Q, and the 3Q 2021 Form 10-Q to correct the Warrant Issuance Error and ERC Recognition Error, as set forth in ¶ 117. On this news, Enservco's stock price fell $0.45 per share, or 12.3%, to close at $3.21 per share on March 28, 2022. Over the next three days, as the market digested this news, Enservco's stock price fell an additional $0.51, or 15.9%, until reaching $2.70 per share when the market closed on March 31, 2022. Notably, there were no other public disclosures by the Company between the filing of the March 28, 2022 Restatement Form 8-K and the closing price for Enservco stock on March 31, 2022. Despite this decline in the Company's stock price, Enservco securities continued to trade at artificially inflated prices through the remainder of the Class Period because the risks concealed by the fraud had not yet fully materialize and/or because of Defendants' continued misstatements and omissions regarding the true scope and severity of the misconduct.

261. Then, on March 31, 2022, during after-market hours, Enservco filed the March 31, 2022 Form NT 10-K, which revealed its inability to timely file its 2021 Form 10-K, as set forth in ¶ 119. On this news, Enservco's stock price fell $0.21 per share, or 7.78%, to close at $2.49 per share on April 1, 2022. Despite this decline in the Company's stock price, Enservco securities continued to trade at artificially inflated prices through the remainder of the Class Period because the risks concealed by the fraud had not yet fully materialize and/or because of Defendants' continued misstatements and omissions regarding the true scope and severity of the misconduct.

262. On April 4, 2022, during after-market hours, Enservco filed the April 4, 2022 Form 8-K with the SEC, disclosing that Defendant Hargrave was resigning effective April 22, 2022, as set forth in ¶ 120. On this news, Enservco's stock price fell $0.19 per share, or 7.48%, to close at $2.35 per share on April 5, 2022. Over the next four days, as the market digested this news, Enservco's stock price fell an additional $0.51, or 20.8%, until reaching $1.86 per share when the market closed on April 11, 2022. Notably, there were no other public disclosures by the Company between the filing of the April 4, 2022 Form 8-K and the closing price for Enservco stock on April 11, 2022. Despite this decline in the Company's stock price, Enservco securities continued to trade at artificially inflated prices through the remainder of the Class Period because the risks concealed by the fraud had not yet fully materialize and/or because of Defendants' continued misstatements and omissions regarding the true scope and severity of the misconduct.

263. On April 18, 2022, during after-market hours, Enservco filed the April 18, 2022 Form 8-K with the SEC, which announced that the Company needed to restate the financials reported in its already-restated 1Q 2021 Form 10-Q/A, the 2Q 2021 Form 10-Q/A, and the 3Q 2021 Form 10-Q/A yet again to correct the DTA Error, and, as a result, the filing of its 2021 Form 10-K would be further delayed, as set forth in ¶ 136. On this news, Enservco's stock price fell $0.38 per share, or 10.47%, to close at $3.25 per share on April 19, 2022. Despite this decline in the Company's stock price, Enservco securities continued to trade at artificially inflated prices through the remainder of the Class Period because the risks concealed by the fraud had not yet fully materialize and/or because of Defendants' continued misstatements and omissions regarding the true scope and severity of the misconduct.

264. On September 1, 2022, during pre-market hours, Enservco announced that it fired its long-time external auditor Plante effective immediately, as set forth in ¶ 141. On this news, Enservco's stock price fell $0.14 per share to close at $1.50 per share on September 1, 2022.

## XII. NO SAFE HARBOR

265. None of the statements alleged herein to be false or misleading are protected by the safe harbor for forward-looking statements under certain circumstances or any similar protections.

266. All statements alleged herein to be false or misleading relate to then-existing facts and conditions. To the extent certain of the statements alleged herein to be false or misleading may be characterized as forward looking, they were not adequately identified as "forward-looking statements" when made and they were not accompanied by any meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in those statements. Indeed, as set forth above, given the then-existing facts contradicting Defendants' statements, the boilerplate and generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements. In addition, the safe harbor does not apply because, at the time each purportedly "forward looking statement" was made, the speaker knew that the statement was materially false or misleading.

