# UNITED STATES DISTRICT COURT
## DISTRICT OF COLORADO

| | |
|---|---|
| ALI SAEE, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>vs.<br><br>ENSERVCO CORPORATION, RICHARD MURPHY, MARJORIE HARGRAVE, CROSS RIVER PARTNERS, L.P., and CROSS RIVER CAPITAL MANAGEMENT LLC,<br><br>     Defendants. | File No. 1:22-cv-1267-DDD-STV<br><br>**DEFENDANTS' MOTION TO DISMISS** |

Defendants Enservco Corporation, Richard A. Murphy and Marjorie Hargrave, Cross River Partners, L.P., and Cross River Capital Management LLC (together, "Defendants"), move to dismiss this action with prejudice, because Plaintiffs have failed to state a claim upon which relief can be granted.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................... 4

    A.    March 2021: Enservco Is A Cash-Strapped Company Operating In A Dynamic Industry Facing Multiple Challenges. .................................. 4

    B.    March 28, 2022: Enservco Voluntarily Discloses The ERC Error And The Warrant Issuance Error. ........................................................... 5

    C.    April 2022: Enservco Discovers One Additional Error And Promptly Discloses It. ............................................................................ 8

    D.    April 2022: CFO Marjorie Hargrave and Controller Donovan Kelly Depart The Company. ..................................................................... 9

    E.    September 1, 2022: Enservco Fires Its Public Auditing Firm, Plante Moran. ............................................................................................ 10

    F.    May-October 2022: Plaintiff Files This Suit. ........................................... 10

STANDARD OF REVIEW ................................................................................. 11

ARGUMENT ........................................................................................................ 12

I.    The CAC Fails To Plead Specific Facts Giving Rise To A Strong Inference Of Scienter. ...................................................................................... 12

    A.    The CAC lacks specific factual allegations giving rise to a strong inference of scienter. ....................................................................... 13

    B.    The more cogent and compelling inference is that Enservco was a leanly staffed company that made three unrelated tax or accounting errors regarding complex and arcane issues in the midst of unprecedented economic challenges. ......................................... 30

    C.    The CAC fails to distinguish among defendants and thus fails under the "group pleading doctrine." ...................................................... 34

II.    Plaintiffs Fail to Adequately Plead Loss Causation. .................................... 35

III.    The CAC Fails To State Claims Under Section 20(a). ................................. 38

CONCLUSION .................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**                                                 **Page(s)**

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ................................................................... 12

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) ...........................................................*passim*

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
505 F. Supp. 2d 662 (D. Colo. 2007)............................................17, 28, 33

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................... 39

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)......................................................................................... 39

*In re BISYS Secs. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005).......................................................... 18

*In re Ceridian Corp. Secs. Litig.*,
542 F.3d 240 (8th Cir. 2008) .........................................................14, 18, 23, 34

*In re China Organic Sec. Litig.*,
2013 WL 5434637 (S.D.N.Y. Sept. 30, 2013) ........................................... 37

*City of Philadelphia v. Fleming Cos., Inc.*,
264 F.3d 1245 (10th Cir. 2001) ..........................................................11, 15, 27, 39

*In re Crocs, Inc. Secs. Litig.*,
774 F. Supp. 2d 1122 (D. Colo. 2011)..........................................15, 33, 35

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)...............................................................................11, 35

*Emps.' Ret. Sys. of Rhode Island v. Williams Cos., Inc.*,
889 F.3d 1153 (10th Cir. 2018) ................................................................. 28

*Ezra Charitable Trust v. Tyco Int'l*,
466 F.3d 1 (1st Cir. 2006) ............................................................................ 18

*Fidel v. Farley*,
    392 F.3d 220 (6th Cir. 2004) ................................................................. 20

*In re Gold Res. Corp. Secs. Litig.*,
    776 F.3d 1103 (10th Cir. 2015) .................................................*passim*

*In re Gold Res. Corp. Secs. Litig.*,
    957 F. Supp. 2d 1284 (D. Colo. 2013) .......................................................... 4

*In re Hertz Global Holdings Inc.*,
    905 F.3d 106 (3rd Cir. 2018) .................................................*passim*

*In re Home Loan Serv. Solutions, Ltd. Sec. Litig.*,
    2016 WL 10592320 (S.D. Fl. June 6, 2016) ................................................ 38

*In re ICG Commc'ns, Inc. Sec. Litig.*,
    2006 WL 416622 (D. Colo. Feb. 7, 2006) .................................................. 36

*In re Level 3 Commc'ns, Inc. Secs. Litig.*,
    667 F.3d 1331 (10th Cir. 2012) .................................................*passim*

*In re Manulife Fin. Corp. Sec. Litig.*,
    276 F.R.D. 87 (S.D.N.Y. 2011) ................................................................. 37

*Matrixx Initiatives v. Siracusano*,
    131 S. Ct. 1309 (2011) ................................................................. 12

*McNamara v. Pre-Paid Legal Services, Inc.*,
    189 F. App'x 702 (10th Cir. 2006) ................................................ 16, 33

*MHC Mut. Conversion Fund v. Sandler O'Neill & Partners*,
    761 F.3d 1109 (10th Cir. 2014) ............................................... 3, 25

*In re Molson Coors Beverage Co. Secs. Litig.*,
    2020 WL 13499995 (D. Colo. Dec. 2, 2020) .......................................*passim*

*Novak v. Kasaks*,
    997 F. Supp. 425 (S.D.N.Y. 1998) ................................................................. 27

*Pirraglia v. Novell, Inc.*,
    339 F.3d 1182 (10th Cir. 2003) ...........................................11, 15, 32

*Podraza v. Whiting*,
    790 F.3d 828 (8th Cir. 2015) .......................................18, 26, 34

*Smallen v. The Western Union Co.*,
    950 F.3d 1297 (10th Cir. 2020) ............................................................ 12, 38

*Southland Securities Corp. v. INSpire Ins. Solutions Inc.*,
    365 F.3d 353 (5th Cir. 2004) ...................................................................... 35

*In re Stonepath Grp., Inc. Secs. Litig.*,
    397 F. Supp. 2d 575 (E.D. Pa. 2005).......................................... 15, 17, 20, 26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................... *passim*

*The Sorkin, LLC v. Fischer Imaging Corp.*,
    2005 WL 1459735 (D. Colo. June 21, 2005)................................. 14, 19, 26

*In re VeriSign, Inc., Derivative Litig.*,
    531 F. Supp. 2d 1173 (N.D. Cal. 2007) ........................................................ 38

*Waters v. General Electric Co.*,
    2010 WL 3910303 (S.D.N.Y. Sept. 29, 2010), *aff'd sub nom. GE Inv'rs v.*
    *Gen. Elec. Co.*, 447 F. App'x 229 (2d Cir. 2011) .......................................... 38

*Webb v. Solarcity Corp.*,
    884 F.3d 844 (9th Cir. 2018) ...................................................................... 20

*Weiss v. Amkor Tech., Inc.*,
    527 F. Supp. 2d 938 (D. Ariz. 2007).......................................................... 38

*West Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
    2008 WL 4838671 (D. Colo. Nov. 6, 2008).............................................. 37

*In re Williams Secs. Litigation-WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) .................................................................. 35

*Wolfe v. Aspenbio Pharma, Inc.*,
    587 F. App'x 493 (10th Cir. 2014) ............................................................. 29

*In re Zagg, Inc. Secs. Litig.*,
    797 F.3d 1194 (10th Cir. 2015) .......................................................... *passim*

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ............................................................. *passim*

**Statutes, Rules & Regulations**

15 U.S.C. § 78j(b) ..........................................................................2, 11, 14, 38

15 U.S.C. § 78t(a) ...........................................................................2, 14, 38, 39

15 U.S.C. § 78u-4(b)(2) ........................................................................... 11

15 U.S.C. §78u-4 *et seq.*.........................................................................*passim*

Fed. R. Civ. P. 12(b)(6) ............................................................................ 13

IRS Code § 382 ......................................................................................... 8

**Other Authorities**

ASC 815-40, *Derivatives and Hedging-Contracts in Entity's Own Equity*................................ 7

"Derivatives and Hedging, Accounting Resources for ASC 815 and IFRS
    9," GAAP Dynamics (available at
    https://www.gaapdynamics.com/insights/accounting-
    topics/derivatives-and-hedging-accounting-resources-for-asc-815-
    and-ifrs-9) (February 2, 2023) ...................................................... 7

SEC's April 12, 2021 Staff Statement (available at
    https://www.sec.gov/news/ public-statement/accounting-reporting-
    warrants-issued-spacs)................................................................... 7

## INTRODUCTION

Like many past cases from this District, Plaintiffs here—shareholders in Enservco, a public company headquartered in Denver—have attempted to unfairly portray a public company's restatement of certain of its financial statements (financials) as a vast accounting and tax fraud. Like many past cases from this District, they have turned three technical tax and accounting errors (all fully disclosed to investors) into a nearly 100-page, prolix complaint. And like many past cases from this District, the Court should dismiss the Consolidated Amended Complaint (Dkt. 34, the "CAC"), because it falls far short of satisfying the heightened pleadings standard required by the Private Securities Litigation Reform Act, 15 U.S.C. §78u-4 *et seq.* (the "PSLRA").

