**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-01267-DDD-STV

JAN LAMBERT, and
ALI SAEE,

      Plaintiffs,

v.

ENSERVCO CORPORATION,
CROSS RIVER PARTNERS, L.P.,
CROSS RIVER CAPITAL MANAGEMENT LLC,
RICHARD A. MURPHY, and
MARJORIE A. HARGRAVE

      Defendants.

---

**PLAINTIFFS' RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

---

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 4

    A.   Relationship with Defendant Murphy and His Investment Fund ................. 4

    B.   Enservco Is Crippled by Its Debt Obligations in 2019 ................................... 4

    C.   Management Attempts to Avoid Bankruptcy ................................................. 5

    D.   Known Disfunction in Enservco's Accounting Group and an Impending
         Funding Crisis Are Ignored ......................................................................... 6

    E.   The Individual Defendants Misrepresent Enservco's Financial Health to
         Refinance Its Remaining Debt ..................................................................... 6

    F.   The Truth Emerges ....................................................................................... 8

LEGAL STANDARD ............................................................................................ 10

ARGUMENT ......................................................................................................... 10

I.    PLAINTIFFS STATE A SECTION 10(B) CLAIM ................................... 10

    A.   The CAC Raises a Strong Inference of Scienter ........................................ 11

        1.   Plaintiffs Allege a Compelling Individualized Motive .......................... 13

        2.   Additional Facts Supporting an Inference of Scienter With Respect to
            Financial Results and GAAP Compliance ............................................. 16

        3.   Additional Facts Supporting an Inference of Scienter With Respect to
            ICRF Statements ................................................................................... 27

        4.   Additional Facts Supporting an Inference of Scienter With Respect to
            Liquidity Statements ............................................................................. 29

        5.   A Holistic Analysis Supports an Inference of Scienter .......................... 30

    B.   The CAC Adequately Pleads Loss Causation .............................................. 34

II.   PLAINTIFFS STATE A SECTION 20(A) CLAIM ................................... 37

CONCLUSION ...................................................................................................... 38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acticon AG v. China Ne. Petroleum Holdings Ltd.*,
    692 F.3d 34 (2d Cir. 2012)..................................................................................... 36

*Adams v. Kinder-Morgan, Inc.*,
    340 F.3d 1083 (10th Cir. 2003) ..............................................................*passim*

*In re Akorn, Inc. Sec. Litig.*,
    240 F. Supp. 3d 802 (N.D. Ill. 2017) .................................................................... 22

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (5th Cir. 2002) .................................................................................. 14

*Anderson v. Spirit AeroSys. Holdings, Inc.*,
    105 F. Supp. 3d 1246 (D. Kan. 2015)............................................................. 11, 31

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
    505 F. Supp. 2d 662 (D. Colo. 2007).................................................................... 17

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ............................................................................................. 36

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................. 10

*Bordertown, LLC v. AmGUARD Ins. Co.*,
    2022 WL 17538186 (D. Colo. Oct. 5, 2022) ......................................................... 30

*Brammer-Hoelter v. Twin Peaks Charter Academy*,
    492 F.3d 1192 (10th Cir. 2007) ........................................................................... 30

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002)................................................................................... 14

*City of Philadelphia v. Fleming Cos.*,
    264 F.3d 1245 (10th Cir. 2001) ........................................................................... 13

*Cowden v. Bd. of Gov. of Colo. St. Univ. Sys.*,
    --- F. Supp. 3d ---, 2022 WL 4349620 (D. Colo. Aug. 23, 2022)........................... 30

*In re Crocs, Inc. Sec. Litig.*,
774 F. Supp. 2d 1122 (D. Colo. 2011)...................................................................... 32

*Croker v. Carrier Access Corp.*,
2006 WL 2035366 (D. Colo. Sept. 23, 2005) ..................................................... 19, 33

*Dobina v. Weatherford Int'l Ltd.*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012) ...................................................................... 28

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) .................................................................................. 14

*Fryman v. Atlas Fin. Holdings, Inc.*,
2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ........................................................... 25

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) ............................................................................. 34-35

*In re Gold Res. Corp. Sec. Litig.*,
776 F.3d 1103 (10th Cir. 2015) .............................................................................. 33

*Goldman Sachs Group, Inc. v. Ark. Teacher Ret. Sys.*,
141 S. Ct. 1951 (2021) ........................................................................................... 35

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014) ............................................................................................... 10

*Herrera v. City of Espanola*,
32 F.4th 980 (10th Cir. 2022).................................................................................. 30

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ................................................................................ 14

*In. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021)......................................................... 28

*In. Pub. Ret. Sys. v. Pluralsight, Inc.*,
45 F.4th 1236 (10th Cir. 2022)......................................................................... 10, 11

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) ......................................................................... 14, 33

*In re Manulife Fin. Corp. Sec. Litig.*,
276 F.R.D. 87 (S.D.N.Y. 2011) .............................................................................. 35

*Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSys.*
  *Holdings, Inc.*,
  2022 WL 377415 (N.D. Okla. Jan. 7, 2022) ......................................................... 12

*MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
  761 F.3d 1109 (10th Cir. 2014) ............................................................................ 15

*In re Molson Coors Beverage Co. Sec. Litig.*,
  2020 WL 13499995 (D. Colo. Dec. 2, 2020)...................................................*passim*

*In re Myriad Genetics, Inc.*,
  2021 WL 977770 (D. Utah Mar. 16, 2021).......................................................21-23

*Nakkhumpun v. Taylor*,
  782 F.3d 1142 (10th Cir. 2015) ................................................................. 11, 13, 34

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.*,
  838 F. Supp. 2d 1148 (D. Colo. 2012)................................................................... 38

*Or. Lab. Emp'rs Pension Trust Fund v. Maxar Techs., Inc.*,
  2020 WL 5500458 (D. Colo. Sept. 11, 2020) ................................................... 26, 32

*In re Pareteum Sec. Litig.*,
  2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021)........................................................ 22

*Peace Officers' Annuity & Ben. Fund of Ga. v. DaVita Inc.*,
  372 F. Supp. 3d 1139 (D. Colo. 2019)................................................................... 34

*Pirraglia v. Novell, Inc.*,
  339 F.3d 1182 (10th Cir. 2003) ......................................................... 13, 15, 16, 33

*Podraza v. Whiting*,
  790 F.3d. 828 (8th Cir. 2015) ............................................................................... 14

*In re Qwest Commc'ns, Int'l, Inc.*,
  396 F. Supp. 2d 1178 (D. Colo. 2004)....................................................... 18, 27, 33

*Resh v. China Agritech, Inc.*,
  2019 WL 1055240 (C.D. Cal. Jan. 8, 2019)......................................................... 25

*In re Rhythms Sec. Litig.*,
  300 F. Supp. 2d 1081 (D. Colo. 2004).................................................................. 36

*In re Ribozyme Pharm., Inc. Sec. Litig.*,
119 F. Supp. 2d 1156 (D. Colo. 2000) ..................................................................... 37

*Robbins v. Oklahoma*,
519 F.3d 1242 (10th Cir. 2008) ............................................................................. 10

*Robledo v. Williams*,
2020 WL 6393110 (D. Colo. Nov. 2, 2020) ............................................................ 30

*Ross v. Career Educ. Corp.*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) ........................................................... 22

*In re Scottish Re Grp. Sec. Litig.*,
524 F. Supp. 2d 370 (S.D.N.Y. 2007) ..................................................................... 21

*In re SemGroup Energy Partners, L.P.*,
729 F. Supp.2d 1276 (N.D. Okla. 2010) ................................................................. 22

*Sorkin, LLC v. Fischer Imaging Corp.*,
2005 WL 1459735 (D. Colo. June 21, 2005) ................................................ 14, 19, 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .............................................................................. 12, 13, 31

*In re Thornburg Mortg., Inc. Sec. Litig.*,
2009 WL 5851089 (D.N.M. Dec. 21, 2009) ........................................................... 12

*In re Thornburg Mortg., Inc. Sec. Litig.*,
695 F. Supp. 2d 1165 (D.N.M. 2010) ......................................................... 14, 16, 37

*Turner Ins. Agency, Inc. v. Farmland Partners Inc.*,
2019 WL 2521834 (D. Colo. June 18, 2019) ......................................................... 25

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ................................................................... 22

*In re Veeco Instruments, Inc. Sec. Litig.*,
235 F.R.D. 220 (S.D.N.Y. 2006) ........................................................................... 29