267. Alternatively, none of the historic or present-tense statements alleged herein to be false or misleading were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## XIII. CLASS ACTION ALLEGATIONS

268. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class. Excluded from the Class are the Individual Defendants, members of their immediate families, Enservco and its officers and directors at all relevant times, any entity in which an excluded party has or had a controlling interest or which is related to or affiliated with any excluded party, and their legal representatives, heirs, successors, or assigns of any such excluded party.

269. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, shares of Enservco's common stock actively traded on the NYSE American. As of March 15, 2021, there were over 11 million shares of Enservco common stock outstanding. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Enservco or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in class actions arising under the federal securities laws.

270. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal laws complained of herein.

271. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

272. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the Enservco's business, operations and financial results;
- whether the Individual Defendants caused Enservco to issue false and misleading financial statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of Enservco securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- the extent of injuries suffered by the Class and the proper measure of damages.

273. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder Against Enservco and the Individual Defendants**

274. Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

275. This Count is asserted against Enservco and the Individual Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

276. During the Class Period, the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the misstatements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations or omissions and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

277. The Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Philip Morris securities during the Class Period;

278. Enservco is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

279. The Company and the Individual Defendants acted with scienter in that they knew that the public statements issued or disseminated in the name of Enservco were materially false and misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of

such statements as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Enservco, their control over, and/or receipt and/or modification of Enservco's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Enservco, participated in the fraudulent scheme alleged herein.

280. The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Enservco personnel to members of the investing public, including Plaintiffs and the Class.

281. As a result of the foregoing, the market price of Enservco securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and other Class members relied on the statements described above and/or the integrity of the market price of Enservco securities during the Class Period in purchasing Enservco securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

282. Had Plaintiffs and the other members of the Class been aware that the market price of Enservco securities had been artificially and falsely inflated by the misleading statements and by the material adverse information which the Individual Defendants did not disclose, they would not have purchased Enservco securities at the artificially inflated prices that they did, or at all.

283. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

284. By reason of the foregoing, Defendants Enservco, Murphy, and Hargrave have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Enservco securities during the Class Period.

**COUNT II**

**Violations of Section 20(a) of the Exchange Act Against the Individual Defendants, Cross River Partners, and Cross River Partners GP**

285. Plaintiffs repeat and reallege every allegation above as if fully set forth herein.

286. During the Class Period, Defendants participated in the operation and management of Enservco, and conducted and participated, directly and indirectly, in the conduct of Enservco's business affairs. Because of their positions, they knew the adverse non-public information about Enservco's business practices.

287. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Enservco's financial condition and results of operations, and to correct promptly any public statements issued by Enservco which had become materially false or misleading. Because of their positions of control and authority as senior officers and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which Enservco disseminated in the marketplace during the Class Period.

288. In addition, Defendant Murphy, along with Defendants Cross River Partners and Cross River GP beneficially owned approximately 18% of the outstanding shares of Enservco's common stock. As a result, Defendants Cross River Partners and Cross River GP were able to

exercise significant influence over all matters requiring approval by Enservco's shareholders, including the approval of significant corporate transactions.

289. Throughout the Class Period, the Individual Defendants, Cross River Partners, and Cross River GP exercised their power and authority to cause Enservco to engage in the wrongful acts complained of herein. The Individual Defendants, Cross River Partners, and Cross River GP, therefore, were "controlling persons" of Enservco within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Enservco securities.

290. By reason of the above conduct, Defendants other than Enservco are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Enservco.

## XIV. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Declaring this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as class representatives;

B. Awarding Plaintiffs and other members of the Class damages and interest;

C. Awarding Plaintiffs and other members of the Class their reasonable costs and expenses, including attorneys' fees, expert fees, and other costs and disbursements; and

D. Awarding such other and further relief as the Court may deem just and proper.

## XV. DEMAND FOR TRIAL JURY

Plaintiffs hereby demand a trial by jury.