Defendant Enservco Corporation ("Enservco" or "the Company") is a company that operates in the domestic onshore oil and natural gas industry. Like many companies in the energy industry, its stock has experienced price volatility, reflecting financial pressures and market dynamics. Unfortunately, the pressures of operating a cash-strapped company during an exceptionally challenging financial environment in the midst of the COVID-19 pandemic led to three unrelated, complex tax and accounting errors. In March and April 2022, therefore, Enservco voluntarily announced that it was restating its financials for the first, second, and third fiscal quarters of 2021.

Plaintiff Ali Saee filed this lawsuit shortly thereafter. Saee, along with current lead plaintiff Jan Lambert (for simplicity, "Plaintiff"), alleges that Enservco and its two lead officers—current CEO Rich Murphy, and then-CFO Marjorie Hargrave (the

"Individual Defendants")—committed intentional securities fraud between March 23, 2021 and September 1, 2022 (the "Class Period"), in violation of Section 10(b) of the Securities and Exchange Act of 1934 ("1934 Act"). Plaintiff also alleges that two Enservco shareholders that provided financing to the Company—Cross River Partners, L.P. and Cross River Capital Management LLC (collectively, "Cross River Defendants")—are liable as "control persons" under Section 20(a) of the 1934 Act. Plaintiff's theory appears to be that because Enservco discovered and then promptly disclosed three unrelated tax/accounting issues, Defendants must have intentionally lied to investors about them. Plaintiff suggests that Defendants must have intended to perpetrate a fraud because Enservco made not one, but two restatements of its financials—the second which was disclosed only one week after the first—and because Enservco later announced that (i) Hargrave and another finance employee had departed the company; and (ii) Enservco had fired its public accounting firm.

Plaintiff cannot explain why anyone would attempt to perpetrate a fraud in such an irrational manner. Merely restating a company's financial statements, which necessarily implicates errors in applying Generally Accepted Accounting Principles ("GAAP"), is not an indicium of securities fraud. *See In re Gold Res. Corp. Secs. Litig.*, 776 F.3d 1103, 1113-14 (10th Cir. 2015); *In re Molson Coors Beverage Co. Secs. Litig.*, 2020 WL 13499995 (D. Colo. Dec. 2, 2020). A restatement may reflect honest mistakes, careless errors, or other mismanagement, but that is not enough. What the CAC alleges is nothing more than improper fraud-by-hindsight. *See Anderson v. Spirit Aerosystems*

*Holdings, Inc.*, 827 F.3d 1229, 1247 (10th Cir. 2016); *MHC Mut. Conversion Fund v. Sandler O'Neill & Partners*, 761 F.3d 1109, 1122 (10th Cir. 2014) (Gorsuch, J.).

Considered in context, the record shows that: the accounting and tax issues precipitating the restatements were unique and complex; Enservco faced an exceptionally challenging environment, with staffing challenges amidst the COVID-19 pandemic; Defendants immediately and voluntarily disclosed the underlying errors; and to mitigate the risk of future problems, Enservco switched auditing firms. Nothing about such actions comes close to alleging that the Individual Defendants acted with scienter, as required for Plaintiff to prove a securities fraud claim.

The CAC substitutes length for substance. It fails to state a claim under the strict pleading standards established in the PSLRA, because it (1) fails to plead sufficient specific facts giving rise to a strong inference that any Defendant acted with scienter; (2) fails to allege loss causation, given that Enservco's stock failed to react to some of the alleged misstatements and actually went *up* after some of the alleged corrective disclosures, and (3) fails to plead controlling person liability against any Defendant. For all of these reasons, the CAC should be dismissed.

## STATEMENT OF FACTS

The following facts are taken from the CAC[1] and documents incorporated therein and that are subject to judicial notice.[2] This includes Enservco's filings with the Securities and Exchange Commission (SEC) from which Plaintiff (selectively) quotes,[3] while setting aside the numerous errors in the CAC.[4]

### A. March 2021: Enservco Is A Cash-Strapped Company Operating In A Dynamic Industry Facing Multiple Challenges.

The Class Period begins in March 2021, when Enservco faced multiple challenges, including a volatile industry, intense competition, and the COVID pandemic.[5] Its stock price had generally been low for years,[6] and it had always been cash-strapped with a thinly-staffed accounting department.[7]

---

[1] Paragraph citations (¶\_) are to the CAC.

[2] Defendants submit as exhibits ("Ex. \_\_") to the Declaration of Jeffrey P. Justman certain SEC filings, press releases, analyst reports, and a chart showing closing stock prices for Enservco. On a motion to dismiss, the Court may consider these documents. *See Tellabs,* 551 U.S. at 322; *In re Gold Res. Corp. Secs. Litig.*, 957 F. Supp. 2d 1284, 1293 (D. Colo. 2013).

[3] As explained below, certain key statements in Enservco's SEC filings are misleadingly omitted via ellipses in the CAC. (¶¶117, 136) (omitting key information putting Enservco's public statements in context).

[4] Demonstrating its "cut-and-paste" nature, the CAC is littered with errors, such as referring to the wrong company (*see* ¶46 (referring to "Elanco") and ¶277 (referring to "Phillip Morris")), and cutting off allegations mid-sentence (¶96) ("[T]he Company was forced to disclose what the Individual Defendants knew all along [sic].").

[5] *See, e.g.,* ¶¶4, 57-59, 83; Ex. 1 (2019 10-K, at 4, 11, 17-28); Ex. 2 (2020 10-K, at 7, 11, 14, 23, 40).

[6] Enservco's highest 2018 closing price was $22.05, it fell each year, and its highest 2021 closing price was $2.99. *See* <u>Enservco Corporation (ENSV) Stock Historical Prices & Data - Yahoo Finance.</u>

[7] ¶¶55-57; Ex. 1 (2019 10-K), at 17; *see also* ¶¶142, 144.

4

In 2020 and early 2021, Enservco sought to improve its financial position in several ways, including by converting subordinated debt and accrued equity held by Defendant Cross River Partners into Enservco securities.[8] On February 3, 2021, Enservco exchanged $1.25 million in subordinated debt and accrued interest with Cross River Partners, for 601,674 shares of common stock, and awarded it a warrant to purchase up to 150,418 shares in the future (the "Cross River Transaction").[9]

### B. March 28, 2022: Enservco Voluntarily Discloses The ERC Error And The Warrant Issuance Error.

The first event giving rise to this case occurred in March 2022, when Enservco voluntarily announced the first of two financial restatements.

On March 28, 2022, Enservco announced that it intended to amend and restate its Form 10-Qs for the fiscal quarters ended March 31, June 30, and September 30, 2021, because it had discovered that it: (1) was not eligible for the full amount of employee retention tax credits ("ERCs") it had recorded pursuant to the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") (the "ERC Error"), and (2) had erred in accounting for its issuance of the warrant in connection with the Cross River Transaction (the "Warrant Issuance Error").[10]

---

[8] ¶¶64, 66-68, 73-74; Ex. 2, 2020 10-K, at 40.

[9] ¶74; Ex. 2, 2020 10-K, at 40.

[10] ¶¶117-118; Exs. 4 (3/28/22 Form 8-K), 5 (3/28/22 Press Release).