*In re Vivendi Univ. S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011) .................................................................... 35

*In re WageWorks, Inc. Sec. Litig.*,
2020 WL 2896547 (N.D. Cal. June 1, 2020) ......................................................... 22

*In re Williams Sec. Litig.-WCG Subclass,*
    558 F.3d 1130 (10th Cir. 2009) ............................................................................... 34

*In re Williams Sec. Litig.,*
    339 F. Supp. 2d 1206 (N.D. Okla. 2003) ................................................................ 14

*Zucco Partners, LLC v. Digimarc Corp.,*
    552 F.3d 981 (9th Cir. 2009) ................................................................................... 24

**Statutes**

15 U.S.C. § 78j(b) ...................................................................................................... 1, 10

15 U.S.C. § 78t(a) ........................................................................................................... 37

15 U.S.C. § 78u-4 ........................................................................................................... 12

26 U.S.C. § 382 (IRC § 382) ............................................................................... 7, 9, 20

**Rules and Regulations**

17 C.F.R. §229.304 .......................................................................................................... 25

17 C.F.R. § 240.10b-5 ...................................................................................................... 10

**Other Authorities**

IRS Notice 2021-20, 2021-11 IRB 922 (Mar. 15, 2021) ............................................... 8

Lead Plaintiff Jan Lambert and Plaintiff Ali Saee ("Plaintiffs") respectfully submit this Response to the Motion to Dismiss filed by Defendants Enservco Corporation ("Enservco"), Cross River Partners, L.P. ("CRP"), Cross River Capital Management LLC ("CRCM"), Richard A. Murphy, and Marjorie A. Hargrave (collectively, "Defendants") (Doc. 49) (the "Motion" or "MTD").

## INTRODUCTION

This is a class action against Defendants on behalf of all persons who purchased or otherwise acquired Enservco securities between March 23, 2021, and September 1, 2022 (the "Class Period"), to recover damages for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

Enservco provides specialized support services to well operators throughout the country, including hot oil acidizing and frac water heating. While business was booming, it pursued aggressive expansion by taking on increasing amounts of debt. But by 2020, the natural gas market was rocked by an industry-wide downturn and business dried up. Enservco fell out of compliance with several financial covenants in its loan agreement and it soon owed over $34 million to its commercial lender, far exceeding its $663,000 in liquid assets. In early 2020, Enservco admitted that its ability to continue as a going concern was doubtful.

In late 2020 and early 2021, Enservco's CEO, Richard Murphy, and CFO, Marjorie Hargrave (the "Individual Defendants") completed a series of transactions which raised fresh capital and reduced its debt to $15 million. These measures

1

provided much-needed relief but the $15 million remaining continued to threaten Enservco's survival unless—as the Individual Defendants acknowledged—it could be refinanced before maturing in October 2022. As such, it became critical for Enservco to maintain a healthy financial position and outlook to secure that financing.

By March 23, 2021, the Individual Defendants took drastic measures to conceal its ongoing financial distress. Rather than inform the market that Enservco lacked cash flow to support operations through 2021, they assured it had "ample" capital to last beyond mid-2022. And, in three consecutive quarterly reports filed on Form 10-Q, they hid the true state of Enservco's net losses by disregarding basic accounting rules for several of the capital improvement projects completed in early 2021.

The market began to learn the truth on November 15, 2021, when Enservco admitted that it ran out of cash and could no longer access its revolving line of credit. Then, instead of filing its annual report on Form 10-K, on March 28, 2022, it revealed that the financial statements in three 10-Q filings made in 2021 needed to be restated to correct two violations of generally accepted accounting principles ("GAAP"). Enservco filed amended 10-Qs on April 11, 2022 (the "First Restatement"). But on April 18, 2022, Enservco announced that it needed to restate those same financials *again* to correct another GAAP violation. It made those filings on May 24, 2022 (the "Second Restatement" and, together with the First Restatement, the "Restatements"). The Restatements revealed that Enservco's net losses were up to *80% greater* than previously reported. This made Enservco miss the deadline to file

its annual report with the SEC. Its two highest-ranking accounting officers, including Hargrave, suddenly resigned. And Enservco ultimately fired its accounting firm soon after that firm signed off on its long-overdue annual report. Enservco's stock fell sharply in response to these disclosures, causing significant losses.

Unable to deny falsity or materiality, Defendants are forced to argue that the Class Action Complaint (Doc. 34) ("CAC") lacks allegations supporting the elements of scienter or loss causation and, at most, pleads an honest mistake that was voluntarily disclosed and remediated. But that simply cannot be squared with the facts alleged. Murphy and Hargrave had powerful motive—with Murphy's investment fund owning nearly 20% of Enservco—to conceal Enservco's true financial condition. Notably, Enservco announced the First Restatement *the same day* that it announced it refinanced its remaining debt. And while any disclosure is, of course, "voluntary," the GAAP violations here were identified by Enservco's accounting firm during its annual audit in March 2022 and needed to be resolved to its satisfaction before it would sign off on Enservco's annual report. This belies any suggestion that the accounting firm was fired, as Defendants contend, to mitigate future errors. It *detected* the errors. Above all else, the Individual Defendants were aware of facts contradicting the accounting treatment they used to inflate Enservco's financials. Defendants' half-hearted attempts to defeat loss causation are equally flawed.

As explained below, the CAC adequately alleges scienter and loss causation under applicable law and Defendants' Motion should be denied.

3

## STATEMENT OF FACTS

### A.    Relationship with Defendant Murphy and His Investment Fund

Since Murphy's appointment to Enservco's Board in January 2016, its largest stockholder has been CRP, a niche investment fund managed by Murphy through CRCM. (¶¶46-47.)[1]  At times, it owned over 25% of Enservco's common stock. (¶46.) In addition to its equity investment, CRP loaned Enservco at least $3 million between 2017-2019. (¶¶50, 56.)  Murphy was named Enservco's CEO in May 2020. (¶63.)

### B.    Enservco Is Crippled by Its Debt Obligations in 2019

Under Murphy's control, Enservco fueled aggressive expansion efforts by taking on an alarming amount of debt. (¶¶45, 53.)  By the end of 2019, Enservco's debts totaled over $36.5 million, including (i) $34 million outstanding under a secured credit facility; and (ii) subordinated promissory notes issued to CRP in a total principal amount of $2.5 million plus interest (the "Subordinated Debt"). (¶¶56-57.)

However, demand for Enservco's services sharply declined during its revenue-generating winter season in 2019-2020 due to an industry-wide downturn that worsened with the COVID-19 pandemic. (¶¶56, 58.)  Making matters worse, Enservco defaulted under the loan agreement for its credit facility, which made all $34 million due and payable. (¶57.)  Unable to access its credit facility, and lacking revenues needed to fund operations, much less its debts, Enservco informed investors in March 2020 that its ability to continue as a going concern was doubtful. (¶59.)

---

[1] Citations to ¶ refer to paragraphs in the CAC.

4

### C.    Management Attempts to Avoid Bankruptcy

Management took several steps to avoid bankruptcy in 2020. On September 15, 2020, CRP exchanged half of its Subordinated Debt for an equivalent amount of Enservco common stock. (¶64.) Later that month, Enservco raised $3.5 million in an equity offering. (¶67.) These activities paved the way for a debt restructuring which reduced its $34 million loan balance by $16 million, converted the remaining $17 million into a term loan, and established a new $1 million revolver. (¶66.)

Enservco carried out several additional initiatives to remain solvent in early 2021. On February 1, 2020, Enservco executed an amendment to its loan agreement that extended the maturity date of its term loan to October 15, 2022. (¶69.) Enservco also raised $8.8 million by holding another equity offering ten days later (the "February 2021 Equity Offering") and used $3 million of those proceeds to reduce the principal balance on its term loan from $17 million to $14 million. (¶¶71-73.) Immediately after the February 2021 Equity Offering, CRP exchanged the remaining half of its Subordinated Debt for (i) an equivalent amount of stock; and (ii) $307,000 in warrants (the "February 2021 Debt for Equity Exchange"). (¶75.)

In 2021, Enservco also began claiming credits available under the employee retention credit ("ERC") program established by the CARES Act, which allowed it to offset federal payroll taxes with eligible wages. (¶¶77-80.)