Dated: November 28, 2022

Respectfully submitted,

*/s/ Justin D. D'Aloia*

Jeremy A. Lieberman
J. Alexander Hood II
Justin D. D'Aloia
POMERANTZ LLP
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
jdaloia@pomlaw.com

*Counsel for Lead Plaintiff, Plaintiff Ali Saee and the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 28th day of November, 2022, I electronically filed the foregoing FIRST AMENDED CLASS ACTION COMPLAINT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Justin D. D'Aloia*
Justin D. D'Aloia
POMERANTZ LLP
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jdaloia@pomlaw.com

**AMENDED CERTIFICATION OF NAMED PLAINTIFF**
**PURSUANT TO FEDERAL SECURITIES LAWS**

1. I, Ali Saee, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 (the "Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995.

2. I have reviewed the First Amended Class Action Complaint (the "Amended Complaint") against Enservco Corporation ("Enservco" or the "Company"), Cross River Partners, L.P., Richard A. Murphy, and Marjorie A. Hargrave (collectively, "Defendants") and authorize the filing of the Amended Complaint in my name.

3. I did not purchase or acquire Enservco securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or the Exchange Act.

4. I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Enservco securities during the class period, including providing testimony at deposition and trial, if necessary.

5. The attached sheet lists all of my transaction in Enservco securities during the Class Period as specified in the Amended Complaint.

6. During the three-year period preceding the date on which this Certification is signed, I have served or sought to serve as a representative party on behalf of a class under the federal securities laws in the following action:

- *Saee v. Enservco Corporation et al.*, 1:22-cv-01267 (D. Colo.) (*filed initial complaint*)

7. I agree not to accept any payment for serving as a representative party on behalf

DocuSign Envelope ID: 626C1866-10DB-4E16-B09C-720E61F38D7B

of the class as set forth in the Amended Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8. I declare under penalty of perjury that the foregoing is true and correct.