With regard to the ERC Error, after consulting with its independent public auditor, Enservco concluded that it was not eligible for a portion of those ERCs "due to the aggregation of eligible employees at the Company and its subsidiaries," and thus had improperly reported approximately $304,000 in ERCs under the then-nascent CARES Act.[11] With regard to the Warrant Issuance Error, Enservco determined that the warrant underlying the Cross River Transaction should have been recorded as a loss equal to its fair value at the date of issuance.[12] Enservco voluntarily told investors that in combination, both errors were material, but also noted that "these restatements are not related to operating matters and do not impact revenue, operating expenses, operating loss, or adjusted EBITDA."[13]

Enservco worked promptly to fix the errors, and on April 11, 2022, filed amended quarterly reports doing so (the "First Restatement").[14] In each such report, it fixed the errors and candidly and voluntarily disclosed that its management had "concluded that a material weakness existed in the Company's internal control over financial reporting and that its disclosure controls and procedures were ineffective."[15]

As is reflected by the sheer length and complexity of the CAC, the ERC and Warrant Issuance Errors related to arcane and complex accounting rules and

---

[11] ¶109.
[12] *See* ¶122; Ex. 6 (2021 Q1 10-Q/A, at 9.)
[13] Ex. 5 (3/28/22 Press Release).
[14] *See* Exs. 6, 7, and 8.
[15] *See* Exs.6 (Q1 2021 10-Q/A, at 9, 43); 7 (Q2 2021 10-Q/A, 9, 42); 8 (Q3 2021 10-Q/A, 9, 40.)

regulations. One difficult topic was how ERCs worked under the CARES Act, which was hardly a year old and lacked interpretive guidelines or precedent.[16] Indeed, Enservco applied for ERCs "based on third-party expert advice at the time and further based on management's understanding of the CARES Act, the rules for which were subsequently clarified."[17] Only well after the CARES Act was enacted did the Internal Revenue Service issue additional guidance explaining the aggregation of employees for the purposes of claiming ERCs.[18]

The accounting principles relevant to the Warrant Issuance Error are governed by similarly arcane rules. One was ASC 815-40, *Derivatives and Hedging-Contracts in Entity's Own Equity*,[19] which was complicated enough that the SEC later had to clarify guidance under it.[20] By citing a decade-old article from the Journal of Accountancy to explain these principles,[21] Plaintiff tacitly concedes this issue is complex and arcane.

---

[16] *See* ¶¶77-80, 102-105, 108, 150.

[17] Ex. 4 (3/28/2021 Press Release).

[18] *See* Notice 2021-20, 2021 WL 807026 (Mar. 3, 2021).

[19] Commentators describe ASC 815 as representing "guidance on a complex area of accounting." *See* "Derivatives and Hedging, Accounting Resources for ASC 815 and IFRS 9," GAAP Dynamics (available at https://www.gaapdynamics.com/insights/accounting-topics/derivatives-and-hedging-accounting-resources-for-asc-815-and-ifrs-9) (February 2, 2023).

[20] *See* SEC's April 12, 2021 Staff Statement (available at https://www.sec.gov/news/public-statement/accounting-reporting-warrants-issued-spacs).

[21] ¶103.

### C.    April 2022: Enservco Discovers One Additional Error And Promptly Discloses It.

On April 14, 2022—three days after filing the First Restatement—Enservco discovered a third, wholly unrelated error in its financial statements arising from a similarly complex issue—this time related to the realizability of a certain amount of deferred tax assets following a change-in-control transaction triggered by the sale of shares of stock to many individual shareholders, not a collective controlling group (the "DTA Error"). Immediately, Enservco informed investors of the error and worked to correct it.[22]

More specifically, Enservco determined that, when it issued 4,199,998 shares of common stock in connection with a February 2021 public offering of its stock, it had experienced a change in control.[23] As a result, and in accordance with Internal Revenue Service Code § 382, the realizability of its deferred tax assets became limited. Enservco determined that for its 2021 Form 10-Qs, it should have recognized deferred tax income expense by recording additional valuation allowance, and for the second and third quarters of 2021, it should have recognized a deferred income tax benefit through a partial release of the company's valuation allowance.[24]

---

[22] ¶¶13, 136; *see* Exs. 9 (4/18/22 8-K); 10 (4/18/22 Press Release).
[23] *See* Exs. 11 (Q1 2021 10-Q/2A, at 2, 9); 12 (Q2 2021 10-Q/2A, at 2, 9); 13 (Q3 2021 10-Q/2A 2, 9.)
[24] *See* Exs. 11 (Q1 2021 10-Q/2A, at 2, 9); 12 (Q2 2021 10-Q/2A, at 2, 9); 13 (Q3 2021 10-Q/2A, at 2, 9.)

On May 24, 2022, Enservco filed its second amended quarterly reports to remedy the DTA Error (the "Second Restatement" and collectively, the "Restatements"). Though the Restatements impacted multiple line-items throughout Enservco's financials, at bottom, once the three Errors had been corrected, Enservco reported approximately $1 million more in net losses, or $0.9 per share, for the nine-month period ended September 30, 2021.[25]

### D.   April 2022: CFO Marjorie Hargrave and Controller Donovan Kelly Depart The Company.

On April 4, 2022—after Enservco announced it would amend its financial statements, but before it filed its First Restatement—Enservco announced that its Chief Financial Officer, Marjorie Hargrave, would depart effective April 22, 2022.[26] Its Controller, Donovan Kelly, also departed the company around the same time.[27]

Though the CAC alleges these departures were "sudden" and "suspicious,"[28] there were ample reasons for them. Among other stressors, Enservco faced an "exceptionally challenging" environment; the account department was "thinly staffed" and "stretched thin"; and CFO Hargrave had to "step in" to do basic, substantive accounting work herself, including the daily cash report—a "tedious" task that alone took 5-6 hours a day to complete.[29]

---

[25] *See* Exs. 13 (Q3 2021 10-Q/2A, at 2, 9), 14 (Q3 2021 10-Q, at 2, 9).
[26] *See* ¶¶120, 246; Ex. 15 (4/4/22 Form 8-K)
[27] ¶¶120, 246.
[28] ¶¶246-247.
[29] ¶¶4, 142, 144.

### E.  September 1, 2022: Enservco Fires Its Public Auditing Firm, Plante Moran.

Finally, the Class Period ends on September 1, 2022, when Enservco announced the dismissal of its independent auditing firm, Plante Moran.[30] This dismissal was Enservco's choice, and there is nothing in the CAC to support the conclusory allegation that this firing was "suspicious."[31]

Notably, Plaintiff chose to end the Class Period on September 1, 2022, even though nothing about the announcement of an auditor change corrected any previously inaccurate statement.[32] Equally problematic for Plaintiff's damages theory, Enservco's stock price actually *rose* after it announced its dismissal of Plante Moran: the closing stock price increased from $1.50 on September 1, 2022 to as high as $1.71 by September 6, 2022.[33]

### F.  May-October 2022: Plaintiff Files This Suit.

The original complaint was filed on May 20, 2022. (Dkt. 1.) On August 25, Jan Lambert was appointed as Lead Plaintiff. (Dkt. 26; *see* Dkt. 18.) On November 28, 2022, Plaintiff filed the CAC, with an entirely different class period, and which alleges vastly broader securities claims than those alleged previously. (Dkt. 34.)

---

[30] *See* ¶¶141, 249; Ex. 16 (9/1/22 Form 8-K).

[31] *Id.*

[32] ¶¶1, 249-253.

[33] *See* Ex. 3, Enservco Corporation (ENSV) Stock Historical Prices & Data - Yahoo Finance

## STANDARD OF REVIEW

A plaintiff suing under Section 10(b) "bears a heavy burden at the pleading stage." *In re Level 3 Comm'ns, Inc. Secs. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012); *see Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1184, 1186 (10th Cir. 2003) (describing burden as "stringent" and "rigorous"). To state a claim for securities fraud under Section 10(b), Plaintiff must allege that, in connection with the purchase or sale of a security: (1) Defendants made a material misrepresentation or omission; (2) with scienter; (3) on which Plaintiff justifiably relied; and (4) that caused Plaintiff to incur economic loss. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Here, Defendants challenge Plaintiff's allegations on elements (2) and (4).

The PSLRA sets a high bar for alleging scienter: the CAC must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. §78u-4(b)(2). This sets a "very stringent" pleading standard for scienter, higher than "any federal court had imposed," as a means "to discourage spurious securities lawsuits. *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1259 (10th Cir. 2001).