**D.    Known Disfunction in Enservco's Accounting Group and an Impending Funding Crisis Are Ignored**

The above initiatives helped stave off bankruptcy but other pressures on Enservco's business were ignored as it struggled to stay afloat. For example, Enservco's accounting department—the group responsible for carrying out its internal controls over financial reporting ("ICFR")—was critically understaffed throughout 2020. (¶142.) Indeed, the group was stretched so thin that it was unable to complete a significant amount of its required work. (¶144.) Hargrave witnessed this first-hand, pitching in herself to complete tasks no one else could do, but refused to hire additional staff. (¶¶144, 147.) Similarly, by early 2021, it was clear that Enservco's cash flows—including the capital raised in its recent equity offerings— would be insufficient to sustain operations through the end of 2021. (¶¶92-94.) Thus, Enservco would be forced to rely on its $1 million revolver during a time of year when it historically did not generate revenue to pay down any advances. (¶¶94-95.)

**E.    The Individual Defendants Misrepresent Enservco's Financial Health to Refinance Its Remaining Debt**

By March 23, 2021, Enservco avoided catastrophe but it was by no means free from the threat of bankruptcy. As the Individual Defendants publicly admitted, the $15 million remaining on the new term loan continued to threaten Enservco's survival unless it could be refinanced before maturing in October 2022. (¶87.) But doing so required a healthy balance sheet. (¶89.) The Individual Defendants knew this and, accordingly, decided to defer refinancing discussions until early 2022 so

Enservco could benefit from the first half of the revenue-generating winter season in the fourth quarter of 2021. (¶89.) But that was not their only ploy.

Throughout 2021, the Individual Defendants falsely assured in SEC filings that Enservco had "ample" capital to fund operations into mid-2022. (¶¶97, 172, 189.)

In addition, they defied basic accounting rules in each Form 10-Q that Enservco filed in 2021 to hide its true financial condition. For example, ASC 470-50 requires the recognition of a loss if debt is extinguished in exchange for consideration that exceeds the value of that debt. (¶¶102-04.) The February 2021 Debt for Equity Exchange resulted in a $304,000 loss because Enservco issued CRP warrants worth $304,000 in addition to an equivalent amount of stock. (¶106.) But none of the 10-Qs recognized such a loss. (¶114.) Similarly, ASC 740 prohibits reporting any part of a deferred tax asset ("DTA"), such as the tax benefit from a net loss carryforward, that is not likely to be realized in future periods. (¶¶125-26.) As Enservco warned in prior SEC filings, the issuance of stock can limit the ability to realize such carryforwards if it triggers an "ownership change" under Section 382 of the Internal Revenue Code ("IRC"). (¶130.) The February 2021 Equity Offer triggered precisely such a change, preventing Enservco from realizing up to $1.4 million of its DTA. (¶¶129, 133.) Yet none of the 10-Qs wrote off that portion of Enservco's DTA. (¶133.)

Finally, the Individual Defendants had Enservco claim ERCs that it was not entitled to receive. In the second quarter of 2021, Enservco amended tax returns for the last two quarters of 2020 to claim over $500,000 in ERCs on wages paid during

7

those periods. (¶81.) However, before it did so, the IRS published guidance clarifying that companies which are part of an "aggregated group," such as Enservco and its subsidiaries, can only claim ERCs "based on the member's proportionate share of the qualified wages giving rise to the credit." IRS Notice 2021-20, 2021-11 IRB 922 (Mar. 15, 2021), available at 2021 WL 807026. In other words, a company in such a group cannot claim ERCs for *all* wages paid to an employee who split time across several affiliated companies. But Enservco did just that. (¶109.) It then violated basic GAAP precepts by reporting it as income in the last two 10-Qs it filed in 2021. (¶¶105, 114.)

Despite all this, each of these 10-Qs represented that the financial statements were prepared in accordance with GAAP and Enservco's ICFR were effective based on an evaluation by Murphy and Hargrave. (¶¶ 113, 132, 149.) They also attached certifications required by the Sarbanes Oxley Act of 2002 ("SOX") in which the Individual Defendants personally attested to these facts. (¶¶165-68, 182-85, 200-03.)

### F.    The Truth Emerges

The market began to learn the truth on November 15, 2021, when Enservco disclosed that it depleted most of its cash balance by September 30, 2021, and recently defaulted under its loan agreement, which restricted it from accessing its $1 million revolver. (¶¶98-99, 259.)

On March 28, 2021—the same day it announced it successfully refinanced its debt—Enservco revealed in a Form 8-K that it needed to restate the financial statements in each quarterly report it filed in 2021 to correct two accounting errors

identified by its accountant, Plante & Moran, during its annual audit. (¶¶116-17, 260.) Specifically, Enservco (i) failed to recognize the $304,000 loss on the warrant it issued to CRP in the February 2021 Debt for Equity Exchange per ASC 470 (the "Warrant Issuance Error"); and (ii) recognized $304,000 in income on ERCs it was not entitled to receive under the IRS aggregation rule (the "ERC Error"). (¶¶122-24.)

On March 31, 2022, Enservco disclosed that it was unable to file its 2021 annual report by the prescribed deadline because of the First Restatement. (¶¶119, 261.) Four days later, it announced that Defendant Hargrave was resigning as CFO effective April 22, 2022. (¶¶120, 262.) Enservco's principal accounting officer ("PAO"), Donovan Kelly, also resigned effective April 21, 2022. (¶120.)

Then, on April 18, 2022, Enservco revealed in a Form 8-K that it needed to restate the same financials *again* to correct another GAAP error and, as such, delay filing its annual report again. (¶¶136, 263.) This time, Enservco had not reduced its DTA to remove the $1.4 million that it could no longer realize under IRC section 382 due to the February 2021 Equity Offering in accordance with ASC 740 (the "DTA Error"). (¶137.) Ultimately, Enservco admitted that a material weakness in its ICFR "resulted in the [three GAAP violations]" which required the Restatements. (¶155.)

After finalizing the two Restatements, on July 7, 2022, Enservco filed its 2021 annual report on Form 10-K, which included an audit opinion from Plante & Moran. (¶253.) But on September 1, 2022, Enservco announced that it had *fired* Plante on August 26, 2022, after engaging another accounting firm to replace it. (¶¶141, 264.)

9

## LEGAL STANDARD

On a motion to dismiss, the Court must accept all well-pleaded facts as true and construe them in a light most favorable to Plaintiffs. *See In. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236 (10th Cir. 2022). To survive dismissal, a complaint need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The question is not whether the facts alleged are likely to be true, but rather whether those facts, accepted as true, plausibly state a claim. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

## ARGUMENT

## I.    PLAINTIFFS STATE A SECTION 10(B) CLAIM

Section 10(b) of the Exchange Act and the SEC's general anti-fraud rule promulgated thereunder, Rule 10b-5, proscribe fraud in connection with the purchase or sale of securities. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. For almost a century, courts have recognized that investors enjoy a private right of action under Rule 10b-5 to enforce its strictures. *See, e.g.*, *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730 (1975)). To state such a claim, an investor must allege (1) a material misstatement; (2) scienter; (3) a connection to the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Pluralsight*, 45 F.4th at 1247.

In Count I, Plaintiffs allege that the Individual Defendants, and thus Enservco, violated Rule 10b-5 during the Class Period by making public disclosures

10

that misstated (i) Enservco's financial condition and compliance with GAAP; (ii) the effectiveness of Enservco's ICFR; and (iii) Enservco's available liquidity. Unlike most securities fraud cases, Defendants do *not* deny that these statements were materially false and misleading. Forced to concede as much in view of the Restatements, Defendants challenge the CAC's allegations with respect to elements (2) and (6) only.

### A.      The CAC Raises a Strong Inference of Scienter

Scienter is a mental state embracing "intent to deceive, manipulate, or defraud" as well as "recklessness." *Pluralsight*, 45 F.4th at 1258-59. Whereas intent refers to "deliberate" behavior, recklessness is a "less culpable mental state" involving "an extreme departure from the standards of ordinary care [which] presents a danger of misleading buyers or sellers that is either known . . . or so obvious that the actor must have been aware of it." *Id.* Thus, "[s]cienter is not limited to situations in which a defendant acted with the primary purpose of misleading shareholders; scienter also exists when a defendant acted with a reckless disregard of a substantial likelihood of misleading investors." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1150 (10th Cir. 2015). For example, "a disregard of the most current factual information before making statements" can suffice. *Anderson v. Spirit AeroSys. Holdings, Inc.*, 105 F. Supp. 3d 1246, 1261 (D. Kan. 2015), *aff'd*, 827 F.3d 1229 (10th Cir. 2016).[2]

---

[2] Under traditional agency principles, "[t]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself" for purposes of Section 10(b). *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003).