**Executed** 11/25/2022
**(Date)**

DocuSigned by:
DC544F1526A7474...
**(Signature)**

Ali saee
**(Type or Print Name)**

**Enservco Corporation (ENSV)** **Ali Saee**

**List of Purchases and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 3/8/2022 | 1 | $6.2200 |
| Purchase | 3/8/2022 | 1 | $5.6600 |
| Purchase | 3/8/2022 | 2 | $5.4900 |
| Purchase | 3/8/2022 | 2 | $4.5000 |
| Purchase | 3/8/2022 | 9 | $5.9900 |
| Purchase | 3/8/2022 | 10 | $8.7300 |
| Purchase | 3/8/2022 | 16 | $6.3500 |
| Purchase | 3/8/2022 | 21 | $8.7500 |
| Purchase | 3/8/2022 | 23 | $6.0000 |
| Purchase | 3/8/2022 | 25 | $5.9500 |
| Purchase | 3/8/2022 | 25 | $6.3300 |
| Purchase | 3/8/2022 | 30 | $6.3400 |
| Purchase | 3/8/2022 | 47 | $6.2900 |
| Purchase | 3/8/2022 | 50 | $8.6700 |
| Purchase | 3/8/2022 | 50 | $8.7300 |
| Purchase | 3/8/2022 | 50 | $8.7300 |
| Purchase | 3/8/2022 | 50 | $8.7300 |
| Purchase | 3/8/2022 | 69 | $8.7500 |
| Purchase | 3/8/2022 | 75 | $6.3400 |
| Purchase | 3/8/2022 | 93 | $4.4000 |
| Purchase | 3/8/2022 | 95 | $7.1100 |
| Purchase | 3/8/2022 | 100 | $6.0000 |
| Purchase | 3/8/2022 | 100 | $5.9700 |
| Purchase | 3/8/2022 | 100 | $5.9700 |
| Purchase | 3/8/2022 | 100 | $5.9700 |
| Purchase | 3/8/2022 | 100 | $5.9900 |
| Purchase | 3/8/2022 | 100 | $6.0000 |
| Purchase | 3/8/2022 | 100 | $7.1100 |
| Purchase | 3/8/2022 | 100 | $7.1100 |
| Purchase | 3/8/2022 | 100 | $7.1100 |
| Purchase | 3/8/2022 | 100 | $7.1100 |
| Purchase | 3/8/2022 | 100 | $7.1100 |
| Purchase | 3/8/2022 | 100 | $7.1100 |
| Purchase | 3/8/2022 | 100 | $8.7300 |
| Purchase | 3/8/2022 | 100 | $6.3200 |
| Purchase | 3/8/2022 | 100 | $6.3200 |
| Purchase | 3/8/2022 | 100 | $6.3200 |
| Purchase | 3/8/2022 | 100 | $6.3200 |
| Purchase | 3/8/2022 | 100 | $6.3200 |
| Purchase | 3/8/2022 | 100 | $6.3400 |
| Purchase | 3/8/2022 | 100 | $6.3400 |
| Purchase | 3/8/2022 | 100 | $6.3400 |
| Purchase | 3/8/2022 | 100 | $6.3400 |
| Purchase | 3/8/2022 | 100 | $6.3400 |
| Purchase | 3/8/2022 | 100 | $6.3400 |
| Purchase | 3/8/2022 | 100 | $6.3400 |
| Purchase | 3/8/2022 | 100 | $4.4900 |
| Purchase | 3/8/2022 | 100 | $4.4900 |
| Purchase | 3/8/2022 | 100 | $4.4900 |

**Enservco Corporation (ENSV)** **Ali Saee**

**List of Purchases and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 3/8/2022 | 100 | $4.4900 |
| Purchase | 3/8/2022 | 100 | $4.5000 |
| Purchase | 3/8/2022 | 120 | $4.5000 |
| Purchase | 3/8/2022 | 127 | $4.5000 |
| Purchase | 3/8/2022 | 150 | $6.3000 |
| Purchase | 3/8/2022 | 168 | $5.9900 |
| Purchase | 3/8/2022 | 200 | $5.9400 |
| Purchase | 3/8/2022 | 200 | $6.0000 |
| Purchase | 3/8/2022 | 200 | $5.9900 |
| Purchase | 3/8/2022 | 200 | $6.3200 |
| Purchase | 3/8/2022 | 250 | $5.9400 |
| Purchase | 3/8/2022 | 250 | $5.9500 |
| Purchase | 3/8/2022 | 300 | $5.9400 |
| Purchase | 3/8/2022 | 300 | $5.9400 |
| Purchase | 3/8/2022 | 300 | $5.9400 |
| Purchase | 3/8/2022 | 300 | $5.9600 |
| Purchase | 3/8/2022 | 300 | $5.9600 |
| Purchase | 3/8/2022 | 300 | $5.9900 |
| Purchase | 3/8/2022 | 315 | $8.6700 |
| Purchase | 3/8/2022 | 458 | $4.5000 |
| Purchase | 3/8/2022 | 517 | $5.9900 |
| Purchase | 3/8/2022 | 600 | $5.9900 |
| Purchase | 3/8/2022 | 600 | $5.9900 |
| Purchase | 3/8/2022 | 600 | $7.1100 |
| Purchase | 3/8/2022 | 600 | $6.3500 |
| Purchase | 3/8/2022 | 700 | $5.9700 |
| Purchase | 3/8/2022 | 750 | $8.7300 |
| Purchase | 3/8/2022 | 790 | $6.3500 |
| Purchase | 3/8/2022 | 880 | $8.6300 |
| Purchase | 3/8/2022 | 1,000 | $6.0000 |
| Purchase | 3/8/2022 | 1,000 | $5.9700 |
| Purchase | 3/8/2022 | 1,000 | $5.9700 |
| Purchase | 3/8/2022 | 1,000 | $7.3000 |
| Purchase | 3/8/2022 | 1,100 | $5.9900 |
| Purchase | 3/8/2022 | 1,100 | $8.6300 |
| Purchase | 3/8/2022 | 1,400 | $5.9900 |
| Purchase | 3/8/2022 | 1,400 | $7.1100 |
| Purchase | 3/8/2022 | 1,500 | $8.7300 |
| Purchase | 3/8/2022 | 1,500 | $8.7300 |
| Purchase | 3/8/2022 | 2,000 | $6.0000 |
| Purchase | 3/8/2022 | 2,000 | $5.8300 |
| Purchase | 3/8/2022 | 2,000 | $7.1800 |
| Purchase | 3/8/2022 | 2,015 | $8.6700 |
| Purchase | 3/8/2022 | 2,300 | $5.9400 |
| Purchase | 3/8/2022 | 2,800 | $7.1100 |
| Purchase | 3/8/2022 | 2,900 | $8.6300 |
| Purchase | 3/8/2022 | 4,058 | $6.0000 |
| Purchase | 3/8/2022 | 5,600 | $7.1100 |
| Purchase | 3/8/2022 | 5,867 | $6.3700 |
| Purchase | 3/8/2022 | 8,640 | $8.7500 |