# ARGUMENT

## I.  The CAC Fails To Plead Specific Facts Giving Rise To A Strong Inference Of Scienter.

The CAC fails to satisfy the PSLRA's requirement that Plaintiff plead sufficient specific facts to give rise to a strong inference of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

Scienter is "a mental state embracing [1] intent to deceive, manipulate, or defraud,' or [2] recklessness." *Smallen v. The Western Union Co.*, 950 F.3d 1297, 1304 (10th Cir. 2020). In this context, recklessness is akin to "conscious disregard," not negligence or even gross negligence. *Id.* at 1305. Recklessness is "something closer to 'a state of mind approximating actual intent.'" *In re Zagg, Inc. Secs. Litig.*, 797 F.3d 1194, 1206 (10th Cir. 2015) (citation omitted). To put it simply, a plaintiff attempting to plead a strong inference of scienter can clear the pleading bar *only* if a "'reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *In re Level 3 Commc'ns, Inc. Secs. Litig.*, 667 F.3d 1331, 1343 (10th Cir. 2012) (quoting *Tellabs*, 551 U.S. at 324).[34]

Unlike other pleading contexts, scienter is a "comparative inquiry": the court looks at the allegations in the complaint, and then it *also* "must consider plausible,

---

[34] While the Tenth Circuit has held that recklessness can in some cases suffice to fulfill the scienter requirement*, see Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003), the Supreme Court has left that issue open. *See Matrixx Initiatives v. Siracusano*, 131 S. Ct. 1309, 1324 (2011). Defendants do not believe recklessness suffices under the PSLRA, and thus preserves the issue for appeal if necessary.

nonculpable explanations for the defendant's conduct." *Tellabs*, 551 U.S. at 324. The Court "must consider the [CAC] in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss," including "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," such as SEC filings, analyst reports, and other publicly available documents. *Id* at 322. Considering these sources, the inquiry is whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323. Any omissions or ambiguities "count against inferring scienter." *Id.* at 326.

### A.   The CAC lacks specific factual allegations giving rise to a strong inference of scienter.

The prolix CAC is nonetheless short on allegations related to scienter. (*See* ¶¶237-253.) When viewed in its totality and compared against the plausible, nonculpable explanations, the CAC falls woefully short.

### 1.   Scienter cannot be inferred from the mere fact of two restatements.

First, the CAC incorrectly implies that the Court should infer scienter merely on the basis of Enservco having made two restatements. Such an argument conflates the elements of falsity and scienter, and is a tactic courts have uniformly rejected.

"[T]he mere existence of an error warranting restatement does not necessarily reflect on the scienter behind that error." *In re Molson Coors Beverage Co. Secs. Litig.*, 2020 WL 13499995, at *4 (D. Colo. Dec. 2, 2020) (Ebel, J., sitting by designation). Why not?

Because any number of reasons can cause companies to restate their financials, including "honest mistakes," *Anderson*, 827 F.3d at 1249, "careless business practices," *The Sorkin, LLC v. Fischer Imaging Corp.*, 2005 WL 1459735, at *9 (D. Colo. June 21, 2005), or other reasons that are neither reckless nor intentional. Courts in this district have thus squarely held that a company's "acknowledgment of past accounting errors is not an admission of a scheme to defraud the investing public." *The Sorkin, LLC*, 2005 WL 1459735, at *8. As Judge Ebel has noted, "to hold otherwise would subject every financial restatement to liability." *In re Molson Coors*, 2020 WL 13499995, at *4.

Nor can the CAC get around this rule by alleging that Enservco had to restate its financials *more than once.* (*See* ¶¶13, 136-41.) Where the errors that cause multiple restatements are unrelated, the number of restatements is irrelevant to the issue of scienter; for this reason, courts have rejected inferences of scienter even when companies restated their financials multiple times. *See, e.g., In re Hertz Global Holdings Inc.*, 905 F.3d 106, 112 (3rd Cir. 2018) (twenty separate accounting adjustments made in fifteen distinct categories were still not sufficient to give rise to a strong inference of scienter); *In re Ceridian Corp. Secs. Litig.*, 542 F.3d 240, 245-46 (8th Cir. 2008) (five accounting restatements made in less than two years were still insufficient to give rise to a strong inference of scienter, because "Section 10(b) and Rule 10b-5 prohibit fraud, not accounting malpractice"). If anything, voluntarily making two accounting restatements to address three *distinct* accounting or tax errors *undermines* any inference of intent, because it shows diligent efforts to correct errors across multiple, unrelated

issues. *See In re Stonepath Grp., Inc. Secs. Litig.*, 397 F. Supp. 2d 575, 588 (E.D. Pa. 2005) ("Since the restatements addressed such unrelated problems, it cannot be said that the mere fact that there were three restatements shows defendants acted recklessly.").

### 2. Scienter cannot be inferred from alleged violations of GAAP or alleged weaknesses in internal controls.

The CAC also alleges scienter based on alleged violations of GAAP, or material weaknesses relating to internal controls over financial reporting. (*E.g.*, ¶¶ 239-242.) On this point, the CAC lacks key details required by Tenth Circuit precedent.

Claims of accounting irregularities or violations of GAAP support a claim of scienter "only when coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors." *Pirraglia*, 339 F.3d at 1191 (quotation omitted); *see In re Crocs, Inc. Secs. Litig.*, 774 F. Supp. 2d 1122, 1154 (D. Colo. 2011) (same). By contrast, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim." *City of Philadelphia*, 264 F.3d at 1261. This is because such arguments amount to improper "fraud by hindsight." *Anderson*, 827 F.3d at 1251. It is easy for any plaintiff to make a post-hoc claim that defendants should have known about allegedly weak internal controls or GAAP violations; but to state a claim under the PSLRA, such allegations must be "coupled with [other] evidence" demonstrating defendants' "fraudulent intent." *City of Philadelphia*, 264 F.3d at 1261 (rejecting fraud-by-hindsight argument).

15

No such "other evidence" is alleged here. The CAC fails to allege that either of the Individual Defendants (or for that matter, anyone else at Enservco), knew about the Warrant Issuance Error, ERC Error, or DTA Error before Enservco filed the Form 10-Qs that later needed to be restated. All the CAC alleges is that Enservco's accounting errors violated GAAP or related to deficient internal controls. But "the fact of violation [of GAAP] is insufficient without some other facts evidencing [the officers] signed the filings with the knowledge that they omitted a required disclosure." *In re Zagg*, 797 F.3d at 1204; *see also McNamara v. Pre-Paid Legal Services, Inc.*, 189 F. App'x 702, 713 (10th Cir. 2006) (unpublished order and judgment) (affirming dismissal because there was no evidence that an alleged GAAP violation "was the result of [Defendants'] fraudulent intent to mislead investors").

Plaintiffs' allegations here mirror those in *In re Gold Res. Corp. Secs. Litig.*, 776 F.3d 1103 (10th Cir. 2015), in which the Tenth Circuit affirmed dismissal for lack of any cogent and compelling inference of scienter. There, a company was forced to restate its financials following accounting errors related to reporting income from a gold mine. The plaintiffs alleged that the *very same factors cited by Plaintiff here*—accounting restatements of significant magnitude, alleged "GAAP violations," and incorrect Sarbanes-Oxley certifications—gave rise to a strong inference of scienter. *Id.* at 1113. Yet the Court affirmed dismissal because the Plaintiff needed, but failed, to allege "*other particularized facts showing fraudulent intent.*" *Id.* at 1114. Indeed, there were *more*

alleged factors favoring an inference of scienter in *Gold Resources Corp.* than there are in the CAC. *A fortiori*, dismissal here is an easy call.

Sitting as a district judge, Judge Ebel also dismissed a similar case for lack of any particularized allegations giving rise to a strong inference of scienter. *See In re Molson Coors Beverage Co. Secs. Litig.*, 2020 WL 13499995 (D. Colo. Dec. 2, 2020). There, the Molson Coors Beverage Company restated its financials due to various tax and accounting errors. Judge Ebel rejected similar allegations: "Like the accounting error, the mere existence of a material weakness in internal controls does not establish Defendants' scienter regarding that weakness." *Id.* at *6. Indeed, "the lack of adequate controls ***arguably cuts against*** an inference of scienter." *Id.* (emphasis added).

Nor can scienter be inferred from Enservco having made "***three*** accounting errors," as Plaintiff alleges. (¶241.) That is because the errors relate to *different,* arcane topics. *See, e.g., In re Stonepath*, 397 F. Supp. 2d at 588; *In re Molson Coors*, 2020 WL 13499995, at *4, *10 (because the restatement arose from a technical tax-accounting error, the court "cannot infer that Defendants knew they were violating GAAP"). Plaintiff admits that these errors related to "complex financial instruments" (¶150), and he has to dig deep into the GAAP archive, citing to a 2013 article from the "Journal of Accountancy," to explain one of the violations. (¶103.) Because Plaintiff "does not allege the accounting errors made by [Enservco] were simple, or even uncommon," his allegations are insufficient. *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 680 (D. Colo. 2007) (holding that the failure to "allege the existence of a single

written document showing that [a company] was actually aware that it was utilizing improper accounting procedures that threatened the financial viability of the company" doomed any allegation of scienter).[35] To the contrary, the errors relate to complex, technical tax and accounting topics.