While a party's scienter may be averred generally under Rule 9(b), the PSLRA imposes the additional requirement that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u-4(b)(2). In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), the Supreme Court held that to qualify as "strong," the inference of scienter must be "cogent and at least as compelling as any opposing [nonculpable] inference one could draw from the facts alleged." Accordingly, *Tellabs* emphasized that courts must consider whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation meets that standard." *Id.* at 323 (emphasis in original).[3]

Defendants attack the CAC as "short on [scienter] allegations" (MTD 13) but they overlook that the CAC pleads a wealth of facts that, taken together, firmly establish a strong inference of scienter.

---

[3] In so holding, *Tellabs* noted that courts may consider "sources courts ordinarily examine when ruling on Rule 12(b)(6)," including matters subject to judicial notice. 551 U.S. at 322. Defendants claim that this provides the Court *carte blanche* to take judicial notice of SEC filings and other publicly available documents. (MTD 13.) But the law is clear that courts may only take notice that the content therein was *publicly available*, not that such content is true. *See In re Thornburg Mortg., Inc. Sec. Litig.*, 2009 WL 5851089, at *2 (D.N.M. Dec. 21, 2009); *see also Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSys. Holdings, Inc.*, 2022 WL 377415, at *6 (N.D. Okla. Jan. 7, 2022) (same).

12

### 1.    Plaintiffs Allege a Compelling Individualized Motive

While the lack of a motive to defraud does not defeat scienter, *Nakkthumpin*, 782 F.3d at 1149, a proper motive can weigh heavily in the "totality of the pleadings." *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 (10th Cir. 2003); *see also Tellabs*, 551 U.S. at 325 ("personal financial gain may weigh heavily in favor of a scienter inference"). The CAC pleads in detail that the Individual Defendants were motivated to misstate Enservco's financial position during the Class Period to successfully refinance its remaining debt in early 2022. (¶¶85-91.)[4]

Defendants paint these allegations as no more than a desire to avoid losing a job or further a business' interests, which are shared by all executives. (MTD 25-26.) That misreads Plaintiffs allegations. But even if it were true, Defendants' authority shows that motives "shared by most companies" can support an inference of scienter if they are "specifically and uniquely related" to the defendant company. *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1268-69 (10th Cir. 2001). Thus, in *Pirraglia*, 339 F.3d at 1191, the Tenth Circuit held that "[w]hile the desire to protect one's own position is shared by all company executives, the defendants in the instant case had especial cause to think that they would lose their jobs if they failed to produce results" based on the facts alleged.

---

[4] Defendants assail Plaintiffs for failing to invoke the word "motive" (MTD 24) but that is neither necessary nor does it whitewash the substance of these allegations.

13

Here, the Individual Defendants knew that Enservco's looming debt obligation posed an "existential threat" to the company's continued survival unless it could be refinanced before maturing in October 2022. (¶¶86-87, 89.) And in this Circuit, courts recognize that the "survival" of an enterprise the defendants manage can supply a proper motive. *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1195 (D.N.M. 2010); *see also In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1234 (N.D. Okla. 2003) (fact that "WCG's continued viability was dependent upon certain measures of WCG's financial performance . . . [under] WCG's debt and bank covenants" is a "strong motive" to misstate financials).[5]

These allegations—which are specific and unique to Enservco—set this case apart from the holdings in *Sorkin, LLC v. Fischer Imaging Corporation*, 2005 WL 1459735 (D. Colo. June 21, 2005), and *In re Level 3 Communications, Inc. Securities Litigation*, 667 F.3d 1331 (10th Cir. 2012), cited by Defendants. (MTD 25-26.) The Individual Defendants did not merely seek to "maintain a credit facility" in the normal course of business, *Sorkin*, 2005 WL 1459735, at *11, or "refinance . . . existing debt at more favorable interest rates," *Level 3*, 667 F.3d at 1346, as would most any

---

[5] While not binding on this Court, *Podraza v. Whiting*, 790 F.3d. 828 (8th Cir. 2015), did not conclude that a desire to "maintain [the company's] survival" is an insufficient motive, as Defendants claim. (MTD 26). Rather, the plaintiffs "fail[ed] to allege specific facts showing that . . . the very survival of [the company]" was "at stake." 790 F.3d at 840-41. Courts uniformly agree that this is a proper motive. *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002) (the "very survival" of the company is a sufficient individualized motive); *see also Frank v. Dana Corp.*, 646 F.3d 954, 960 (6th Cir. 2011) (same); *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (5th Cir. 2002) (same); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1064 (9th Cir. 2000) (same).

14

company.  Rather, Enservco's *very existence* hinged on its ability to secure a new credit facility large enough to cover its $15 million debt.

Nor, for that matter, is this a motive that lacks an element of "[personal] gain." *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1122 (10th Cir. 2014) (cited at MTD 25).  As in *Pirraglia*, 339 F.3d at 1191, Hargrave had "especial cause" to fear she would lose her sole source of full-time income if Enservco went belly-up. (¶90.)  And far from having "no incentive" (MTD 26), the outsized equity stake in Enservco by Murphy's investment fund, CRP, provided millions of reasons to misstate Enservco's financials. (¶91.)  That investment would evaporate if, as was warned, Enservco ceased operations.  Further, there is ample reason to infer that this would cause Murphy's investors to lose confidence in his investment prowess:  CRP's portfolio contained a "relatively small number of securities" and Murphy publicly expressed "confidence" in the future of Enservco's business after converting $2.8 million of subordinated (but secured) debt held by CRP into even more equity in 2020 and 2021. (¶¶47, 65, 76, 91.)

The motive here is buttressed, not "undercut" (MTD 28), by the timing of the Restatements.  Enservco announced the need for the First Restatement *immediately after announcing that it secured a new credit facility*. (¶¶116-17.)  And it is hardly "irrational," as Defendants claim (MTD 28), that Enservco announced the need for the Second Restatement days after the First Restatement.  As explained below, the Restatements were far from voluntary, and the only compelling inference is that

15

Plante & Moran identified other accounting shenanigans after further scrutinizing Enservco's books following the First Restatement.

Finally, Defendants are mistaken that the lack of insider stock sales weighs against the inference of scienter. (MTD 27.) As Defendants seemingly recognize, the Tenth Circuit has expressly refused to "infer . . . that [defendants] lacked motive to defraud" from the absence of such allegations. *Pirraglia*, 339 F.3d at 1191 n.12. More fundamentally, the *other* motive allegations in the CAC "fill[] the gap left by the lack of suspicious insider-trading activity." *Thornburg*, 695 F. Supp. 2d at 1194.

### 2.     Additional Facts Supporting an Inference of Scienter With Respect to Financial Results and GAAP Compliance

As it later admitted in the Restatements, each Form 10-Q that Enservco filed in 2021 reported financial results that violated basic GAAP rules (¶¶122-24, 137-40), contrary to the disclosures therein that the financial statements were "prepared in accordance with GAAP." (¶¶113, 132.) As explained below, myriad facts further support the inference these statements were made with scienter.

### *Nature of the GAAP Violations*

Defendants devote much of their Motion to arguing that GAAP violations, or a restatement, cannot alone raise a strong inference of scienter. (MTD 2-3, 13-18.) But that vastly oversimplifies Plaintiffs' allegations. There is no dispute that GAAP errors will support a strong inference of scienter "only when coupled with evidence that the violations . . . were the result of the defendant's fraudulent intent." *Pirraglia*, 339 F. 3d at 1191. And, as set forth above and below, there is a variety of such other

16

evidence here.  However, Defendants' own authority confirms that GAAP errors can

*bolster* the inference of scienter if the accounting errors are "simple," *In re Molson*

*Coors Beverage Co. Sec. Litig.*, 2020 WL 13499995, at *4 (D. Colo. Dec. 2, 2020) (Ebel,

J.), or are of "significant magnitude." *Andropolis v. Red Robin Gourmet Burgers, Inc.*,

505 F. Supp. 2d 662, 681 (D. Colo. 2007).  Both are present here.

As Judge Ebel explained, "[a] violation of a simple accounting rule could be

indicative of scienter, and the simpler the rule the stronger the implication." *Molson*

*Coors*, 2020 WL 13499995, at *4.  Throughout their Motion, Defendants repeatedly

label the accounting rules here as "arcane" and "complex."  (MTD 1-2, 6-8, 17-18, 31-

32.)  But what this strategy lacks in substance is not made up for by sheer repetition.