**Enservco Corporation (ENSV)** **Ali Saee**

**List of Purchases and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 3/8/2022 | 8,905 | $7.1100 |
| Purchase | 3/9/2022 | 1 | $3.7800 |
| Purchase | 3/16/2022 | 500 | $2.7500 |
| Purchase | 3/16/2022 | 500 | $2.7600 |
| Purchase | 3/18/2022 | 800 | $2.9700 |
| Purchase | 3/31/2022 | 500 | $2.8900 |
| Purchase | 4/1/2022 | 500 | $2.5900 |
| Purchase | 4/1/2022 | 500 | $2.5600 |
| Purchase | 4/1/2022 | 500 | $2.5400 |
| Purchase | 4/6/2022 | 500 | $2.2300 |
| Sale | 3/8/2022 | (9,948) | $7.5600 |
| Sale | 3/8/2022 | (7,600) | $6.0600 |
| Sale | 3/8/2022 | (2,000) | $7.8200 |
| Sale | 3/8/2022 | (2,000) | $8.4400 |
| Sale | 3/8/2022 | (1,971) | $6.0900 |
| Sale | 3/8/2022 | (1,799) | $7.5600 |
| Sale | 3/8/2022 | (1,200) | $6.0600 |
| Sale | 3/8/2022 | (1,200) | $7.6000 |
| Sale | 3/8/2022 | (1,000) | $6.0700 |
| Sale | 3/8/2022 | (1,000) | $6.0500 |
| Sale | 3/8/2022 | (1,000) | $6.0200 |
| Sale | 3/8/2022 | (973) | $7.6200 |
| Sale | 3/8/2022 | (900) | $7.6000 |
| Sale | 3/8/2022 | (800) | $6.0600 |
| Sale | 3/8/2022 | (800) | $6.0600 |
| Sale | 3/8/2022 | (500) | $6.0800 |
| Sale | 3/8/2022 | (500) | $7.5700 |
| Sale | 3/8/2022 | (484) | $7.6000 |
| Sale | 3/8/2022 | (400) | $6.0800 |
| Sale | 3/8/2022 | (400) | $6.0800 |
| Sale | 3/8/2022 | (400) | $6.0000 |
| Sale | 3/8/2022 | (400) | $6.0000 |
| Sale | 3/8/2022 | (324) | $7.6300 |
| Sale | 3/8/2022 | (300) | $6.0500 |
| Sale | 3/8/2022 | (300) | $6.0200 |
| Sale | 3/8/2022 | (300) | $6.0200 |
| Sale | 3/8/2022 | (300) | $6.0200 |
| Sale | 3/8/2022 | (300) | $7.6400 |
| Sale | 3/8/2022 | (300) | $7.6300 |
| Sale | 3/8/2022 | (264) | $6.0200 |
| Sale | 3/8/2022 | (251) | $6.0600 |
| Sale | 3/8/2022 | (210) | $6.0200 |
| Sale | 3/8/2022 | (200) | $6.0800 |
| Sale | 3/8/2022 | (200) | $6.0800 |
| Sale | 3/8/2022 | (125) | $7.6000 |
| Sale | 3/8/2022 | (106) | $6.0000 |
| Sale | 3/8/2022 | (104) | $6.0600 |
| Sale | 3/8/2022 | (100) | $6.0800 |
| Sale | 3/8/2022 | (100) | $6.0800 |
| Sale | 3/8/2022 | (100) | $6.0800 |