It is particularly disingenuous for Plaintiff to claim that the Individual Defendants committed a complex accounting fraud when they allege that Chief Financial Officer Hargrave "did not have a firm grasp on accounting," lacked expertise in "doing the nitty gritty accounting work," and had a "hard time understanding accounting sometimes." (¶145.) These allegations squarely *undermine* any notion that Hargrave (or CEO Murphy, who was even further removed from accounting and tax issues) acted with the requisite intent. *See Ezra Charitable Trust v. Tyco Int'l*, 466 F.3d 1, 9 (1st Cir. 2006) (rejecting inference of scienter on similar facts).

### 3. Scienter cannot be inferred from the magnitude of the accounting errors.

Next, the CAC alleges that scienter can be inferred from the supposed "magnitude" of the alleged accounting errors. (¶¶243-45.) Here, Plaintiff's arguments are factually incorrect and legally insufficient.

---

[35] Courts across the country are thus in accord that mere GAAP violations add nothing to the scienter analysis. *See, e.g.*, *Podraza v. Whiting*, 790 F.3d 828, 837 (8th Cir. 2015) ("[P]leading an amalgam of unrelated GAAP violations, without more, does not give rise to a strong inference of scienter."); *In re Ceridian Corp. Secs. Litig.*, 542 F.3d 240, 246 (8th Cir. 2008) (same); *In re BISYS Secs. Litig.*, 397 F. Supp. 2d 430, 448 (S.D.N.Y. 2005) (GAAP violations "merely establish that the reports were false," not that the reports were issued "with the requisite fraudulent intent").

Factually, it is incorrect for Plaintiff to contend that the errors were of "significant" magnitude. The so-called Warrant Issuance Error and the ERC Error were made in one restatement only because *collectively*, they surpassed the materiality threshold. But individually, both were the sort of "immaterial errors" that Plaintiff concedes could be corrected with a "little r restatement" in "future filings." (*See* ¶38) (describing such restatements). By definition, all financial restatements are "material," meaning in the aggregate they have surpassed some degree of "magnitude" that requires restatement. But that does not mean that any shareholder can show a strong inference of scienter merely by alleging that the circumstances leading to a restatement was of "significant magnitude."

To the contrary, as Judge Ebel recently noted, "scienter allegations can also be lacking despite issues of significant financial magnitude." *In re Molson Coors*, 2020 WL 13499995, at *5-6. Hence, in *Molson Coors*, an error that understated the company's liabilities by $400 million—a much larger amount that those present here—did "not alone raise a strong inference of scienter," and required "other particularized facts." *Id*; *see also Anderson*, 827 F.3d at 1251 ("[T]he size of the loss does not suggest that the four executives knew or recklessly disregarded the risks."); *The Sorkin, LLC*, 2005 WL 1459735, at *6 (even where restatement caused net income to go from $3.3 million to a $0.8 million loss, rejecting allegation of scienter and dismissing complaint).

On this issue, courts have rejected inferences of scienter when the alleged "magnitude" of the restatements were *far greater* than alleged in the CAC. In *In re Hertz*

*Global Holdings Inc.*, 905 F.3d 106 (3rd Cir. 2018), for example, the Hertz rental car company corrected material errors to Hertz's 2011, 2012, and 2013 financial statements, that, cumulatively, overstated its pre-tax income by $215 million and its net income by $132 million. The Third Circuit affirmed dismissal, noting: "A company's admission even to significant accounting errors, however, is insufficient by itself to give rise to a strong inference of scienter." *Id.* at 116. The magnitude of the restatement was weakened by "the fact that the accounting errors were spread across myriad accounting categories," and because overstating Hertz's income by between 10% and 32% was "not sufficiently drastic" to give rise to a strong inference that the Defendants acted with scienter. *Id.* at 116; *see also, e.g., Webb v. Solarcity Corp.*, 884 F.3d 844, 858 (9th Cir. 2018) (restatement disclosing that net income was overstated by 15% to 67% per quarter did not give rise to strong inference of scienter in the absence of other compelling allegations); *In re Stonepath Grp.*, 397 F. Supp. 2d at 588 (restatement eliminated $7.1 million in net income and replaced it with a loss, which was "undeniably large," but "alone it does not establish recklessness"). This case involves errors of a much lower magnitude than those in *Hertz, Stonepath*, or *Webb*.

On this point, the Sixth Circuit got it right when it stated that "[a]llowing an inference of scienter based on the magnitude of fraud 'would eviscerate the principle that accounting errors alone cannot justify a finding of scienter.' It would also allow the court to engage in speculation and hindsight, both of which are counter to the PSLRA's mandates." *Fidel v. Farley,* 392 F.3d 220, 231 (6th Cir. 2004) (cleaned up).

### 4. Scienter cannot be inferred from the departures of Hargrave and non-defendant Donovan Kelly.

Next, the CAC alleges that "dual resignations" of Hargrave and non-Defendant Donovan Kelly "support the inference of scienter." (¶246.) On this issue, Plaintiff's arguments are entirely meritless.

Under governing law, Hargrave's departure does not help "establish an earlier intent to defraud." *In re Zagg*, 797 F.3d at 1205. At most, her departure is "an acknowledgment that the company identified a better way of doing things moving forward, not an indicator that fraudulent intent existed at the time the alleged omissions occurred." *Id; see also In re Molson Coors*, 2020 WL 13499995, at *11 (executive departures had "no weight" in scienter analysis because there were no allegations explaining why the departure was suspicious).

The Ninth Circuit has persuasively explained that for any executive departure following a restatement to bear on an inference of scienter, "a plaintiff must plead facts refuting the reasonable assumption that the resignation occurred as a result of restatement's issuance." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009). "Absent allegations that the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances, the inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or as compelling as the inference

that the employees resigned or were terminated for unrelated personal or business reasons." *Id.*; *see also In re Hertz*, 905 F.3d at 118 ("In other words, for corporate departures to strengthen an inference of scienter, there must be particularized allegations connecting the departures to the alleged fraud.").

No such particularized allegations are present here. The CAC merely alleges in conclusory fashion that the timing of Hargrave's departure was "suspicious" or "sudden" (¶246-247), without identifying any specific facts explaining why. The far more cogent, compelling, and correct explanation for Hargrave's departure is that after years of doing a lot of the "substantive [financial] work herself," including the "daily cash report"—a "tedious" task which took five to six hours per day in itself (¶144)—she decided to move on to less arduous employment. This explanation is particularly compelling because the accounting department was "stretched thin" (¶142), and Enservco was facing an "exceptionally challenging" environment featuring an "industry-wide downturn" with "sharply declining oil prices" and "the onset of the COVID-19 pandemic" (¶4, 58.) Hargrave only had so much energy and time to give before a transition made sense.

The CAC alleges that Hargrave served as CFO for "less than two years and nine months" (¶247), but fails to explain why that period of time should be considered unusual. Past Enservco executives have departed after similar periods. (*See* Ex. 17 at fig. 41; Ex. 18 at fig. 36; Ex. 19 at fig. 37; Ex. 20 at fig. 38.) *See In re Hertz*, 905 F.3d at 119 ("Corporate resignations do not strengthen an inference of scienter, when, as here, the

allegations do not cogently suggest that the resignations resulted from the relevant executives' knowing or reckless involvement in a fraud."); *cf. In re Ceridian*, 542 F.3d at 249 (even after executive resignations, the opposing inference—that an executive was asked to leave "for incompetence, not fraud"—was more compelling in the absence of "facts giving rise to a strong inference of fraud").[36]

That leaves the allegations that non-defendant Kelly's departure gives rise to an inference of scienter (¶246), but they are even weaker. Nothing about a corporate controller departing at "around the same time" as the Chief Financial Officer suggests fraud. (¶¶120, 246.) If anything, a more plausible inference from the CAC is that once Hargrave announced her departure, Kelly decided to leave because he didn't want to work under a replacement CFO. The CAC's sole paragraph about Kelly's departure (¶247) is far too conclusory to give rise to any inference of scienter. *See, e.g., In re Zagg*, 797 F.3d at 1205; *Zucco*, 552 F.3d at 1002.

**5.    Scienter cannot be inferred from dismissal of Enservco's audit firm.**

Next, the CAC suggests that dismissal of Enservco's independent audit firm, Plante Moran, "further support[s] the inference of scienter." (¶249.) This argument is legally baseless.