As alleged, ASC 470-50—the rule governing the Warrant Issuance Error—states in

plain terms that the difference between the consideration provided to extinguish debt

and the value of the debt must be recognized as a gain or loss.  (¶102.)[6]  Thus, a loss

arises if the consideration provided exceeds the value of the debt.  The same is true if

the transaction is with a related party.  (¶104.)  Plaintiffs' reference to a "decade-old

article from the Journal of Accountancy" does not change the analysis.  (MTD 7.)  The

article merely illustrates the rule's *application*.  As for the ERC Error, Enservco was

ineligible to receive certain ERCs "due to the aggregation of eligible employees at the

Company and its subsidiaries."  (¶117.)  Defendants observe that the IRS did not

---

[6] Defendants refer to ASC 815-40 as the applicable rule.  (MTD 7.)  But that is
neither the rule that Enservco cited for purposes of correcting the Warrant Issuance
Error nor is it the one the CAC pleads as the relevant rule.  (¶¶122-24.)

17

clarify the ERC aggregation rules until "well after the CARES Act was enacted" in 2020. (MTD 7.) But the notice they cite was release a month *before* the quarter in which Enservco claimed the improper ERCs (¶109), and it makes clear that "[t]he amount of [ERCs] with respect to a member of [an] aggregated group," including a parent-subsidiary group, "is based on the member's proportionate share of the qualified wages giving rise to the credit." 2021 WL 807026.

These two rules could not be more straight-forward. Indeed, their simplicity is confirmed by the fact that Enservco's independent accountant, Plante & Moran, identified both errors during its annual audit (¶¶251-52). *Cf. Molson Coors*, 2020 WL 13499995, at *4 ("That the error was indeed complex" is "confirmed by the fact that PwC conducted annual audits . . . and failed to identify the error"). Defendants do not compel a different conclusion by asserting that the errors related to "complex financial instruments." (MTD 17.) What matters is the *accounting treatment* for those instruments (complex or not).

In addition, errors of significant magnitude can bear on scienter as it is likely that "Defendants would be aware of such a significant financial issue." *Molson Coors*, 2020 WL 13499995, at *6. Defendants attempt to downplay the magnitude of the Restatements by viewing each error in isolation. (MTD 19.) But courts properly focus, instead, on the collective impact. *See In re Qwest Commc'ns, Int'l, Inc.*, 396 F. Supp. 2d 1178, 1194 (D. Colo. 2004) (considering impact of *twelve* surviving accounting manipulations). Here, the three errors overstated Enservco's net income

18

between 19% to 80%, depending on the period. (¶245.)  It is inapposite that other courts refused to infer scienter from restatements involving "far greater" dollar amounts.  (MTD 19-20.)  Courts consider the impact of such amounts *on net income* and have held that much smaller impacts are "significant."  *See Adams*, 340 F.3d at 1106 (25% of net income); *Molson Coors*, 2020 WL 13499995, at \*5 (23% of net income); *see also Croker v. Carrier Access Corp.*, 2006 WL 2035366, at \*11 (D. Colo. Sept. 23, 2005) ("courts in this circuit refer to net income").  Moreover, Defendants miss the mark by arguing that significant errors cannot alone raise a strong inference of scienter.  (MTD 19-20.)  The point is that significant errors can lend further weight to an inference of scienter.  *E.g.*, *Adams*, 340 F.3d at 1106 ("magnitude" of the error "strengthen[s]" the inference of scienter); *Sorkin*, 2005 WL 1459735, at \*6 ("The size of the earnings restatement is relevant to the assessment of scienter").

Finally, it is suspicious that the Warrant Issuance Error and the ERC Error inflated Enservco's financial results by exactly the same amount:  $304,000.  (¶117.)

### ***Defendants' Awareness of Contemporaneous Facts***

The Motion all but ignores that the Individual Defendants were aware of facts contradicting the accounting treatment used at the time of their false statements.

For instance, both Individual Defendants were aware that the consideration issued to CRP in the February 2021 Debt for Equity Exchange exceeded the value of the Subordinated Debt it surrendered.  Indeed, because CRP is an entity controlled by Murphy, both Murphy and Hargrave signed the Note Conversion Agreement that

19

set forth the terms of the exchange, including that CRP would surrender its Subordinated Debt for an equivalent amount of Enservco stock *and warrants worth $304,000*. (¶107.) Thereafter, Murphy made several filings with the SEC which reported that CRP not only received an equivalent amount of Enservco stock for its Subordinated Debt but also *warrants worth $304,000*. (*Id.*) Both Murphy and Hargrave then signed Enservco SEC filings in 2021 which failed to report a loss for the warrants. (¶¶112-14.)

As for the ERC Error, Enservco admittedly applied for the improper credits based, in part, on "management's understanding of the CARES Act." (¶118.) But management already knew how to identify eligible wages without violating the aggregation rule by the time it claimed the improper ERCs in the second quarter of 2021. It claimed $223,000 in ERCs during the prior quarter without issue. (¶110.) The inference of scienter is strengthened by the fact that both Individual Defendants spoke about the importance of these ERCs to the "bottom line" on the corresponding investor call held the same day they filed the inaccurate Form 10-Q. (¶115.)

The DTA Error is the most egregious of all. Beginning in March 2020, both Murphy and Hargrave signed SEC filings which stated that Enservco's DTA could become limited if it experienced an "ownership change" under IRC § 382 and even warned that such a change could arise from "a new issuance of stock by [Enservco]." (¶130.) In fact, both made this same disclosure *in the registration statement for the February 2021 Equity Offering*. (*Id.*) Of course, by signing that filing, the Individual

20

Defendants were also aware that Enservco was issuing new stock. (¶72-73.) Despite being on plain notice of this possibility, Murphy and Hargrave signed SEC filings thereafter which failed to recognize that Enservco experienced an ownership change in the February 2021 Equity Offering which prevented it from realizing up to $1.4 million of its DTA. (¶132-35.)

This type of willful ignorance is indistinguishable from that which courts have sustained as recklessness. *See Adams*, 340 F.3d at 1106 (scienter established when CFO knew that "a key operation of the company was losing money" and "falsely reported a profit for it" in SEC filings); *see also, e.g.*, *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 (S.D.N.Y. 2007) ("contemporaneous circumstances (none of which changed), of which [defendants] were aware . . . made their failure to take an earlier valuation allowance tantamount to conscious misbehavior").

### ***Suspicious Resignations of Enservco's Accounting Officers***

The inference of scienter is further supported by the suspicious and sudden resignations of Hargrave and Enservco's PAO, Donovan Kelly (¶¶246-48). *See Molson Coors*, 2020 WL 13499995, at \*11 ("Executive departures can strengthen an inference of scienter if they are numerous, uncharacteristic or accompanied by suspicious circumstances"); *see also In re Myriad Genetics, Inc.*, 2021 WL 977770, at \*22 (D. Utah Mar. 16, 2021) (same). In an effort to evade this law, Defendants contend that the CAC fails to explain why the departures were suspicious or sudden and, as such, it is reasonable to presume that Enservco "identified a better way of

doing things moving forward" or that these two executives left for personal reasons. (MTD 21-23.)  The facts properly before the Court negate that explanation.

First, the suspicious nature of these two departures finds ample support in the CAC.  Hargrave and Kelly represented the entirety of Enservco's accounting and external reporting management.  (¶¶30, 32-33, 247.)  Contrary to Defendants' *ipse dixit* (MTD 23), it is highly unusual for both to resign *at the same time.  See Myriad Genetics*, 2021 WL 977770, at \*22 (demotion of executive "days apart" from resignation of another officer was suspicious); *see also Ross v. Career Educ. Corp.*, 2012 WL 5363431, at \*10 (N.D. Ill. Oct. 30, 2012) (same for three executives that "resigned concurrently").  Moreover, both resigned within *days* of Enservco announcing the First Restatement, which is itself probative of scienter.  *See In re SemGroup Energy Partners, L.P.*, 729 F. Supp.2d 1276, 1299 (N.D. Okla. 2010) (ouster of CFO "immediately before [company's] bankruptcy" added to inference of scienter); *see also In re WageWorks, Inc. Sec. Litig.*, 2020 WL 2896547, at \*6 (N.D. Cal. June 1, 2020) ("close temporal proximity" of resignation to restatement "weigh[s] against an innocent inference that defendants resigned for 'unrelated personal or business reasons'").[7]  Further, Enservco agreed to provide Hargrave with additional

---

[7] *Accord In re Pareteum Sec. Litig.*, 2021 WL 3540779, at \*17 (S.D.N.Y. Aug. 11, 2021) (replacement of top executives "within a few weeks" of a restatement); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) (resignation of CFO "in the wake of the restatement") *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-76 (N.D. Cal. 2009) (resignations "contemporaneous[]" with restatement).

benefits upon her resignation beyond what she was already entitled to receive in exchange for an unconditional release of all claims against the company. (¶248.)