**Enservco Corporation (ENSV)** **Ali Saee**

**List of Purchases and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Sale | 3/8/2022 | (100) | $6.0700 |
| Sale | 3/8/2022 | (100) | $6.0700 |
| Sale | 3/8/2022 | (100) | $6.0600 |
| Sale | 3/8/2022 | (100) | $6.0500 |
| Sale | 3/8/2022 | (100) | $6.0500 |
| Sale | 3/8/2022 | (100) | $6.0500 |
| Sale | 3/8/2022 | (100) | $6.0000 |
| Sale | 3/8/2022 | (100) | $6.0000 |
| Sale | 3/8/2022 | (100) | $6.0000 |
| Sale | 3/8/2022 | (100) | $6.0000 |
| Sale | 3/8/2022 | (100) | $6.0000 |
| Sale | 3/8/2022 | (100) | $6.0000 |
| Sale | 3/8/2022 | (100) | $6.0000 |
| Sale | 3/8/2022 | (100) | $6.0000 |
| Sale | 3/8/2022 | (100) | $7.6400 |
| Sale | 3/8/2022 | (100) | $7.6300 |
| Sale | 3/8/2022 | (100) | $7.6300 |
| Sale | 3/8/2022 | (100) | $7.6300 |
| Sale | 3/8/2022 | (100) | $7.6200 |
| Sale | 3/8/2022 | (100) | $7.6000 |
| Sale | 3/8/2022 | (100) | $7.6000 |
| Sale | 3/8/2022 | (100) | $7.6000 |
| Sale | 3/8/2022 | (80) | $6.0200 |
| Sale | 3/8/2022 | (72) | $6.0200 |
| Sale | 3/8/2022 | (69) | $7.6100 |
| Sale | 3/8/2022 | (50) | $7.6200 |
| Sale | 3/8/2022 | (50) | $7.5700 |
| Sale | 3/8/2022 | (50) | $7.5700 |
| Sale | 3/8/2022 | (49) | $7.6000 |
| Sale | 3/8/2022 | (41) | $7.6500 |
| Sale | 3/8/2022 | (30) | $7.6100 |
| Sale | 3/8/2022 | (25) | $6.0200 |
| Sale | 3/8/2022 | (25) | $6.0000 |
| Sale | 3/8/2022 | (20) | $6.0300 |
| Sale | 3/8/2022 | (20) | $6.0000 |
| Sale | 3/8/2022 | (19) | $6.0000 |
| Sale | 3/8/2022 | (17) | $6.0000 |
| Sale | 3/8/2022 | (10) | $6.0600 |
| Sale | 3/8/2022 | (6) | $6.0200 |
| Sale | 3/8/2022 | (5) | $7.6200 |
| Sale | 3/8/2022 | (2) | $5.4100 |
| Sale | 3/8/2022 | (1) | $5.5900 |
| Sale | 3/8/2022 | (1) | $7.6100 |
| Sale | 3/8/2022 | (1) | $7.5900 |
| Sale | 3/8/2022 | (1) | $7.5800 |
| Sale | 3/8/2022 | (1) | $4.8000 |