---

[36] The CAC's sole paragraph that Hargrave received "even greater benefits" as a result of her separation agreement (¶248) adds nothing. It is common for executives to receive additional benefits upon separation from the company, in exchange for waiving certain rights. Nothing in such arrangements suggests fraudulent intent.

On this issue, the Ninth Circuit got it right in *Zucco*: "Here, the resignation of . . . [Defendant's] independent accounting firm [shortly] after the restatement was issued is not surprising—it had just been partially responsible for the corporation's failure to adequately control its accounting procedures. This is not enough to support a strong inference of scienter." *Zucco*, 552 F.3d at 1002. So too here.

If anything, the facts about Plante Moran's dismissal are even less suggestive of any inference of scienter than in *Zucco*. There, the auditing firm *resigned* (with the inference being that it resigned in protest over fraudulent practices). Here, by contrast, Enservco "fired" Plante Moran. (¶249.) Nothing in the CAC's few paragraphs on this issue (¶¶249-53) explains why the Court may infer that the Individual Defendants or Enservco acted with scienter based on Enservco's decision to change auditing firms. The more cogent and compelling inference is that Enservco became dissatisfied with a firm that acquiesced in, or at a minimum failed to detect, various tax and accounting errors and control weaknesses, and reasonably decided a change was in order. *See Zucco*, 552 F.3d at 1002.

## 6.     The CAC does not plead a plausible motive.

The foregoing sections address the only specific sections of the CAC tailored to scienter. Notably, there is ***no section*** in the CAC addressing any motive from any Defendant to commit securities fraud. Indeed, the word "motive" is not found anywhere in over 100 pages of the CAC. That is telling.

Charitably read, the CAC includes three scattershot, throwaway paragraphs discussing alleged "incentives" one or more Defendants had to misrepresent Enservco's financials (¶¶8, 90, 91). Specifically, the CAC alleges the Individual Defendants had an "incentive" to pursue various "cash-maximizing business strategizes" to make it appear that Enservco was in a better financial position ahead of refinancing discussions, so as to either (1) avoid the risk of losing Defendants' investments or (2) avoid losing their jobs. (¶¶8, 90, 91.) None of these allegations suffices to establish any motive to commit securities fraud, because they are too generic, and would apply to all corporate defendants.

As the Tenth Circuit has explained in a similar context, "[g]eneral motives for management to further the interests of the corporation," including "a motive to refinance [the company's] debt," "fail to raise an inference of scienter." *In re Level 3*, 667 F.3d at 1346. This is because corporate officers "always have an incentive to improve the lot of their companies, but this is not, absent unusual circumstances, a motive to commit fraud." *Id.* Instead, a company's refinancing of "existing debt" most plausibly reflects "nothing more than a general desire to further the corporation's interests." *Id* Or as then-Judge Gorsuch has held, a motive that defendants acted to "facilitate a stock offering to raise badly needed capital," without allegations "that the defendants themselves stood to gain personally," is insufficient to create an inference of scienter, because such a motive was "shared by all companies." *MHC Mut. Conversion*, 761 F.3d at 1122.

The CAC suggests that Defendants had a "powerful economic incentive" to misrepresent Enservco's financial position given that its ability to continue as a going concern purportedly hinged on its ability to successfully refinance its debt. (¶8.) But the desire to "maintain the company's corporate survival" does "not present an unusual or heightened motive and does not support a strong inference of scienter." *Podraza*, 790 F.3d at 840-41. Nor is the related allegation—that Defendants had an incentive to mislead investors to "secure a new source of financing" (¶90)—sufficient, because the "desire to maintain a credit facility is a motive shared by all corporate executives." *The Sorkin, LLC,* 2005 WL 1459735, at *11; *see also In re Stonepath*, 397 F. Supp. 2d at 592-93 (rejecting materially indistinguishable motive, because "such motive could be imputed to any company"; noting that "standing alone even severe cash flow problems are insufficient to establish motive"; "Otherwise, any corporation that was subject to debt covenants and whose stock price declined would be susceptible to a securities fraud action").

The CAC's allegation about Murphy's "economic incentive"—related to his investment in Cross River Partners (¶91)—makes even less sense. Murphy had no incentive to artificially inflate the stock price of a company that was an integral part of the Cross River Partners portfolio. Plaintiff's allegation that Cross River Partners' investment in Enservco was so significant that its loss "could cause investors" to "lose faith in Murphy's investment management strategy and leave Cross River Partners altogether" (¶91) is speculative and unsupported.

Generously interpreted, the CAC's few allegations about "incentives" boil down to arguments that, at most, the Individual Defendants did not want to jeopardize Enservco's business, ability to continue as a going concern, or their employment. (¶¶8, 90, 91.) But these are motives are shared by all companies and "thus would not ordinarily support an inference of fraudulent intent." *City of Philadelphia*, 264 F.3d at 1268. As the Tenth Circuit stated, the alleged motive to "facilitate a notes offering" was "the epitome of a shared business motive and thus cannot by itself sustain a claim of securities fraud." *Id.* at 1269; *see also Anderson*, 827 F.3d at 1238-39 (argument that executives had a motive to mislead in order to buy time to fix a difficult financial situation was at most suggestive of a "general corporate motive" that "would not contribute to an inference of scienter"); *Novak v. Kasaks,* 997 F. Supp. 425, 430 n.5 (S.D.N.Y. 1998) (alleged motive to raise capital insufficient as a matter of law to allege scienter).

On the issue of motive, it is also notable that **the CAC never alleges Defendants made any sales of stock during the Class Period.** That is a common motive pleaded in many securities-fraud lawsuits. And while the absence of a motive from inside-stock sales "is not dispositive," the absence of "convincing allegations" of a motive "counts against scienter." *In re Level 3*, 667 F.3d at 1347; *see also In re Gold Resources*, 776 F.3d at 1117 n.8 (absence of allegations of inside stock sales "cuts the other way"); *City of Philadelphia*, 264 F.3d at 1270 (where plaintiffs "ma[d]e no concrete allegations that any of the Defendants sold [company] stock at an inappropriately inflated price, or that they

in any other way benefitted in some concrete and personal manner from making the alleged misrepresentations and/or omissions," allegations of scienter were insufficient); *Red Robin*, 505 F. Supp. at 678 (the inference of scienter is "particularly weak given that Plaintiff does not allege inside stock sales intended to take advantage of Red Robin's purportedly intentional inflation of earnings").

Plaintiff's motive argument is likewise undercut by the close proximity of the two Restatements. The CAC has no explanation for why the Defendants would perpetuate a complex accounting fraud and then *voluntarily*, and irrationally, announce the errors *twice within a one-week period. See In re Zagg*, 797 F.3d at 1206 (allegations of motive were "undercut by the fact that [the defendants] did personally disclose [the issue]"). Nor does the CAC explain why Defendants would have a motive to commit fraud continuing to the end of the putative class period, September 1, 2022, long after the two Restatements were issued. (¶¶1, 141.)

In short, because the CAC's allegations of motive are largely, if not entirely, absent, any circumstantial allegations of scienter must be "correspondingly greater." *In re Molson Coors*, 2020 WL 13499995, at *7. Or as the Tenth Circuit has put it, Plaintiff's allegations of scienter "are unpersuasive because the [CAC] fails to allege any plausible motive why Defendants would wish to mislead investors." *Emps.' Ret. Sys. of Rhode Island v. Williams Cos., Inc.*, 889 F.3d 1153, 1173 (10th Cir. 2018).

### 7. Scienter cannot be inferred from Defendants' positions with Enservco, statements attributable to confidential witnesses, SOX certifications, or anything else in the CAC.

There is little else in the CAC that could even plausibly be read to address the element of scienter, but for completeness, Defendants address a handful of straggler allegations. None comes even close to creating a strong inference of scienter.

First, like plaintiffs in other securities lawsuits, Plaintiffs here attempt to create an inference of scienter based merely on Defendants' "positions with the company" (*see* ¶¶286-87.) But the Tenth Circuit has "rejected the notion that knowledge may be imputed solely from an individual's position with the company." *Wolfe v. Aspenbio Pharma, Inc.*, 587 F. App'x 493, 497 (10th Cir. 2014) (affirming dismissal); *see Anderson*, 827 F.3d at 1245 (similar).