Rather than address these facts, Defendants primarily argue that past Enservco CFOs "departed after similar periods" by cherry-picking content from analyst reports that are external to the CAC. (MTD 22 (citing Exs.17-20).) Not only is the Court prohibited from considering that information on this Motion, *supra* note 3, this grossly mischaracterizes the content they cite. Defendants seemingly refer to a series of tables that note when past executives resigned. But none of those tables specify how long each executive served or explain the reasons for each departure.

In any case, there can be no debate that the resignations here were unusually abrupt. For starters, there was no successor identified for Hargrave in the filing announcing her departure (Ex. 15). *See Myriad Genetics*, 2021 WL 977770, at *22 (CEO departure was "unusual" where there was "no successor identified"). In addition, these two executives left amidst the Restatements, forcing Murphy to sign the SEC filings comprising the Second Restatement as "Interim Principal Financial Officer and Interim Principal Accounting Officer." Exs. 11-13. This dispels any suggestion that Enservco found "a better way of doing things moving forward." And the alternative explanation proffered by Defendants—that Hargrave "decided to move on to less arduous employment" (MTD 22)—is not a permissible inference to draw from the CAC as it is not alleged that she found any other full-time employment following her stint at Enservco.

23

### *Termination of Enservco's Longtime Auditor*

The inference of scienter is also supported by Enservco's reflexive termination of its longtime auditor, Plante & Moran, after finalizing the Restatements. (¶¶141, 249-53.) Relying exclusively on *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009), Defendants argue that this does not favor an inference of scienter because it is "not surprising" to part ways with an accounting firm after discovering accounting errors, and submit they fired Plante "to mitigate the risk of future problems." (MTD 3, 24.) This argument misapprehends the law and the facts.

As an initial matter, *Zucco* is not the law in this Circuit. Even if it were, the Ninth Circuit acknowledged in *Zucco* that the resignation of an auditor after a restatement *can* support an inference of scienter if there are facts pled which refute the assumption that the resignation was simply a consequence of the need for the restatement. *Id.* at 1002. The complaint there failed to do so given that the accounting firm oversaw (and approved) *six quarters* of accounting improprieties, so it was, in some sense, "partially responsible for the corporation's failure to adequately control its accounting procedures." *Id.*

Here, in contrast, the three Form 10-Q filings that were subject to the Restatements were *unaudited*, and the accounting errors were *detected* by Plante during its annual audit in March 2022. (¶¶251-52.) This uproots any suggestion that Enservco terminated Plante to "mitigate the risk of future problems." For similar reasons, Defendants' attempt to distinguish this case on the ground that Plante was

24

fired, rather than resigned, is equally misguided.  (MTD 24.)  As other courts have recognized, "firing an independent accounting firm [soon] after it has looked at your books and opined that you have materially misstated your financials is fishy." *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *26 (N.D. Ill. Apr. 18, 2022); *see also Turner Ins. Agency, Inc. v. Farmland Partners Inc.*, 2019 WL 2521834, at *6 (D. Colo. June 18, 2019) (Ebel, J.) (fact that defendant "switched auditors" soon after making improper loans added to inference of scienter); *Resh v. China Agritech, Inc.*, 2019 WL 1055240, at *5-6 (C.D. Cal. Jan. 8, 2019) (terminating auditor after it "called for [an] investigation" of financial matters was "suspicious").[8]

### *Involuntary Remediation*

It also bears emphasis that Plante & Moran uncovered the improper accounting during its annual audit of Enservco's financials in early 2022.  (¶¶251-52.)  Indeed, the SEC filing announcing the departure of Plante expressly stated that there was a "reportable event" within the meaning of Item 304(a)(1)(v) of Regulation S-K (¶155), which, in turn, requires registrants to disclose if "[t]he account . . . advised the registrant" of certain accounting defects.  17 C.F.R. §229.304(a)(1)(v).  Defendants wax poetic that Enservco reported the GAAP errors and took steps to correct them "voluntarily."  (MTD 1, 3, 5-6, 14, 28, 32-33.)  But this disregards that Enservco's

---

[8] The three months that passed between the Second Restatement and Plante's dismissal does not suggest otherwise.  Enservco needed a clean opinion from Plante to issue its long overdue annual report on Form 10-K and swiftly replaced Plante once it made that filing in July 2022 and engaged a new firm.  (¶¶141, 251-53.)

25

remedial actions "came *only after*" the improper accounting was spotted by Plante. *Or. Lab. Emp'rs Pension Trust Fund v. Maxar Techs., Inc.*, 2020 WL 5500458, at *15 n.6 (D. Colo. Sept. 11, 2020) (emphasis in original). That provided ample incentive to snap into action. A failure to resolve the errors to Plante's satisfaction would prevent it from issuing an unqualified audit opinion for Enservco's forthcoming annual report on Form 10-K, which was already delayed due to the Restatements. (¶¶15, 119.) The fact that Enservco did not report the errors "on its own accord" but "only did so after its financial health and accounting practices were questioned by [another party]" further supports the inference of scienter. *Maxar*, 2020 WL 5500458, at *15.

### *Defendants' Positions*

In addition, Murphy and Hargrave were at the helm of Enservco during the Class Period. (¶¶26-27.) Defendants maintain that scienter cannot be inferred "solely from an individual's position with the company." (MTD 29.) But the law is clear that a defendant's position is "relevant in [the] weighing of the totality of the allegations," and can *add* to an inference of scienter. *Adams*, 340 F.3d at 1106. Given the nature of the accounting fraud, the inference of scienter for Hargrave is strengthened by her position as CFO. *Id.* (scienter for GAAP violations strengthened by "the fact that [the party] was Kinder-Morgan's chief financial officer"). Indeed, she was directly responsible for GAAP accounting and financial reporting. (¶247.) It is also relevant that Murphy was "the most senior executive" at Enservco. *Adams*, 340 F.3d at 1106. At a minimum, both signed SOX certifications attesting that the information in each

26

SEC filing subject to the Restatements "fairly presents, in all material respects, the financial condition and results of operations of the Company" under GAAP. (¶¶165, 182, 200.)    The fact that they were "in positions where the overall picture of [Enservco's] finances routinely was examined and evaluated" further strengthens the inference of scienter. *Qwest*, 396 F. Supp. 2d at 1197-98.

### 3.    Additional Facts Supporting an Inference of Scienter With Respect to ICRF Statements

In each Form 10-Q it filed during the Class Period, Enservco admittedly misrepresented the effectiveness of its ICFR as regards its accounting practices. As it later revealed, Enservco's ICFR during each period in question was compromised by the fact that it had "not properly segregated duties" regarding the way that transactions were executed. (¶¶153-55.)  The Individual Defendants were not only aware of this during the Class Period but they refused to remediate it.  Defendants do not meaningfully dispute this and, if anything, concede the underlying issue.

To start, there is no debate that Enservco lacked sufficient accounting personnel throughout the Class Period.  By August 2021, the accounting department was down from eight full-time employees to just four.  (¶142.)  As Enservco shed accounting staff, remaining employees were forced to take on the work of those who left.  (¶147.)  When down to six full-time employees in mid-2019, there was already "no one . . . to do" certain tasks.  (¶¶142, 144.)  There is little reason to believe that this improved as Enservco lost two more accounting employees.  Indeed, Defendants freely admit in the Motion that the accounting department was "*under*staffed"—not

27

adequately staffed—and lacked enough "accounting personnel to complete [the 2021] transactions in an error-free manner." (MTD 31.) And Enservco confirmed that the staffing woes did not abate by reporting in August 2022 that it was unable to file a Form 10-Q on time because of "internal and external staffing issues." (¶148.)