Second, to the extent Plaintiff may point to the CAC's handful of allegations from so-called "confidential witnesses" ("CWs") (*see* ¶¶29-33, 58, 107, 142-48), they say nothing about Defendants' intent. They either speak to Enservco's financial condition (paragraph 58 alleges that Enservco was "struggling to stay alive"), work Hargrave did on financial or accounting matters (paragraph 144 alleges she performed "tedious" daily cash report work), or her strengths and weaknesses (paragraph 30 claims she had a "pushy personality"). None of these allegations support any inference of scienter, and some of them squarely *undermine* it by painting a picture of a company prone to careless errors or other mismanagement. (*See, e.g.* ¶¶58, 145, 147.) Given the CAC's other allegations that the alleged errors related to "complex financial instruments" (¶150), the

CW allegations add nothing. Most importantly, no CW statement establishes that any Defendant knew of the tax or accounting problems but decided to make false statements anyway, which "further cuts against an inference of scienter." *In re Molson Coors*, 2020 WL 13499995, at *8.

Finally, the CAC includes a bevy of conclusory allegations that the Individual Defendants signed certifications under Sarbanes-Oxley (SOX) that ultimately proved to be false. (¶¶165, 168, 182, 185, 200, 203, 214, 217, 223, 226, 232, 235, 240.) But the "bare allegation" that an officer filed inaccurate SOX certifications "adds nothing substantial to the scienter calculus." *In re Zagg*, 797 F.3d at 1205; *see also In re Gold Resources*, 776 F.3d at 1116; *Zucco*, 552 F.3d at 1003-04; *Hertz*, 905 F.3d at 118.

**B.    The more cogent and compelling inference is that Enservco was a leanly staffed company that made three unrelated tax or accounting errors regarding complex and arcane issues in the midst of unprecedented economic challenges.**

Plaintiff will likely argue that while the factors identified above are insufficient individually, when viewed "in combination," or "holistically," they add up to create a strong inference of scienter. Under *Tellabs*, the Court must consider all allegations holistically and then compare them against "plausible, nonculpable explanations for the defendant's conduct." 551 U.S. at 324. Viewing all sources holistically, Plaintiff's theory of scienter is not only not cogent and not compelling; it completely falls apart.

By far the more cogent and compelling inference is that Enservco was a cash-strapped company operating with a lean accounting department in the midst of an

"exceptionally challenging industry-wide downturn." (¶4.) Then the COVID-19 pandemic hit, causing further challenges and uncertainty. (*Id.*) Enservco attempted to take advantage of opportunities Congress created for struggling companies during the pandemic—including claiming employee retention credits under the CARES Act—and it also attempted to improve its financial position by refinancing some of its debt. (*E.g*, ¶¶4-7.) Plaintiff never challenges Enservco's contemporaneous SEC filings describing the restatements as involving "complex" transactions made under "unique" circumstances. (Ex. 16 (9/1/22 Form 8-K, at 3; *see also* ¶150 (describing "complex financial instruments").

By the CAC's own account, Enservco did not have a full complement of sophisticated accounting personnel to complete these "complex" transactions in an error-free manner. The accounting department had only "six people," only three of whom had bachelor's degrees in accounting. (¶142.) Enservco was "stretched thin," forcing the CFO, Hargrave, to perform five-to-six-hour daily tasks normally assigned to others. (¶142, 144.) Hargrave is alleged not to have a "skill set" in accounting, with various witnesses claiming that "she didn't really have that accounting knowledge" and that "she had a hard time understanding accounting sometimes." (¶145.)

Unfortunately, the pressures of operating a cash-strapped, understaffed company in an exceptionally challenging financial environment led to errors when it came to complex tax and accounting issues. (*See supra* Fact Section Parts B and C.) Notably, the Restatements were "not related to operating matters and do not impact revenue,

31

operating expenses, operating loss, or adjusted EBITDA." (Ex. 5, 3/28/22 Press Release; *see also* Ex. 4, 3/28/22 Form 8-K (noting that "adjustments to correct the errors will have no impact on revenues, operating expenses, or loss from operations," or on "Adjusted EBITDA").) Plaintiff is *not* being candid with the Court in pleading the CAC with ellipses (…) to omit the modest impact of the First Restatement on Enservco's financials.

By far the more cogent picture is that Enservco was doing the best it could amidst (1) an unprecedented economic environment; (2) a global pandemic; and (3) accounting staffing challenges. It *voluntarily* reported three unrelated and complex tax and accounting issues upon their discovery (even if some were immaterial individually, and did not have an impact on revenues or EBITDA). At worst, this paints a picture of honest mistakes, careless errors, or other form of benign mismanagement that falls far short of intent to defraud. *See, e.g., See, e.g., Pirraglia*, 339 F.3d at 1192 ("It is equally possible to conclude that [defendants] made some incorrect accounting decisions regarding a limited number of transactions," and thus rejecting inference of scienter); *In re Level 3*, 667 F.3d at 1345 (similar); *In re Gold Resources*, 776 F.3d at 1116 (similar). The Tenth Circuit's decisions in *Pirraglia*, *Level 3*, and *Gold Resources* all affirmed dismissal where the more cogent and compelling explanations were similar to Enservco's here.

Decisions from this District dismissing similar cases confirm that there are more cogent and compelling inferences to draw from the CAC than fraud. As to Enservco's accounting department being "stretched thin" (¶142), "if anything, [thin staffing] might

favor Defendants by explaining why the accounting problem was missed, without saying anything about Defendants' scienter—it suggests mistake without resort to fraud." *In re Molson Coors*, 2020 WL 13499995, at *10; *see also Red Robin*, 505 F. Supp. 2d at 688.

Notably too, Enservco voluntarily restated its financials and announced the errors to the investing public, rather than under threat of litigation or regulatory investigation. "The fact that the [complaint] shows efforts by [Defendant] to remedy the various problems that it was encountering is also inconsistent with a strong inference of scienter"; efforts to fix problems "suggest a motive to remedy problems, not to conceal them," *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1147 (D. Colo. 2011), *aff'd sub nom. Sanchez v. Crocs, Inc.*, 2016 WL 3959191 (10th Cir. July 19, 2016). The CAC is replete with allegations about the numerous steps Enservco took to voluntarily address these issues, including by informing investors of cash constraints and other financial issues (¶¶4, 59, 83, 88), fixing problems once they were identified, including by twice restating its financials (¶¶117, 136) and by hiring a new public accounting firm (¶264). The most cogent and compelling inference is that Defendants undertook good faith efforts to fix inadvertent errors, and nothing more. *See also, e.g., McNamara*, 189 F. App'x at 713 (if defendants intended to deceive investors, it "makes little sense for them to overtly disclose their scheme to the SEC and public"); *Red Robin*, 505 F. Supp. 2d at 678-79 (similar).

This case is just like the many tax and accounting restatement cases that this Court and others have dismissed because the far more cogent and compelling inference is honest mistakes, careless errors, or other mismanagement. The allegations in *Gold Resources*, *Hertz*, *Ceridian*, and *Molson Coors* were far stronger, but the Courts there nonetheless rejected any inferences of scienter. *See In re Gold Resources*, 776 F.3d at 1113-14; *In re Ceridian*, 542 F.3d at 246-48; *In re Hertz*, 905 F.3d at 117; *In re Molson Coors*, 2020 WL 13499995, at *6-12.[37]

Accordingly, the Court should dismiss the CAC for lack of sufficient allegations of scienter. If it does this, it need not proceed further.

### C.   The CAC fails to distinguish among defendants and thus fails under the "group pleading doctrine."

The CAC also should be dismissed because it impermissibly "groups" all Defendants together and attempts to plead scienter collectively. This approach runs afoul of the "group pleading doctrine," which the PSLRA does not allow.

As the Fifth Circuit has explained, the group pleading doctrine—which allowed securities-fraud plaintiffs to collectively lump defendants together simply by using the

---

[37] *See also, e.g.*, *Zucco*, 552 F.3d at 1007 (the more compelling inference was that the company "was experiencing problems controlling and updating its accounting and [tax] practices, [and] there was no specific intent to fabricate the accounting misstatements at issue here"); *Podraza*, 790 F.3d at 838 (an inference of fraudulent intent was "further contradicted" by the fact that the company disclosed the underlying factual issues leading to the restatement); *In re Ceridian*, 542 F.3d at 246 ("Without something more, the opposing inference of nonfraudulent intent—that these were mistakes by accounting personnel undetected because of faulty accounting controls—is simply more compelling.").

phrase "defendants"—"cannot withstand the PSLRA's specific requirement that the untrue statements or omissions be set forth with particularity as to 'the defendant' and that scienter be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind." *Southland Securities Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 364-65 (5th Cir. 2004). Hence, courts in this district have held that "general allegations regarding the 'individual Defendants' or "[company] executives" "fail to support a strong inference of [a specific executive's] scienter." *In re Crocs, Inc. Secs. Litig.*, 774 F. Supp. 2d 1122, 1152 (D. Colo. 2011).