Further, the Individual Defendants were undeniably aware of this at the time of their misstatements. Enservco's accounting department reported to Hargrave through the Controller. (¶¶30, 32-33, 247.) After beginning in mid-2019, Hargrave personally observed the bottleneck herself. The staffing shortage was so apparent that she took on menial tasks the accounting group could not complete on its own. (¶144.) In this context, it cannot be argued that Murphy was unaware. Indeed, the law recognizes that Hargrave's knowledge of the staffing calamity "reduces the likelihood" that Murphy, as CEO, was "ignorant" of it. *Adams*, 340 F.3d at 1106. Further, Murphy represented in his SOX certifications that he personally tested Enservco's ICFR during each period in question. (¶240.) And assuming the "truth[]" of that statement,[9] he either "knew [of] or recklessly disregarded" the obvious control failure through those evaluations. *In. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *9 (M.D. Tenn. Apr. 8, 2021); *see also Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 246 (S.D.N.Y. 2012) (similar). In fact, Murphy is believed to have been informed of the staffing shortfall directly from Hargrave prior to the start

---

[9] Plaintiffs challenge statements in the SOX certifications claiming that the Individual Defendants designed effective ICFR, but do not take issue with the statements therein that they tested Enservco's ICFR. (¶¶168, 185, 203.)

28

of the Class Period. (¶145.) Despite this, the Individual Defendants refused to hire new accounting employees. (¶146.)

This is not a case of mere "mismanagement." It is one thing to not detect a control weakness when adequate resources are in place to support the control program. But it is an entirely different matter to inform the market that ICFR is effective when a known staffing crisis prevents relevant employees from adhering to basic control standards. *See In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006) (knowledge of headcount reduction in accounting group which impacted compliance "constitutes strong circumstantial evidence of recklessness (if not conscious misbehavior)"). That Enservco may have been "cash-strapped," as Defendants repeatedly note (MTD 1, 4, 30-31), is no excuse. That does not relieve it from complying with the federal securities laws, including the obligation to make accurate disclosures.

### 4. Additional Facts Supporting an Inference of Scienter With Respect to Liquidity Statements

Beginning in the 10-K for 2020 and continuing in each Form 10-Q filed thereafter, Enservco falsely assured investors that it had "ample" capital to sustain operations through mid-2022. (¶¶97, 172, 189.) But as Defendants knew, and subsequent events confirmed, those representations had no basis in fact. (¶¶92-95, 98-101.) The industry-wide downturn that severely curbed demand for Enservco's services continued into 2021. (¶87.) Having just endured similar conditions from the same period in the prior year, the Individual Defendants knew, as of March 23, 2021,

that Enservco's cash flows would be at least $3 million short of its operating expenses, even with the proceeds from the February 2021 Equity Offering. (¶¶93-94.) And there were several not unlikely constraints on Enservco's ability to access its $1 million revolver to make up for that shortfall. (¶95.)

Defendants do not even attempt to deny this. They never *once* argue, and have thereby waived, that this aspect of Plaintiffs' claim should be dismissed. *See Cowden v. Bd. of Gov. of Colo. St. Univ. Sys.*, --- F. Supp. 3d ---, 2022 WL 4349620, at \*7 (D. Colo. Aug. 23, 2022) (defendant "waives an issue by failing to make any argument" in a motion to dismiss). Indeed, it is black letter law that "[i]issues not raised in the opening brief" on a dispositive motion "are deemed abandoned or waived." *Brammer-Hoelter v. Twin Peaks Charter Academy*, 492 F.3d 1192, 1207 (10th Cir. 2007); *see also Herrera v. City of Espanola*, 32 F.4th 980, 990 n.5 (10th Cir. 2022) (applying this rule to a motion to dismiss). To hold otherwise—and permit Defendants to present argument on reply—would unfairly deprive Plaintiffs of the opportunity to respond. *See Bordertown, LLC v. AmGUARD Ins. Co.*, 2022 WL 17538186, at \*2 (D. Colo. Oct. 5, 2022) (explaining policy and collecting cases); *see also Robledo v. Williams*, 2020 WL 6393110, at \*2 (D. Colo. Nov. 2, 2020) (Domenico, J.) ("[N]ew arguments in the Reply are not properly before the court and will not be addressed.").

### 5. A Holistic Analysis Supports an Inference of Scienter

As noted, the CAC must raise an inference of scienter that is "at least as compelling as any opposing [nonculpable] inference" drawn from the facts alleged.

*Tellabs*, 551 U.S. at 324.  However, the inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.*  In other words, "a tie goes to the plaintiff."  *Anderson*, 105 F. Supp. 3d at 1262.[10]

Defendants maintain that the more compelling inference to draw from the facts alleged is that Enservco made "inadvertent errors" falling short of fraud.  (MTD 32-33.)  But this version of events requires the Court to suspend consideration of numerous facts pled in the CAC.  The only compelling inference to draw from those facts is that Defendants acted with scienter.

Defendants stress that, throughout 2001, Enservco was "cash strapped," "understaffed" and operating in a "challenging" market, as if that somehow cloaks the GAAP violations in innocence.  (MTD 30-32.)  That is absurd and turns the CAC's allegations on their head.  Those circumstances are precisely what led the Individual Defendants to defraud investors:  recognizing the vital importance of securing a new form of financing—and what they stood to lose if they did not—they concealed the impact of those market conditions and the understaffing in Enservco's accounting department by boosting its financials and declaring that its ICFR was effective.

To the extent those allegations alone place the innocent and culpable inferences in equipoise, the other facts pled (and ignored in Defendants' *Tellabs*

---

[10] Defendants misplace reliance on cases addressing the group pleading doctrine. (MTD 34-35.)  Many courts acknowledge that this remains an open issue, *Molson Coors*, 2020 WL 13499995, at \*3, and, in any case, the allegations Defendants refer to meticulously distinguish between Defendants as appropriate.  (¶¶237-53.)

31

analysis) tip the scales.  As discussed above, the accounting treatment used under Hargrave's oversight to inflate Enservco's results conflicted with facts the Individual Defendants knew and public disclosures they previously made.  In addition, Hargrave and Kelly—Enservco's two most senior accounting officers—abruptly resigned soon after the first errors were detected by Plante & Moran.  And far from ousting Plante & Moran to prevent future errors (MTD 33), Murphy removed Plante & Moran following over a decade of service after it uncovered the GAAP violations.

Furthermore, Enservco's efforts to address the GAAP errors were hardly "voluntary," as Defendants claim.  (MTD 33.)  It took action only once the accounting lapses were spotted by a third party and needed to be resolved to its satisfaction.  In any case, any "remediation" by Enservco—whether disclosing the Restatements or firing Plante & Moran—took place *after* the Individual Defendants accomplished their goal of refinancing its remaining debt.  This case therefore stands in stark contrast to the one cited by Defendants, where the company took steps to "remedy problems" during the same period when it was allegedly defrauding investors.  *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1147 (D. Colo. 2011), *aff'd sub nom. Sanchez v. Crocs, Inc.*, 2016 WL 3959191 (10th Cir. July 19, 2016).

These allegations are more than enough.  A pleading that alleges a number of red flags that conflict with the accounting, involuntary remediation, and GAAP violations of significant size raises a strong inference of scienter.  *See Maxar*, 2020 WL 5500458, at *15-16.  Similarly, knowledge of contrary facts by defendants in "high

32

positions," together with "compelling allegations of motive" suffice. *Qwest*, 396 F. Supp. 2d at 1197-98; *see also Croker*, 2006 WL 2035366, at *8 (D. Colo. July 18, 2006) (knowledge of contrary facts, magnitude of misstatement, positions of authority, motive, and SOX certifications satisfy scienter). All that is present here and more.

Defendants' remaining cases do not suggest otherwise. (MTD 32-33.) In *Level 3*, 667 F.3d at 1345-46, the plaintiff relied on internal reports that did not conflict with defendants' public statements and failed to plead a viable motive. And the complaint from *In re Gold Resource Corporation Securities Litigation*, 776 F.3d 1103 (10th Cir. 2015), did not allege any facts suggesting scienter beyond GAAP violations, including, for example, motive. Most notably, *Pirraglia*, 339 F.3d 1182, did not affirm dismissal for failure to plead scienter. It held that the plaintiff adequately alleged scienter and reversed. *Id.* at 1192-93. Finally, in *Molson Coors*, 2020 WL 13499995, at*10, Judge Ebel held that *a failure to detect* a control weakness "might favor Defendants by explaining why the accounting problem was missed," not that a *known*, but undisclosed, weakness might do so. This distinction is particularly meaningful here, where the material weakness in Enservco's ICFR admittedly "resulted in the [three GAAP violations]" that required the Restatements. (¶155.)