The CAC fails this test because most of the allegations of scienter (¶¶237-253) simply address "Defendants," without explaining *which* Defendant is alleged to have acted with fraudulent intent. That is insufficient. *In re Crocs*, 774 F. Supp. 2d at 1152. The CAC can be dismissed on this additional, alternative basis.

## II.   Plaintiffs Fail to Adequately Plead Loss Causation.

The CAC also fails to adequately plead loss causation, and can be dismissed for this additional reason.

To plead a securities-fraud claim, Plaintiffs must plead that one or more material misrepresentations caused a loss, known as loss causation. *In re Williams Secs. Litigation-WCG Subclass*, 558 F.3d 1130, 1136 (10th Cir. 2009); *see Dura*, 544 U.S. at 346. In the "typical loss causation situation," a plaintiff first alleges an "inflation of the stock price due to" the misrepresentation, followed by a corrective disclosure and "an immediate

decline in the stock price[.]" *In re ICG Commc'ns, Inc. Sec. Litig.*, 2006 WL 416622, at *10 (D. Colo. Feb. 7, 2006). The problem for Plaintiff is that on key dates, Enservco's stock price *moved in the wrong direction* for his damages claim: the alleged misrepresentations in Enservco's 2021 Form 10-Qs did not artificially inflate the price of Enservco's stock; the price actually declined after they were made. And the price did not decline after the alleged corrective disclosures; it increased after some of them.

The CAC alleges there were ten public filings that comprised the alleged fraud. With the exception of the three that occurred on April 11, 2022 (as part of the "First Restatement"), the closing price of Enservco stock actually *decreased* after the remaining announcements, as shown in this table:

| Alleged False Statement (Date—SEC Filing) (Paragraph of the CAC) | Stock Price at Close of Day of Alleged Misrepresentation[38] | Stock Price at Close of Day After Alleged Misrepresentation |
|---|---|---|
| **3/23/21**—2020 10-K (¶¶156-160) | $1.78 | $1.74 |
| **5/13/21**—1Q 2021 Form 10-Q (¶¶161-173) and Press Release (¶¶174-76) | $1.28 | $1.27 |
| **8/5/21**—2Q 2021 Form 10-Q (¶¶ 177-190) and Press Release (¶¶ 191-94) | $1.22 | $1.18 |
| **11/15/21**—3Q 2021 Form 10-Q (¶¶ 195-206) and Press Release (¶¶ 207-09) | $1.28 | $1.19 |

[38] Stock prices taken from Yahoo! Finance Historical Prices for ENSV. *See* Ex. 3.

Because the stock price *decreased* after the alleged misrepresentations, Plaintiff has failed to plausibly allege the artificial inflation necessary to establish loss causation. *See In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 103 (S.D.N.Y. 2011) (an unexplained decline in stock price during period of alleged artificial inflation defeats loss causation).

Plaintiff has the opposite problem when it comes to certain of the corrective disclosures. For example, with regard to the "First Restatement" made on April 11, 2022 (*see* ¶121), Enservco stock closed at $1.86 on April 11 and it closed at $2.22 on April 12, 2022, a 19% trip in the wrong direction.[39] Likewise, Plaintiff's alleged "Second Restatement" occurred on May 24, 2022, when Enservco filed a second amendment to its Form 10-Qs. On May 24, 2022, Enservco stock closed at $1.93, while it closed at $1.96 the next day and continued to increase to a high of $2.41 (a 25% increase) on March 31. Finally, Plaintiff's proposed class period ends on September 1, 2022, when Enservco announced it fired its external auditor. (¶1, 264.) Enservco stock closed at $1.50 on September 1 and at $1.70 on September 2. Apparently, investors were pleased by this news.

When stock increases after a corrective disclosure, a plaintiff has failed to plausibly plead loss causation. *In re China Organic Sec. Litig.*, 2013 WL 5434637, at *8 (S.D.N.Y. Sept. 30, 2013); *see also West Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, 2008 WL 4838671, at *6 (D. Colo. Nov. 6, 2008) ("No stock price drops occurred in

---

[39] Ex. 3.

the aftermath of this disclosure; rather, the initial response to the registration statement drove stock prices up."); *Waters v. General Electric Co.*, 2010 WL 3910303, at *8 (S.D.N.Y. Sept. 29, 2010), *aff'd sub nom. GE Inv'rs v. Gen. Elec. Co.*, 447 F. App'x 229 (2d Cir. 2011) ("The Court cannot find, and Plaintiffs have not cited, a single section 10b-5 case in which the plaintiff prevailed on a motion to dismiss when the stock price *increased* after an announcement revealing an alleged fraud."); *In re Home Loan Serv. Solutions, Ltd. Sec. Litig.*, 2016 WL 10592320, at *5 (S.D. Fl. June 6, 2016) (quoting same); *In re VeriSign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1208 (N.D. Cal. 2007) ("[I]t is questionable whether plaintiffs will ever be able to allege loss causation, because VeriSign's stock price went up, not down" after the disclosure); *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938 (D. Ariz. 2007) (plaintiffs did not plead loss causation when "once a corrective disclosure was issued[,] the stock price actually increased"). The Court may dismiss the CAC for this alternative reason.

## III.   The CAC Fails To State Claims Under Section 20(a).

Count II alleges "controlling person" claims against the Individual Defendants under Section 20(a) of the 1934 Act.[40] Because Plaintiff has not properly pleaded claims under Section 10(b), its Section 20(a) claim must also be dismissed. *See Smallen*, 950 F.3d

---

[40] Section 20(a) imposes joint and several liability on any "person who, directly or indirectly, controls any person liable" for securities fraud under the 1934 Act, "unless the controlling person acted in good faith and did not directly or indirectly induce" the violation. 15 U.S.C. § 78t(a).

at 1315; *In re Gold Resources*, 776 F.3d at 1118; *In re Level 3*, 667 F.3d at 1347; *City of Philadelphia*, 264 F.3d at 1271.

There are also additional reasons Count II fails to state a claim as to the Cross-River Defendants. To state a "controlling person" claim, Plaintiff must plead facts showing (1) a primary violation of the securities laws and (2) control over the primary violator by the alleged controlling person." *In re Gold Resources*, 776 F.3d at 118; *City of Philadelphia*, 264 F.3d at 1270. In alleging Section 20(a) liability, the CAC must still contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The CAC's only factual basis for alleging that the Cross River Defendants "controlled" Enservco is that Defendant Murphy "beneficially owned approximately 18% of the outstanding shares of Enservco" along with the Cross River Entities. And that the Cross River Entities could "exercise significant influence over all matters requiring approval by Enservco's shareholder, including the approval of significant corporate transactions." (¶288-89.)

Documents incorporated into the CAC bely this conclusory assertion. The Cross River Defendants are Enservco shareholders, and whenever they entered into transactions with Enservco, they were arm's length, represented by separate counsel, and fully disclosed. There is no plausible factual allegation suggesting that either Cross River Defendant had the power to control the contents of statements made by Enservco's two highest-ranking executives, or the content of Enservco's SEC filings or

press releases. Neither Cross River Defendant signed any of Enservco's SEC filings, and none of the statements in those filings are attributed to the Cross River Defendants. Plaintiff's claim that the Cross River entities are "controlling persons" with respect to statements allegedly made by others is not supported by the facts.

## CONCLUSION

For these reasons, the Court should dismiss the CAC.

Dated: February 10, 2023.

**FAEGRE DRINKER BIDDLE & REATH LLP**

*/s/Jeffrey P. Justman*
Michael R. MacPhail
Megan M. Farooqui
Jeffrey P. Justman
1144 15th Street, Suite 3400
Denver, Colorado 80202
Telephone: (303) 607-3500
Michael.MacPhail@faegredrinker.com
Jeff.Justman@faegredrinker.com
Megan.Farooqui@faegredrinker.com

*Attorneys for Defendants*

## **PRACTICE STANDARD III(A)(1) CERTIFICATION**

I hereby certify that the foregoing motion complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1), as modified by the Court's February 9, 2023 Order Granting Defendants' Unopposed Motion to Exceed Word Limit (Dkt. 48).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 10th day of February 2023, a true and correct copy of the foregoing **DEFENDANTS' MOTION TO DISMISS** was e-filed with the Court through CM/ECF and served on all counsel of record.

<u>/s/ Paul D. Bryant</u>
Paul D. Bryant, Legal Administrative Assistant