In fact, Judge Ebel explained in *Molson Coors* that the nonculpable inference was more compelling than the inference of scienter for four reasons:

> (1) the lack of any witness, internal documents, or other direct evidence corroborating scienter, (2) the lack of a motive, (3) that the alleged fraud involves a technical tax issue . . . and (4) that PwC's audits did not detect the error.

33

*Id.* at \*12.  In this matter, the opposite is true with respect to *every single factor*.

###    B.    The CAC Adequately Pleads Loss Causation

Loss causation, as the name implies, is "the causal link between the alleged misconduct and the economic harm ultimately suffered."  *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1136 (10th Cir. 2009) (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).  To plead loss causation, a plaintiff must "allege facts showing a causal connection between the revelation of the truth to the marketplace and losses [it] sustained."  *Nakkhumpun*, 782 F.3d at 1154.  Unlike scienter, loss causation allegations are subject to basic Rule 8 notice pleading.  *See Peace Officers' Annuity & Ben. Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1155 (D. Colo. 2019).  The CAC readily satisfies this standard.

Plaintiffs allege that they suffered losses when Enservco's stock price declined in response to disclosures that revealed the full extent of the fraud on November 15, 2021, March 28, 2022, March 31, 2022, April 4, 2022, April 18, 2022, and September 1, 2022.  (¶¶259-64.)  Unable to seriously refute these allegations, Defendants raise two straw man arguments, both of which are easily disposed.

Seizing on dicta from a 2006 decision, Defendants first argue that there could not have been any "inflation" in Enservco's stock removed by these disclosures because the misstatements between March 23, 2021, and November 15, 2021, did not *increase* Enservco's stock price.  (MTD 36-37.)  But this wrongly equates inflation with positive movement in the issuer's stock.  That is not the law.  *See Glickenhaus*

34

& *Co. v. Household Int'l, Inc.*, 787 F.3d 408, 416 (7th Cir. 2015) ("[A] stock can be inflated even if the price remains the same or declines after a false statement because the price might have fallen even more."); *see also In re Vivendi Univ. S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 562 (S.D.N.Y. 2011) ("A statement can cause inflation by causing the stock price to be artificially maintained at a level that does not reflect its true value"), *aff'd* 838 F.3d 223 (2d Cir. 2016). Indeed, the Supreme Court recently acknowledged the concept of "inflation maintenance" in *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 141 S. Ct. 1951 (2021). That the stock price declined in response to each disclosure above shows, as the CAC alleges, that there was inflation in Enservco's stock. *See Glickenhaus*, 787 F.3d at 415 ("The best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward"). The sole authority cited by Defendants*, In re Manulife Financial Corporation Securities Litigation*, 276 F.R.D. 87 (S.D.N.Y. 2011), is not to the contrary. There, the court refused to allow a party to recover losses from a period during which it alleged inflation maintenance, without any corrective disclosures. *Id.* at 103. That is simply not the case here.

Next, Defendants observe that the stock price increased, not decreased, in response to the First Restatement on April 11, 2022, the Second Restatement on May 24, 2022, and the announcement on September 1, 2022, that Enservco fired Plante & Moran. (MTD 37.) However, the CAC *does not allege that the First or Second Restatement were corrective.* The market had already responded to that information

35

days earlier when Enservco announced the need for each in a Form 8-K. (¶¶260, 263.) The only announcement Defendants correctly identify as "corrective" is the one from September 1, 2022, but here too they stumble. Defendants base their argument on the fact that the closing price increased *the day after this disclosure*. But the CAC alleges that investors suffered losses on September 1, 2022, not September 2, 2022. (¶264.) This is consistent with the widely accepted principle that "the market price of shares traded on well-developed markets reflects all publicly available information." *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988). As alleged, the announcement was made before the market opened, so this news would be reflected in the share price by the end of the trading day, which the Court must accept as true on this Motion. *See In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081, 1092 (D. Colo. 2004) (courts must "accept [party]'s allegations as true" for "loss causation").[11]

At most, Defendants note that the share price rebounded the day after a loss event. But "the fact that the price rebounded does not, at the pleading stage, negate the plaintiffs' showing of loss causation." *Acticon AG v. China Ne. Petroleum Holdings Ltd.*, 692 F.3d 34, 39 (2d Cir. 2012). If anything, this raises an issue of fact inappropriate for resolution on a motion to dismiss. *Id.* at 39-41. And, of course, it does not address the many other loss-causing disclosures pled in the CAC.

---

[11] To the extent the CAC refers to the closing price the day after a corrective disclosure, that is because the disclosure took place *after the close of trading* and, thus, could not have impacted the market price on that day. (¶¶259, 261-63.)

36

## II.    PLAINTIFFS STATE A SECTION 20(A) CLAIM

In Count II, Plaintiffs bring a "control person" claim against all Defendants other than Enservco under Section 20(a) of the Exchange Act. 15 U.S.C. § 78t(a).  This type of claim requires (1) a primary violation; and (2) control over such person(s) by the defendant.  *Adams*, 340 F.3d at 1107.  As Defendants acknowledge (MTD 39), claims under Section 20(a) are not subject to Rule 9(b).  The CAC clears this low bar.

Plaintiffs state a primary violation for all the reasons described above.  *See In re Ribozyme Pharm., Inc. Sec. Litig.*, 119 F. Supp. 2d 1156, 1167 (D. Colo. 2000) (stating an underlying claim defeats "primary violation" challenge).  Defendants only remaining contention is that the CAC fails to plead that the two Cross River entities "controlled" a primary violator.  (MTD 39.)  Thus, Defendants concede that Murphy and Hargrave were controllers.  This dooms their argument with respect to the Cross River entities.

Control does not require a showing that defendants "actively participate" in the fraud.  *Thornburg*, 695 F. Supp. 2d at 1190.  Rather, it is only necessary to have "possession, direct or indirect, of *the power* to direct or cause the direction of the management and policies of a person." *Adams*, 340 F.3d at 1108 (emphasis added); *see also Thornburg*, 695 F. Supp. 2d at 1189 (control requires "only some indirect means of discipline or influence short of actual direction").  Thus, it is irrelevant that the Cross River entities did not "sign[] any of Enservco's SEC filings."   (MTD 40.) Moreover, the CAC pleads much more than the fact that Cross River entities owned

37

18% of Enservco.  (MTD 39.)  It also makes clear that their manager, Murphy, *also served as the CEO of Enservco.*  (¶¶26, 47-48.)  This, as Defendants openly admit, is more than enough to establish control.  *See Adams*, 340 F.3d at 1108 (CEO "possesses ultimately management authority of the corporation"); *see also In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp. 2d 1148, 1181 (D. Colo. 2012) (parent fund controlled subsidiary through employee who served as its CEO).  Indeed, he signed all the disclosure documents at issue and is a primary violator.

## CONCLUSION

For all the foregoing reasons, the Court should deny Defendants' Motion.

Dated: April 11, 2023

Respectfully submitted,

 */s/ Justin D. D'Aloia*
Jeremy A. Lieberman
Justin D. D'Aloia
POMERANTZ LLP
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
jdaloia@pomlaw.com

*Counsel for Lead Plaintiff, Plaintiff
Ali Saee and the Class*

Lesley F. Portnoy, Esq.
PORTNOY LAW FIRM
1800 Century Park East, Suite 600
Los Angeles, California 90067
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Additional Counsel for Lead Plaintiff*

Brian Schall
THE SCHALL LAW FIRM
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
brian@schallfirm.com

*Additional Counsel for Plaintiff Ali
Saee*

## <u>CERTIFICATE OF COMPLIANCE WITH PRACTICE STANDARD III(A)(1)</u>

I hereby certify that, on this 11th day of April, 2023, the foregoing RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1), as modified by the Court's March 28, 2023, Order granting Plaintiffs' Unopposed Motion to Exceed Word Limit (Doc. 55).

*/s/ Justin D. D'Aloia*
Justin D. D'Aloia
POMERANTZ LLP
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jdaloia@pomlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that, on this 11th day of April, 2023, I electronically filed the foregoing RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Justin D. D'Aloia*
Justin D. D'Aloia
POMERANTZ LLP
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jdaloia@pomlaw.com